1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MICHAEL GRESS,                          No.  2:13-cv-0328 TLN KJN P

12                Plaintiff,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   DR. CHRISTOPHER SMITH, et al.,

15                Defendants.

16

17        Plaintiff is a state prisoner, proceeding through counsel, with this civil rights action filed

18   under 42 U.S.C. § 1983.  Plaintiff contends that defendants were deliberately indifferent to his

19   serious medical needs by failing to diagnose his brain tumor for over four years, and following

20   the diagnosis of a brain meningioma, failing to adequately treat his seizure disorder.  (ECF No. 53

21   at 1.)  Plaintiff also argues that several neurologists informed plaintiff that his seizure disorder

22   could be reduced or eliminated by radiation treatment, but Mule Creek State Prison ("MCSP")

23   staff will not follow their recommendations.  (ECF No. 53-1 at 9.)  Finally, plaintiff includes state

24   law claims for negligence/medical malpractice.  (Id.)

25        Defendants filed motions for summary judgment.  As discussed below, the undersigned

26   recommends that the motions be granted in part and denied in part.

27   ////

28   ////

                                           1

This complex medical case warrants several initial observations.

The court is sympathetic to plaintiff's frustrations with his challenging medical conditions, as well as the lengthy delay he experienced while awaiting accurate diagnoses, as well as a decision on the pending motions. Such medical cases are always difficult because the benefit of hindsight can color one's perspective, and difficult diagnoses and treatment options always seem more clear-cut with the benefit of hindsight. In reality, brain tumors are often very difficult to diagnose, as Dr. Ko confirmed, citing examples of Ted Kennedy and two medical doctors, including a neurologist, who were each unaware they had a brain tumor until after each had suffered a seizure. Moreover, plaintiff's case was further complicated by an underlying seizure condition.

Here, with benefit of hindsight, it is known that plaintiff had a brain tumor. Once removed it was found to be a nonmalignant, 3.8 centimeter meningioma. Even when first responders reported the possibility that plaintiff had suffered a seizure, Dr. Naseer and Dr. Tseng were not convinced based on plaintiff's symptoms and medical history. While we now know that plaintiff was also suffering epilepsy with partial simple seizures, it appears that his epilepsy was in addition to the meningioma, because he continued to have these seizures even after the tumor was resected. Further, diagnosis of partial simple seizures is complicated by the fact that there are no outward appearances demonstrating that the patient is having a seizure. In addition, the medical professionals initially believed that plaintiff's residual symptoms might have been the result of the surgery to remove the tumor. But even after the doctors determined plaintiff had epilepsy, it turns out plaintiff's epilepsy is medically refractory, making it difficult to control plaintiff's partial simple seizures with medication.

Despite these difficulties, the lengthy medical records demonstrate plaintiff received myriad medical tests and treatments, including medical professionals regularly checking on him. Overall, this is not a case where medical staff did nothing while knowing plaintiff suffered from a brain tumor. Unfortunately, despite such medical records, plaintiff's medical expert focused solely on the standard of care required, not deliberate indifference. This limited analysis is

especially unfortunate given the court's finding that plaintiff's medical malpractice claims are barred by the statute of limitations.

Conversely, defendants failed to provide declarations from each named defendant. Given the rigorous deliberate indifference standard, it is important to know a particular defendant's thought processes. Where the court has recommended below that certain of plaintiff's claims should proceed, it is because the court could not determine if the professional's treatment of plaintiff was appropriate, potentially negligent, or more significantly deliberately indifferent.

Finally, where the court has found the possibility of deliberate indifference, it is based on the delay in treatment for plaintiff suffering additional seizures. Significantly, the implications and possible damages from such delay remains unclear given the fact that plaintiff had seizures both before and after the brain tumor surgery, as well as the high bar required to show deliberate indifference. But ultimately those are issues to be addressed at trial.

BACKGROUND

Plaintiff filed his pro se complaint on February 15, 2013.[1] (ECF No. 1 at 3, 32.) An early status/mediation conference was held on August 22, 2013. On September 23, 2013, counsel was appointed to represent plaintiff. An amended complaint was filed by counsel on October 23, 2013. On April 1, 2014, an answer was filed by defendants Akintola, Dr. Barnett, Chase, Fong, Dr. Galloway, Hashimoto, Heatley, Heffner, Kettelhake,[2] Dr. Naseer, Smith, Todd, Dr. Tseng, and Villanueva. (ECF No. 33.) On June 11, 2014, a second amended complaint was filed by plaintiff. (ECF No. 53.) On July 11, 2014, defendants Dr. Smith, Dr. Tseng, Dr. Galloway, Dr. Naseer, Dr. Nale, Hashimoto, Heatley, Heffner, Fong, Todd, Akintola, Chase, Kettelhake, and Villanueva filed an answer to the second amended complaint. (ECF No. 56.) On June 8, 2015, defendant Moreno filed an answer. (ECF No. 84.) On May 3, 2016, Dr. Barnett filed an answer

[1] "[T]he Houston mailbox rule applies to § 1983 complaints filed by pro se prisoners." Douglas v. Noelle, 567 F.3d 1103, 1109 (9th Cir. 2009), citing Houston v. Lack, 487 U.S. 266 (1988).

[2] Despite references in the record to "Kettlehake," defendant Alan Kettelhake spells his last name "Kettelhake." (Kettelhake Dep. at 4.)

to the second amended complaint.  (ECF No. 98.)[3]

Pursuant to the June 30, 2017 order of the district court (ECF No. 163), the following motions for summary judgment are before the court:

- On August 15, 2016, defendants Heatley, Dr. Nale, Todd, Akintola, Moreno, Kettelhake and Villanueva filed a motion for summary judgment or, in the alternative, partial summary judgment.  (ECF No. 117.)

- On August 15, 2016, defendants Tseng, Galloway, Naseer, Smith and Barnett renewed their motions for summary judgment or, in the alternative, motions for partial summary judgment.  (ECF Nos. 118-22 (re-noticing ECF Nos. 103-07).)

Plaintiff filed an opposition to the pending motions, as well as evidentiary objections. (ECF Nos. 130-38.)  Defendants filed a reply on July 7, 2017.  (ECF No. 164.)  On March 30, 2018, plaintiff was granted fourteen days in which to file a sur-reply.  No sur-reply was filed. On October 9, 2018, plaintiff submitted his declarations bearing his signature.  (ECF No. 170.)

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at

---

[3]  Defendants Evans, Chase, Hashimoto, Col, Fong and Heffner were dismissed from this action. (ECF Nos. 55, 69, 88 & 102.)

4

trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

5

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

EIGHTH AMENDMENT CLAIMS

I. Standards Governing Eighth Amendment Medical Claims

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment of the United States Constitution. Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

While the Eighth Amendment entitles plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014) (*en banc*); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th

Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (*en banc*).

To establish "deliberate indifference" to such a need, the prisoner must demonstrate: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Jett, 439 F.3d at 1096. The requisite state of mind is one of *subjective recklessness*, which entails more than ordinary lack of due care. Wilhelm, 680 F.3d at 1122 (emphasis added). The plaintiff can show a defendant is deliberately indifferent under this standard "only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" Jett, 439 F.3d at 1096 (quoting Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004)).

An "isolated exception" to the defendant's "overall treatment" of the prisoner does not state a deliberate indifference claim. Jett, 439 F.3d at 1096. Similarly, "mere malpractice, or even gross negligence" in the provision of medical care does not establish a constitutional violation. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990); see also Farmer, 511 U.S. at 835 (deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety'") (quoting Whitley, 475 U.S. at 319); Wilhelm, 680 F.3d at 1123 (a "negligent misdiagnosis" does not state a claim for deliberate indifference).

In addition, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, "the plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to the plaintiff's health.'" Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted); Snow, 681 F.3d at 988. In other words, so long as a defendant decides on a medically acceptable course of treatment, his or her actions will not be considered deliberately indifferent even if an alternative course of treatment was available.

Jackson, 90 F.3d at 332.

"[D]eliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003) (citing Farmer, 511 U.S. at 842). Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citations omitted). Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S. at 104-05; Hallett v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002); Wilhelm, 680 F.3d 1123 n.8 ("unnecessary delay in administration of prescribed treatment can amount to deliberate indifference."). To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335; Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." Jett, 439 F.3d at 1096; see also McGuckin, 974 F.2d at 1060. The defendant must have been subjectively aware of a serious risk of harm and must have consciously disregarded that risk. See Farmer, 511 U.S. at 845.

A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).[4] A failure to *competently* treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id. Also, a prison official who ignores a treating physician's instructions may act in deliberate indifference. See Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[A] prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon.") A prison official

---

[4] In Ortiz, the Ninth Circuit reversed summary judgment where medical staff and doctor knew that the pretrial detainee had a head injury, but prescribed contraindicated medications, disregarding evidence of complications to which the defendants had been specifically alerted by the private treating physician. Id.

who interferes with the instructions of a physician may be liable for an Eighth Amendment violation.  See Hamilton v. Edell, 981 F.2d 1062, 1066-67 (9th Cir. 1992) (prison officials' decision to force inmate to fly in contravention of treating physician's specific orders could constitute deliberate indifference to inmate's medical needs), overruled in part on other grounds, Saucier v Katz, 533 U.S. 194 (2001).

In order to defeat a summary judgment motion, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809 F.2d at 630, that defendant's actions, or failure to act, were "in conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90 F.3d at 332 (citing Farmer, 511 U.S. at 837).

II.  Other Relevant Standards

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the plaintiff's alleged deprivation.  Rizzo v. Goode, 423 U.S. 362, 371 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Supervisory personnel are customarily not liable under § 1983 for the actions of their employees under a theory of respondeat superior, because every defendant is liable only for his or her own misconduct.  Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009).  A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Henry A. v. Willden, 678 F.3d 991, 1003-04 (9th Cir. 2012) (citing Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011)).  "'A supervisor can be liable in his individual capacity for his own culpable action or

9

inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" <u>Starr</u>, 652 F.3d at 1208 (quoting <u>Watkins v. City of Oakland</u>, 145 F.3d 1087, 1093 (9th Cir. 1998)). A plaintiff must also show that the supervisor had the requisite state of mind to establish liability, which turns on the requirement of the particular claim -- and, more specifically, on the state of mind required by the particular claim -- not on a generally applicable concept of supervisory liability. <u>Oregon State University Student Alliance v. Ray</u>, 699 F.3d 1053, 1071 (9th Cir. 2012). Vague, bald, or conclusory allegations concerning an official's involvement in civil rights violations are not sufficient. <u>See</u> <u>Ivey v. Bd. of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982); <u>Hydrick v. Hunter</u>, 669 F.3d 937, 941 (9th Cir. 2012) (plaintiff's claims against the defendants were "devoid of specifics.").

III. <u>Plaintiff's Serious Medical Needs</u>

The parties do not dispute, and the undersigned finds, that based upon the evidence presented by the parties in connection with the pending motions, a reasonable juror could conclude that plaintiff's meningioma and seizure disorder constitute objective, serious medical needs. <u>See</u> <u>McGuckin</u>, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").

////

////

////

////

////

////

////

////

10

IV.  First Cause of Action:  Deliberate Indifference

    A.  Undisputed Facts and Medical Records[5]

1. Plaintiff is currently 44-years-old, a state prisoner, and was housed at MCSP at all times relevant herein.

**2004-2006**

2. In January of 2004, plaintiff reported intermittent peripheral vision loss for one year, and later reported sudden vision loss in left eye (80% on lat. side of left eye) x 2 in last 8 months.  Denied hypertension or weakness.  No progressive headaches.  (ECF No. 134 at 2; 4-5.)  On February 4, 2004, the doctor at DVI performed an eye and neurological exam, checking both as "normal," and noted plaintiff's good physical condition except for sudden vision loss.  (Id. at 7.)  On March 3, 2004, plaintiff reported visual problems during a routine medical exam.  (ECF No. 134 at 9.)

3. At all times relevant herein, it is undisputed that Dr. Galloway was a physician and surgeon working for the California Department of Corrections and Rehabilitation ("CDCR") and assigned to MCSP.  (ECF No. 104-2 at 2.)  Other than his general medical education, Dr. Galloway has no specialized training or experience in neurology, is not an oncologist, neurologist, or neurosurgeon, and has no specialized training in diagnosing or treating brain tumors.  (Id.)

4. It is undisputed that the only policy or procedure that Dr. Galloway had involvement in creating and implementing was the use of a problem list, which contains annotations of

---

[5]  Plaintiff's medical records are included not for the truth of their content (i.e. what plaintiff complained about) but to show when he was seen and the medical treatment he did receive, as well as to demonstrate what the medical records may have revealed to subsequent treating medical professionals.

prior diagnoses.  (ECF No. 130-1 at 4.)  This procedure was for the benefit of patients, including plaintiff.  (Id.)

5.  On January 10, 2006, plaintiff was seen by Dr. Galloway, and the medical record states that plaintiff complained of acne, dry skin, and a "pinching pain" in his throat, diagnosed as Globus Sensation, and mild muscle pain in his lower back.[6]  (ECF Nos. 134 at 11; 104-2 at 2.)

6.  On January 16, 2006, plaintiff completed a health care services request form ("CDC 7362"), identifying his problem as "Per Dr. request; to see eye Dr. about blurred vision." (ECF Nos. 103-3 at 28; 134 at 13.)  Written on the top of the form is a notation:  "Op . . . seen 5/31/06."  (Id.)

7.  At all times relevant herein, Akintola was a physician's assistant ("PA") assigned to work at MCSP.  (ECF No. 117-4 at 1.)  PA Akintola's job duties did not include supervising any other employees.  (Id.)

8. On May 3, 2006, plaintiff saw defendant PA Akintola for complaints of headaches.  (ECF No. 134 at 15.)

---

[6] Dr. Galloway declares that plaintiff "did not make any mention of having any type of issues with his vision at that time."  (ECF No. 104-2 at 2.)  Dr. Galloway declares he did see a notation in plaintiff's medical records that a couple of weeks later, plaintiff was seen by an ophthalmologist [sic] Dr. Col, but Dr. Galloway did not know who made the referral or why. (Id.)  Defendants also provided a computer disk containing plaintiff's medical file in electronic form.  (ECF No. 104-3.)  However, the court is not required to ferret out facts from the entire medical record to support defendants' arguments.  See, e.g., Dennis v. BEH-1, LLC, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008) ("We will not manufacture arguments for an appellant . . . . 'Judges are not like pigs, hunting for truffles buried in briefs.'") (internal quotation marks and citations omitted).  The court has not reviewed the documents contained on the computer disk. Plaintiff declares he told Dr. Galloway that plaintiff (a) was having vision loss in his left eye with headaches; (b) saw spinning fans in his left eye and it was an ongoing disruption to his daily activities; (c) reported this issue to the medical staff of the county jail, Tracy Prison, and was having continued episodes while at Lancaster Prison; (d) asked for a referral for a CT scan, and Dr. Galloway told plaintiff to go see the optometrist about the issue and report back after getting a diagnosis; and (e) was having back, neck and headache pains.  (ECF No. 132-3.)

9. On June 5, 2006, plaintiff reported to the RN line complaining of headache and back pain. (ECF No. 134 at 17; 164-1 at 59.) Dr. Galloway charted that plaintiff reported having headaches for "many years." (Id.) Dr. Galloway observed "CN II-XII grossly intact." (Id.) Plaintiff's Motrin had expired; Dr. Galloway noted it "worked well," renewed it, and assessed plaintiff as an "anxious person," and "tension headache." (Id.)

10. On June 10, 2006, plaintiff was seen by a licensed optometrist, Dr. Col, and plaintiff's vision was noted as 20/20. (ECF No. 103-3 at 30; 132-3 at 3.)

11. On July 15, 2006, plaintiff completed a CDC 7362: "Shakes in arms, legs, and body x wks. + with weakness off and on. Daily." (ECF No. 134 at 20.)

12. It is undisputed that at this time, plaintiff never used the term "seizure" and he was not diagnosed as having seizures. (ECF No. 130-1 at 9.)

13. On July 19, 2006, defendant Moreno saw plaintiff and her medical record noted he complained of being shaky for weeks, "feels better after eating." (ECF No. 134 at 20.) Plaintiff also complained of bumps on his genitals, itchy. (Id.) Moreno noted plaintiff was taking Depakote, and Moreno observed "tremors" of plaintiff's hands. (Id.) Plaintiff declares that he explained to Moreno that plaintiff (a) had seen many doctors in the past and recently Dr. Galloway for plaintiff's vision problems, specifically the left side; (b) was having body tremors with weakness accompanying the visual episodes; (c) saw the optometrist who said plaintiff has 20/20 vision; and (d) has had many blood tests for this issue, and they always come back within normal limits.[7] (ECF No. 132-3 at 4.) Plaintiff's vitals were within normal limits. (ECF No. 134 at 24.) Defendant Moreno's plan was "Labs." (ECF No. 134 at 20.)

---

[7] Defendants did not provide a declaration by defendant Moreno.

14. On July 19, 2006, orders were written for a comprehensive metabolic panel. (ECF No. 134 at 22.)

15. On July 28, 2006, the comprehensive metabolic panel reflected plaintiff's carbon dioxide was mildly elevated, 29 (range is 16-26 mmol/L), but the remaining tests were within normal limits, including his glucose, 70 (range is 65-99 mg/dL). (Id.)

16. On August 3, 2006, Dr. Galloway notified plaintiff that his test results were "essentially within normal limits or are unchanged" and no follow-up was required. (ECF No. 134 at 28.)

17. On August 7, 2006, plaintiff was seen on RN line for follow-up for shakes and weakness, and genital problems ("see 7362"). (ECF No. 134 at 30.) Dr. Galloway wrote that plaintiff was concerned regarding scrotal lesions for months; the doctor assessed follicular cyst, and the plan was reassurance.[8] (ECF No. 134 at 30.)

18. On August 14, 2006, plaintiff completed a CDC 7362: "follow-up on body tremors." (ECF No. 134 at 32.) The CDC 7362 reflects that RN Moreno reviewed the request, noting plaintiff's weight, but the remainder of the form is not completed.[9] (ECF No. 134 at 32.)

---

[8] Plaintiff declares that during this visit, he told Dr. Galloway that plaintiff saw Dr. Col, who said plaintiff had 20/20 vision and that the vision problems could be caused by painless migraines. (ECF No. 132-3 at 4.) Plaintiff declares that he told Dr. Galloway the same thing he told RN Moreno on August 19, 2006, and also refreshed Dr. Galloway's memory about their past conversation and the history of the visual episodes and how they were now accompanied by body shakes and weakness. (ECF No. 132-3 at 4.) Dr. Galloway informed plaintiff that the blood test came back within normal limits. (Id.) Dr. Galloway declares that plaintiff's primary concern was the scrotal lesions, and that plaintiff "did not have any complaints regarding headaches or visual disturbances." (ECF No. 104-2 at 3.)

[9] Plaintiff declares that he received the CDC 7362 back on August 14, 2006, noting it was reviewed by Moreno, but that plaintiff was not seen or interviewed by Moreno, and did not receive a recommended treatment or a referral to a doctor. (ECF No. 132-3 at 4.) However, handwritten on top of the CDC 7362 is "RN MD  8/28." (Id.) The record reflects plaintiff was seen by a doctor on August 28, 2006.

14

19. On August 28, 2006, plaintiff was seen on RN line for body tremors by Dr. Galloway. (ECF No. 134 at 34.) For the subjective, Dr. Galloway charted that plaintiff complained of: "persistent or perhaps worsening episodes of malaise that have existed for over a year. [Plaintiff] also describes these events prior to incarceration. He states (but without compelling certainty) that the symptoms respond to food within minutes. He has no loss of consciousness. Symptoms include feeling tremor, weak, . . . sweating, light-headed, no chest pain or shortness of breath." (ECF No. 134 at 34.) Dr. Galloway observed a fine hand tremor, suggested monitoring plaintiff's blood sugar and blood pressure when symptoms occur, and ordered additional lab work.[10] (Id.)

_____

[10] Plaintiff declares that he reviewed with Dr. Galloway plaintiff's past vision episodes, including reporting the vision problem to the county jail and DVI medical staff; also, plaintiff explained or told Dr. Galloway that (a) plaintiff knows when the body tremors and weakness will begin because it always starts after the spinning fans in his left peripheral vision; (b) that plaintiff was having a hard time seeing objects directly in front of him while having the visual episodes; and (c) the episodes of visual problems, body tremors and weakness were an ongoing and increasing problem. (ECF No. 132-3 at 5.) After Dr. Galloway suggested plaintiff may have an issue with blood sugar, plaintiff was frustrated and told the doctor that plaintiff's blood work always comes back within normal limits, but plaintiff followed Dr. Galloway's orders and came in for the blood sugar checks. (Id.)

Dr. Galloway denies that plaintiff had any complaints regarding headaches or visual disturbances, and declares that plaintiff was not in distress. (ECF No. 104-2 at 3.) Dr. Galloway's impression was that plaintiff's symptoms were minor and likely related to his psychiatric medications (Prozac, Depakote) and the anxiety that plaintiff was being treated for in the mental health unit. (ECF No. 104-2 at 3.) Dr. Galloway wanted to determine whether plaintiff's issues were related to his blood sugars or similar causes, requiring testing at the time plaintiff experienced the symptoms. (Id.) Dr. Galloway also wanted to check to make sure plaintiff's thyroid was functioning properly and to check his medication levels to determine whether they needed to be adjusted. (Id.)

Dr. Slyter opines that Dr. Galloway should have been aware that there was an undiagnosed neurological condition characterized by unremitting and stereotyped visual symptoms consistently on the left side, body tremors, headaches, and, at times, confusion. (ECF No. 132-1 at 3.) Dr. Slyter states that Dr. Galloway did not perform an adequate and thorough neurological exam, and did not seek or obtain the opinion of a neurologist or a brain MRI scan. (Id.) But Dr. Ko points to a February 4, 2004 eye and neurological exam marked "normal," Dr. Galloway's June 5, 2006 note, "CN II-XII grossly intact," and plaintiff's vague and common reported symptoms, as well as a variety of potential causes: side effects of Depakote, history of drug abuse, anxiety, panic attacks, and engaging in exercise without eating and hydrating properly.

20. Each time plaintiff experienced visual episodes with body tremors and weakness, plaintiff presented to C yard clinic where his blood sugar was tested from August 28, 2006, through September 2, 2006; the readings were within normal limits: 100, 137, 75, 85, 101, 90. (ECF No. 132-3 at 5; 134 at 36.) Plaintiff's blood pressure was also checked. (ECF No. 132-3 at 5.)

21. Prior to plaintiff's visit on August 31, 2006, he experienced a particularly bad episode of vision and shakes. (ECF No. 132-3 at 5.)

22. On September 12, 2006, plaintiff completed a CDC 7362: "follow-up of body tremors." (ECF No. 134 at 38.)

23. On September 14, 2006, defendant Moreno saw plaintiff, noting plaintiff was seen for these symptoms before. (ECF No. 134 at 38.) Plaintiff declares that he was frustrated and asked Moreno if there was more that could be done. (ECF No. 132-3 at 5.) Moreno notes plaintiff's blood sugars within normal limits, and plaintiff would like to see a doctor for possible diagnosis. (ECF No. 134 at 38.) Moreno assessed plaintiff was at risk for injury from tremors, and Moreno's plan was "MD evaluation." (ECF No. 134 at 38.) However, Moreno did not note a follow-up appointment with a physician on the CDC 7362.[11] (ECF No. 134 at 38.) As risk precautions, Moreno advised plaintiff "do not get up fast," "don't walk if you are dizzy," and "lie down if lightheaded." (ECF No. 134 at 38.)

24. It is undisputed that defendant Karen Todd was a licensed Physician's Assistant ("PA") employed for more than 30 years. (ECF No. 130-1 at 67.)

---

(ECF No. 164-1 at 3.)

[11] Plaintiff declares that defendant Moreno told plaintiff to eat something and sit down at the time of the episodes, but that nothing more could be done because test results showed no concern. (ECF No. 132-3 at 5.)

25. It is undisputed that on October 4, 2006, defendant Todd examined plaintiff and performed diagnostic tests that were within normal limits, and referred plaintiff to see the doctor. (ECF No. 130-1 at 67.) The October 4, 2006, 11:30 a.m. medical record states "Dr. line follows RN line 9/14/06 for [follow-up] for body tremors." (ECF No. 134 at 40.) Plaintiff declares he saw defendant Todd regarding a CDC 7362 and then a follow-up in the nurse's line. (ECF No. 132-3 at 6.)

26. Defendant PA Todd reviewed plaintiff's August 28, 2006 physical exam, lab and blood sugar results, noted plaintiff was not shaking, and that plaintiff reported his tremors "currently are staying the same," and he continues to be "very active – playing volleyball, soccer [and] football, usually all day Mon. – Fri."[12] (ECF No. 134 at 40.) "When tremors start he sits out and eats an apple or anything, improves, returns to the activity." (Id.) Defendant Todd charted plaintiff's drug abuse profile: 17 years: meth, marijuana, alcohol, LSD, mushrooms, cigarettes. (ECF No. 134 at 40.) Todd's assessment was episodic dysphoria, etiology unknown, and recommended follow-up with Dr. Nale. (ECF No. 134 at 40.)

27. It is undisputed that defendant Todd discussed plaintiff's lab results with plaintiff, and referred him to Dr. Nale for a follow-up. (ECF No. 130-1 at 89.)

28. It is undisputed that plaintiff self-reported his history of drug abuse, and that he was also taking psychiatric medications which can cause symptoms such as slight body tremors. (ECF No. 130-1 at 13.)

29. On October 4, 2006, Dr. Galloway signed off on PA Todd's order referring plaintiff to Dr. Nale. (ECF No. 134 at 42.) Plaintiff declares that he does not see Dr. Galloway again,

---

[12] Plaintiff declares he also told Todd about plaintiff's history of vision problems, left side spinning fans, and continued body tremors, and that all blood work returned within normal limits. (ECF No. 132-3 at 6.)

and that there are no notes from Dr. Galloway about plaintiff's treatment or suggestions to doctors at this time.  (ECF No. 132-3 at 6.)

30. On October 14, 2006, Dr. Nale noted plaintiff's refusal for today, but requested to be rescheduled.  (ECF No. 134 at 46.)

31. On October 25, 2006, plaintiff completed a CDC 7362 asking that his doctor's appointment be rescheduled.  Plaintiff wrote that he had to cancel last Friday's appointment to send out letter of importance, and that Friday's appointment with doctor was to go over blood work ("I think it may be of importance.").  (ECF No. 134 at 44.)

32. It is undisputed that Dr. Nale examined plaintiff on November 7, 2006, and plaintiff alleges Dr. Nale failed to provide plaintiff proper care.  (ECF No. 130-1 at 61.) Specifically, Dr. Nale's November 7, 2006 progress notes recorded plaintiff's complaints as "episodic tremors; malaise/chronic/since childhood/ no syncope.  No (tachycardia) palpitations.  [Blood sugar] monitored, all normal range except slightly lower when having symptoms.  Occurs mostly in the evening and post exertion."  (ECF No. 134 at 46.)  Plaintiff also complained of acne flare-up.  (Id.)  Dr. Nale's assessment was recorded as "1) tremors ? reactive ? to drop in [blood sugar] though still in normal range; 2) Acne ... avoid sugary foods -- take tetracycline."  (ECF No. 134 at 46.)  Dr. Nale prescribed tetracycline and requested follow-up in three months.  (ECF No. 134 at 46-47.)

33. Plaintiff declares that he told Dr. Nale (a) plaintiff's "entire history all the way back to the county jail" to the present, that the results of the optometrist and numerous blood tests were within normal limits; and (b) plaintiff "was concerned about the body tremors and weakness because they always start after the spinning fans in [plaintiff's] left peripheral vision begin."  (ECF No. 132-3 at 6.)  Plaintiff declares that Dr. Nale told plaintiff that "there is nothing he can do for [plaintiff,] that plaintiff's previous test results were within

normal limits and [plaintiff was] making more out [of] these episodes than they are."  (Id.)

Plaintiff was scared and frustrated that Dr. Nale would not help plaintiff, and "expressed

... concern that more should be done."  (Id.)  Plaintiff declares that Dr. Nale "was very

aggressive and intimidat[ing] so [plaintiff] reluctantly left."  (Id.)

34. On December 11, 2006, plaintiff completed a CDC 7362:  "need a re-prescription for 600

mg Ibuprofen for migraines and back pain."  (ECF No. 135 at 2.)

**2007-2009**

35. It is undisputed that on February 6, 2007, Dr. Nale examined plaintiff, and plaintiff alleges

Dr. Nale failed to provide plaintiff proper care.  (ECF No. 130-1 at 61.)  On his progress

notes, Dr. Nale recorded that plaintiff was being seen for follow-up for body tremors.

(ECF No. 135 at 4.)  Dr. Nale charted follow-up on acne and "tremors - ? alleged

hypoglycemia not confirmed," plaintiff complained of "occasional [low blood pressure]

without any [illegible], no neurological dysfunction and fairs well with use of NSAIDs."

(ECF No. 135 at 4.)  Dr. Nale assessed "alleged hypoglycemic symptoms not clinically

supported," "-- less frequent since Depakote [discontinued]," "-- reassurance/observe."

(ECF No. 135 at 4.)

36. Plaintiff declares he told Dr. Nale that his issues continued, and that he still had body

tremors with visual problems in his left peripheral vision and felt weak.  (ECF No. 132-3

at 6.)  Plaintiff confirms that Dr. Nale told plaintiff and wrote down, "no neurological

dysfunction," but declares that Dr. Nale did not conduct any diagnostic tests or order new

tests.[13]  (ECF No. 132-3 at 6.)

---

[13] Plaintiff also declares that Dr. Nale told plaintiff to take Ibuprofen for the headaches, migraines and body tremors, that the symptoms are all in plaintiff's head and he should stop complaining, and there was nothing more that Dr. Nale or medical staff could do for plaintiff because plaintiff's labs are within normal limits so no need for follow-up.  (ECF No. 132-3 at 6-7.)  Plaintiff felt defeated and "it was pointless to continue to pursue help."  (ECF No. 132-3 at 7.)  Defendants did not provide a declaration by Dr. Nale.

37. On February 13, 2007, plaintiff's prescription to Prozac was discontinued, and he was prescribed Effexor XR. (ECF No. 135 at 5.)

38. On March 15, 2007, the Effexor XR dose was increased from 37.5 mg to 75 mg. (Id.)

39. Plaintiff declares that in 2008, he was taking Effexor and Trileptal (bipolar). (ECF No. 132-3 at 7.)

40. On June 18, 2008, plaintiff walked into the C yard medical clinic because he had a strong visual and tremor episode. Nonparty RN Wohlers had to complete the CDC 7362 for plaintiff because he was having a hard time writing due to the shaking and lack of comprehension: "I had some tremors in my hands this a.m. and just felt funny." (ECF No. 132-3 at 7; 135 at 7.) Plaintiff told Wohlers about plaintiff's "entire medical history;" that plaintiff "had seen many doctors and nurses in the past," that plaintiff "had many episodes since [plaintiff's] last visit with Dr. Nale, but today's episode was 'aggressive.'" (ECF No. 132-3 at 7.) Plaintiff declares that Wohlers told plaintiff to sit down and drink water if plaintiff has any more episodes, and that nothing more could be done. (ECF No. 132-3 at 7.)

41. Plaintiff declares that on September 3, 2008, he talked with mental health staff about reducing his medications because he did not think he was bipolar, and began to wean off the Effexor and Trileptal. (ECF No. 132-3 at 7) (no medical record.)

42. By December of 2008, plaintiff declares he was off mental health medications. (ECF No. 132-3 at 7.)

43. On December 23, 2009, plaintiff returned "out of concern. His BH was elevated 7/29/09 which prompted his referral. He admits to chronic headaches. He also experiences throat fullness which comes and goes." (ECF No. 135 at 9.) The assessment was rule out hypothyroidism, and a CBC and Thyroid profile were ordered. (ECF No. 135 at 9-10.)

**2010**

44. On January 7, 2010, plaintiff completed a CDC 7362: "optical: blurred vision." (ECF No. 135 at 12.) Plaintiff's form was reviewed on January 11, 2010, and was signed by defendant Dr. Col, O.D., on January 14, 2010, noting "See consult exam." (ECF No. 135 at 12.)

45. Plaintiff declares that from February 2007 to October 2010, he followed Dr. Nale's instructions and took Ibuprofen to treat headaches, migraines and body tremors. (ECF No. 132-3 at 7.)

46. On October 12, 2010, around 8:00 a.m., while working in the PIA meat plant, plaintiff began to have an onset of visual problems and body tremors. (ECF No. 132-3 at 7.) Plaintiff informed his lead, and then went into more severe body shaking. Plaintiff's head involuntarily turned to the left, plaintiff went to the ground, and he was shaking. (Id.) It is undisputed that an inmate reported plaintiff was having a seizure. (ECF No. 130-2 at 5.) Other inmates were holding plaintiff while he was on the ground.

47. RN Schuber wrote on the First Medical Responder – Data Collection form:

08:25 arrived to meat plant. [Plaintiff] being wheeled out to hall for eval. Eyes open staring off to the side. Non verbal @ this time. . . 08:33 arrived in the TTA -- [Plaintiff] alert and oriented x 3. Was conversing all the way in to the TTA. Denies LOC (loss of consciousness). Had star pattern type vision prior to episode.

(ECF No. 103-3 at 9.)

48. RN Schuber noted the chief complaint as "possible seizure," and "rule out seizure" by the mechanism of injury. (ECF No. 103-3 at 10.)

49. On October 12, 2010, Industrial Supervisor Higuera completed a report and a chrono stating that around 8:20 a.m., he was told plaintiff was having a seizure; Higuera "immediately responded to the area and observed" plaintiff "convulsing and being

21

supported by two inmate workers so that [plaintiff] would not hurt himself." (ECF No. 135 at 14-15.) The supervisor pushed his personal alarm and custody staff responded; the supervisor informed custody it was a medical emergency, and custody staff summoned medical staff, who responded and took plaintiff to medical for treatment. (ECF No. 135 at 14-15.)

50. Plaintiff does not recall going from the meat plant to the triage and treatment area ("TTA"), but recalls waiting outside the TTA for treatment. (ECF No. 132-3 at 8.)

51. On October 12, 2010, at 8:33 a.m., plaintiff was signed into the TTA with the chief complaint noted as "Code I, seizure activity, reports 'I was working and saw starry things.'" (ECF No. 135 at 17.)

52. At 8:35 a.m., a nonparty nurse charted: "Right now my vision is good. 'I am really weak.' 'I have been seeing a star pattern & sparklings in front of my eyes this morning.'" (ECF No. 135 at 18.) The nurse wrote plaintiff "reports has had starry type visual disturbance in past but it resolved itself after about 20 minutes with rest. Denies any med/substances this a.m. Diaphoretic. No seizure activity. Reports weak and dizzy." (ECF No. 135 at 18.) At 8:45 a.m., the nurse charted plaintiff was safe without further evidence of seizure activity. "Reports 'I feel better.'" Denies visual disturbance. (ECF No. 135 at 18.) EKG done and given to doctor. (Id.) At 8:55 a.m., nurse charted doctor at bedside and educating plaintiff, follow-up in five days. (Id.)

53. It is undisputed that Dr. Naseer is a medical doctor and practiced medicine for more than 15 years. (ECF No. 105-2 at 3; 130-1 at 14.) It is undisputed that other than his general medical school education, Dr. Naseer does not have any specialized training or experience in neurology; he is not an oncologist, neurologist, neurosurgeon or related specialist, and

does not have any specialized training in diagnosing or treating brain tumors. (ECF No. 105-2 at 3; 130-1 at 14-15.)

54. It is undisputed that defendant Dr. Naseer saw plaintiff only once, in the TTA on October 12, 2010. (ECF Nos. 105-2 at 3, 8; 132-3 at 8.) Dr. Naseer explained that the TTA is similar to an urgent care center where inmates can seek treatment for acute conditions without completing a CDC 7362 or scheduling an appointment. (ECF No. 105-2 at 3.)

55. Dr. Naseer's TTA Progress Note records that plaintiff had a history of tension headaches and was brought to the TTA on a gurney for near syncope (fainting) and possible seizures; plaintiff reported that he was at work and started feeling dizzy and weak, then started seeing lights and stars with no peripheral vision; had mild twitching in his arms and neck but did not lose consciousness; plaintiff sat down and waited for the gurney to take him to the TTA.[14] (ECF Nos. 105-2 at 8 (progress note); 135 at 20.) Dr. Naseer charted that

_____

[14] Plaintiff declares that he told Dr. Naseer plaintiff did not remember being brought to the TTA, that plaintiff's vision was hazy and he felt strange, like he was drunk; that while working, plaintiff experienced a loss of vision and began to see spinning fans in his left peripheral vision and his body started shaking and his legs felt weak and he fell to the ground and lost all body control. (ECF No. 132-3 at 8.) Plaintiff declares he explained his medical history, and that he had these symptoms in the past, but that the intense body shaking was new. (Id.) Plaintiff explained to Dr. Naseer that plaintiff has had many blood tests, blood pressure checks, blood sugar tests, and even saw an optometrist, but all tests returned within normal limits, and there has been no medical explanation for his symptoms. Plaintiff declares that Dr. Naseer asked plaintiff whether he had a history of seizures; plaintiff denied any personal or family history of seizures. Later, Dr. Naseer told plaintiff his blood pressure was a bit low and suggested plaintiff may have hyperventilated. Plaintiff protested he did not hyperventilate, but lost all body control and did not remember being transported to the TTA. (ECF No. 132-3 at 8.) Plaintiff declares that Dr. Naseer did not perform any neurological diagnostic tests. Plaintiff declares Dr. Naseer attempted to release plaintiff, but plaintiff did not want to be released and told the doctor plaintiff wanted more tests done; plaintiff was scared. Plaintiff declares that Dr. Naseer told plaintiff he was fine and could get dressed and go back to work; plaintiff objected that he did not feel fine, and repeated that he had never experienced anything like that before.
On the other hand, Dr. Naseer's declaration confirms the content of his progress note, but declares plaintiff reported he used to have similar episodes about once a month but they resolved on their own about six months earlier. (ECF No. 105-2 at 4.) Dr. Naseer declares that he did a complete physical examination of plaintiff, who was awake, alert and in no apparent distress, and appeared to Dr. Naseer to be entirely normal. (ECF No. 105-2 at 4.) Dr. Naseer declares plaintiff had no physical issues at that time. (Id.)
Plaintiff declares Dr. Naseer insisted plaintiff return to the meat plant. (ECF No. 132-3 at 7-8.) Dr. Naseer declares that plaintiff requested to be released so he could go back to work. (ECF

plaintiff was awake, alert and had no symptoms. (ECF Nos. 105-2 at 8; 135 at 20.) "[Patient] states had similar episodes ~ 6 months ago & prior to this was occurring every month, but this resolved." (ECF No. 105-2 at 8.) Plaintiff had a past history of being bipolar, depression, tension headaches and the globus sensation (a feeling that something was stuck in his throat.) (ECF No. 105-2 at 8 (progress note).) Dr. Naseer checked plaintiff's blood pressure, blood sugar, and did an EKG. (ECF No. 135 at 17; 132-5 at 8.)

56. At 9:01 a.m., the TTA nurse charted that plaintiff stated "I'm better" – "just a little weak," and noted no evidence of distress or seizure activity, and no complaints of pain. (ECF No. 135 at 18.) Plaintiff was dressing himself in multiple layers of clothing. (ECF No. 135 at 21.) At 9:07 a.m. on October 12, 2010, the nurse noted plaintiff was ambulatory from the TTA with steady gait, no evidence of seizure activity. (ECF No. 135 at 21.)

57. Dr. Naseer's assessment and plan indicated plaintiff may have had transient altered mental status, secondary to syncope (fainting) which is secondary to possible partial hypotension versus potential seizures. (ECF No. 105-2 at 8 (progress note).) Dr. Naseer also noted that plaintiff experienced anxiety which would be a likely cause of his arms shaking.[15]

---

No. 105-2 at 4.) Defendants contend that such statement is supported by plaintiff's CDC 7362 dated October 12, 2010, in which he wrote he "needs to see a doctor asap to rule out the possibility of seizures. My work needs a clearance for me to work. I must be seen quickly to ease the minds of my supervisors." (ECF No. 164-1 at 95.)

[15] Dr. Naseer declares that at the time he saw plaintiff, Dr. Naseer did not think plaintiff had suffered a seizure because plaintiff did not lose consciousness, reported only mild twitching and lightheadedness. (ECF No. 105-2 at 4.) Because plaintiff had no symptoms when Dr. Naseer examined plaintiff, and reported his past similar episodes went away on their own, Dr. Naseer believed that the most likely cause of the incident was syncope (fainting spells), characterized by lightheadedness, feeling dizzy, and seeing stars and lights. (Id.) Dr. Naseer considered whether plaintiff possibly could have suffered a seizure, but opined that was highly unlikely and inconsistent with plaintiff's medical history, the reported symptoms, and the doctor's examination of plaintiff. (Id.)

Dr. Naseer suggested that if plaintiff's symptoms returned, he should have a further examination and work up and possibly a head CT scan, and plaintiff was to follow-up with his primary care physician in five days. (ECF No. 105-2 at 8.)

58. On October 12, 2010, Dr. Naseer ordered plaintiff to follow-up with the yard doctor in five days, and noted two test results were within normal limits. (ECF No. 135 at 23.)

59. On October 12, 2010, at around 9:30 a.m., plaintiff returned to work at the meat plant, but still complained of not feeling well. (ECF No. 135 at 25, 26.) Supervisor Higuera called the "C" clinic and spoke with RN Schuber, who told Higuera to have plaintiff return to the clinic and Schuber would give plaintiff a lay-in.[16] At 9:45, plaintiff returned to "C" work change with a lay-in. (ECF No. 135 at 25, 26.)

60. On October 12, 2010, plaintiff completed a CDC 7362: "I need to see a [doctor] A.S.A.P. to rule out the possibility of seizures. My work needs a clearance for me to work. I must be seen quickly to ease the minds of my supervisors. [¶] This is a follow-up to that

---

[16] Plaintiff declares that Higuera would not let plaintiff go back to work. (ECF No. 132-3 at 9.) Higuera's documents do not confirm this fact. (ECF No. 135 at 25-26.) Higuera does refer to plaintiff earlier having a seizure in the meat plant. (ECF No. 135 at 25-26.) However, Dr. Naseer declares that a lay person's description of "seizure" is not a medical diagnosis, but rather a lay person's description of someone shaking, and that "[i]n order to reach a medical diagnosis of seizures, a person would have to be thoroughly examined and have diagnostic tests performed." (ECF No. 105-2 at 3.) Plaintiff objects that Dr. Naseer did not witness the alleged seizure and therefore cannot state with certainty that no witness had medical training, i.e. a correctional officer. On the other hand, it is undisputed that an inmate reported plaintiff's seizure, and plaintiff did not provide any witness declaration attesting to medical training, or any medical record or expert declaration confirming that plaintiff suffered a "grand mal seizure" at work on October 12, 2010, as plaintiff alleged in his pleading (ECF No. 53 at 9, ¶ 58).

Dr. Slyter states that it was the first responders who identified "possible seizure." (ECF No. 132-1 at 6.) Dr. Slyter also states that plaintiff reported "convulsing." (Id.) In his declaration, plaintiff declares he went to the ground, shaking and convulsing, and that Higuera wrote in his report (ECF No. 132-3 at 8, 9.) that plaintiff was convulsing. But plaintiff does not declare that he told Dr. Naseer that plaintiff was convulsing, and there is no mention of convulsing in the first responder's notes, TTA nurse notes or Dr. Naseer's notes. Plaintiff did not provide a declaration by Higuera or any other eyewitness to the seizure. Dr. Tseng testified that form 128-A's are generally not filed in inmates' medical files, and that a layperson's report of a person "convulsing" would not necessarily mean the person had a seizure. (Tseng Dep. at 46.)

25

medical emergency on 10-12-10 per request of my work supervisor and his conversation

with medical." (ECF No. 135 at 28.) The CDC 7362 was stamped received: "10OCT13

am 07:09." (ECF No. 135 at 28.)

61. It is undisputed that Dr. Tseng is a licensed medical doctor, board certified in internal

medicine, working with the California Correctional Health Care Services branch of the

CDCR, assigned as a physician and surgeon to MCSP, where he was a primary care

physician. (ECF No. 103-3 at 2; 130-1 at 29.)

62. It is undisputed that on October 14, 2010, plaintiff was seen by defendant Dr. Tseng

regarding the seizure. (ECF No. 135 at 28; 164-1 at 95.) Plaintiff declares that he told Dr.

Tseng that plaintiff had a seizure on October 12, 2010, and did not remember being

transported across the yard, and they discussed plaintiff's prior blood tests. (ECF No.

132-3 at 9.) Plaintiff recalls Dr. Tseng had plaintiff's medical file in front of him during

their discussion. (ECF No. 132-3 at 9.)

63. Dr. Tseng declares that he would have to rely on the prisoner's reported history and

current complaints if the medical records were not available for review, and that given the

thousands of inmates at MCSP, he did not have time to review all medical charts in

advance. (ECF No. 103-3 at 2.) Dr. Tseng gave plaintiff a four week no work chrono and

a two week follow-up pending blood test results. (ECF Nos. 103-3 at 18; 132-3 at 9; 135

at 29; 164-1 at 95.)

64. Plaintiff declares he expressed concern that something more should be done because prior

blood test results were within normal limits and doctors tell plaintiff there is no reason for

concern. Plaintiff declares Dr. Tseng wanted plaintiff to see mental health staff, that the

doctor was not worried, plaintiff should not be concerned, and to return to TTA if plaintiff

had another episode. (ECF No. 132-3 at 9.)

26

65. On October 14, 2010, additional lab work was ordered, including a CBC with differential and a thyroid panel. (ECF No. 135 at 23.) Plaintiff's medications were also changed, but it appears such changes were made by mental health personnel. (ECF No. 103-3 at 17; Tseng Dep. at 73.)

66. On October 20, 2010, plaintiff declares he had a vision and head pressure episode while on the yard. (ECF No. 132-3 at 9.) Plaintiff went to the yard clinic and saw an unidentified nurse who took plaintiff's blood sugar and vitals; results were normal as episode continued. Plaintiff declares the episode went on for seven hours, consisting of visual auras in his left peripheral vision, but the nurse did not refer plaintiff to a doctor. (ECF No. 132-3 at 9) (no medical record provided.)

67. On October 25, 2010, plaintiff tried to play soccer, but had vision problems and had to stop. (ECF No. 132-3 at 9.)

68. On October 27, 2010, plaintiff needed assistance to go to chow because he could not see people in front or to the left of him. (ECF No. 132-3 at 9.) After chow, plaintiff went to medical because the vision episode persisted. (ECF No. 132-3 at 9-10.)

69. It is undisputed that defendant Villanueva is a Licensed Vocational Nurse ("LVN"), employed at MCSP. (ECF Nos. 117-5 at 1, 132-3 at 10, 130-1 at 78.) LVN Villanueva assisted doctors and medical staff, and could not prescribe medications or order diagnostic tests, other than simple dip stick and blood tests. (ECF No. 117-5 at 1.)

70. On Wednesday, October 27, 2010, LVN Villanueva saw plaintiff and charted that he complained of dizziness, blurring of vision, headache, and she took his vital signs (BP 114/76) and Oxygen level. (ECF No. 135 at 31.) LVN Villanueva noted plaintiff's appointment on Monday's MD line, and advised plaintiff to go rest, walk and get up slowly, noting plaintiff's gait was steady. (ECF No. 135 at 31.)

27

71. On November 1, 2010, plaintiff again saw Dr. Tseng. (ECF No. 135 at 33.) Dr. Tseng charted that two weeks ago, plaintiff had visual disturbance -- flickering light in peripheral vision, up left side, associated with confusion/poor concentration. (ECF No. 135 at 33 (progress note).) "Neck started twitching -- body started to twitch. Vision seemed to get dark. [Plaintiff] says he does not recall getting transported to TTA, but RN notes no loss of consciousness. [Plaintiff] feeling weak/vision hazy/confusion. Gradually improved over about 2 hr." [¶] "2nd episode occurred ~ 1 week later -> was playing soccer, visual disturbance -- loss vision [left] side -- went to clinic – normal vs. without twitching, but visual disturbance lasted 7 hrs. [Plaintiff] feels that the only thing that has changed was Lamictal." (ECF No. 135 at 33.) Dr. Tseng marked as within normal limits the following objective exams: general; cardio; pulmonary; abdomen; musculoskeletal; skin; neurological. (Id.) For assessment/plan, Dr. Tseng wrote: "Transient exertional [symptoms]. ?psychosomatic? ?new onset symptom? Intro cranial lesion? - [check] MRI brain. Temporary work restriction. [Plaintiff] declines LBC -- [symptoms] only occur with strenuous exertion. Consider EEG, but possible due to [changes] in 4 meds, will re-evaluate/monitor over time before getting EEG."[17] (ECF No. 135 at 33.) Dr.

[17] In his declaration, plaintiff states he talked with Dr. Tseng about plaintiff's history of episodes since 2004 and that plaintiff has seen multiple doctors at MCSP with no explanation of his symptoms. (ECF No. 132-3 at 10.) Plaintiff expressed his concerns that something should be done rather than just giving him follow-up appointments, and that he was having severe headaches. (Id.) When Dr. Tseng told plaintiff that his glucose was a little elevated and plaintiff needed to eat something at the times of the episodes, plaintiff was "furious and yelled that [he] had a seizure and [Dr. Tseng] needed to do something to help me." (Id.) Plaintiff declares that Dr. Tseng said, "To be honest with you, because of the budget, there is nothing we can do for [you] unless you are dying." (Id.) Plaintiff asked how did the doctor know plaintiff did not have a brain tumor or that plaintiff was dying, and asked if an MRI could be done in case. (Id.) Plaintiff declares Dr. Tseng responded that "it was not necessary and began to write notes." (Id.) Plaintiff got up to leave, and the doctor said, "let's go ahead and do a MRI to rule out a tumor, just to put your mind at ease." (Id.)

In his declaration, Dr. Tseng denies making a statement as to the budget, because "the budget was never a concern in determining what care or treatment a patient should receive." (ECF No.

Tseng wrote plaintiff a chrono for a four month work restriction, and a follow-up visit in 75 days, with "follow up possible new onset seizure disorder." (ECF No. 135 at 36; 132-3 at 10.)

72. On November 1, 2010, Dr. Tseng requested plaintiff receive an MRI; principle diagnosis "[500] seizure," medical necessity: "37 y/o male with episodes acute onset homonymous hemianopsia -- transient, associated with confusion, muscle twitching. Possible new onset seizure disorder, possible mass lesion. [510]" (ECF No. 135 at 35.) Dr. Tseng marked the request "routine." (Id.) Dr. Tseng explained he ordered the MRI routine as opposed to emergent because plaintiff could self-ambulate, communicate with ease, had a long history of symptomology, and did not appear to be in immediate distress. (ECF No. 103-3 at 3.) Because a service came once a month to perform MRI's, Dr. Tseng knew that plaintiff's MRI would be performed in 30 days or less. (Id.)

73. The MRI was approved on November 2, 2010. (ECF No. 135 at 35.)

74. On November 6, 2010, plaintiff suffered another episode, and completed a CDC 7362: "follow-up on seizure chrono. Had another episode. Dr. said put in slip immediately to see him if I have another episode." (ECF No. 135 at 38.)

75. The CDC 7362 is stamped "'10NOV08am06:30" as the date received, "administrative response," and an appointment has been scheduled with the primary care provider in approximately 1 week," and signed by an unidentified RN. (ECF No. 135 at 38.)

76. Plaintiff was not seen by a doctor on November 6, 2010, or in response to his CDC 7362 completed that date. (ECF No. 132-3 at 10.)

77. On December 3, 2010, plaintiff received an MRI scan of his brain. (ECF No. 135 at 40.)

---

103-3 at 3.)

78. Later on December 3, 2010, plaintiff declares he experienced excessive blindness and trouble maneuvering among the crowd of inmates going to the chow hall; his cellmate helped plaintiff walk. (ECF No. 132-3 at 11.)

79. From December 4, 2010, to December 9, 2010, plaintiff had vision problems, weakness, and severe headaches (9 out of 10 pain). (Id.)

80. On December 10, 2010, plaintiff experienced major vision loss and a headache with severe pain, 10 out of 10. (Id.) Plaintiff suffered this severe pain all night, and the pain was so bad plaintiff wanted to die. (Id.)

81. Plaintiff suffered a severe headache on December 11, 2010. (Id.)

82. On December 12, 2010, plaintiff completed a CDC 7362: "Having continued eye episodes at least twice a week on a regular basis. Headaches are now regular. Headache pain is at a scale of 10. I have run out of person for whom I can get aspirin from. Need to see Nurse or Dr. Dr. is aware of my visual episodes. 20 days ago I received slip stating I will see the Dr. in a week." (ECF No. 135 at 42.) The CDC 7362 is stamped received: "10DEC13pm07:02." (Id.)

83. Defendant Kettelhake was an LVN working at MCSP. (ECF No. 117-5 at 1.)

84. Defendant Kettelhake noted twice on the December 12, 2010 CDC 7362 that plaintiff was seen by appointment on 12/11/10. (ECF No. 135 at 42.) But plaintiff was not seen on December 11, 2010, because it was a Saturday and the clinic is closed on Saturday.[18] (ECF No. 132-3 at 11.)

---

[18] Plaintiff declares that Kettelhake refused to treat plaintiff and did not refer him to a doctor. (ECF No. 130-1 at 74.) Defendant Kettelhake testified that the incident took place on December 12, 2010, and Mr. Kettelhake did not see plaintiff, but reviewed the paper request for medical services submitted by plaintiff. (ECF No. 130-1 at 74, citing Kettelhake Dep. at ¶47:24-25.) Defendants point to no medical record demonstrating plaintiff was seen on December 11, 2010, or that he was seen by medical professionals between December 12, 2010, and December 15, 2010, for his level 10 pain reported in the CDC 7362.

85. Plaintiff did not see a nurse or a doctor in response to his December 12, 2010 CDC 7362.

86. On December 14, 2010, the radiologist dictated the MRI impression: "The dominant abnormality is a 3.8 complex mass within the posterior parietal lobe. Extensive vasogenic edema extends superior to the parietal lobe and inferiorly into the right occipital lobe. Significant mass effect upon the right occipital horn is noted. Findings are most suggestive of a malignant neoplasm, either primary or metastatic. The mass may be intra or extraaxial. Recommend the patient return for post-contrast imaging to further assess." (ECF No. 135 at 40.)

87. On December 14, 2010, at 2000 (8:00 p.m.), Dr. Tseng completed a record that Walter Pepper (radiology) called Dr. Tseng to report plaintiff's MRI showed a "brain tumor – mid brain with edema, no midline shift, no bleed. Dr. Pepper felt it would be appropriate to address this first thing in the a.m. Plan: inform TTA M.D. in a.m. regarding above findings for urgent follow-up." (ECF No. 135 at 44; 164-1 at 71.)

88. On December 15, 2010, plaintiff was informed he had a tumor in his head and needed emergency surgery. (ECF No. 132-3 at 11.)

89. On December 15, 2010, plaintiff was seen in the TTA by nonparty Dr. Rudas, who noted "reported seizure 10/12/10; visual disturbance." (ECF No. 135 at 46.) Dr. Rudas charted that "over the last month, [plaintiff] is having ~ 2 episodes per week of visual disturbance with transient loss of left visual field vision and [plaintiff] is seeing 'swirling lines' in his left visual field. [Plaintiff] also had a severe headache . . . [the] last week." (ECF No. 135 at 46.) "Prior to 10/12/10 no history of seizures." (Id.) Upon neurological exam, Dr. Rudas noted "left sided visual field defect." (Id.) Dr. Rudas reviewed the MRI results, and discussed plaintiff's case "in detail" with Dr. Morris Senegor, neurosurgeon. (Id.)

90. Dr. Rudas assessed right parietal 3.8 cm brain mass: suspect neoplasm. (Id.) Dr. Senegor accepted plaintiff's direct admission to St. Joseph's Hospital in Stockton on December 15, 2010. (ECF No. 135 at 48.)

91. Upon admission, plaintiff reported he has had "scintillations in his left visual field for approximately 4 years," and had a first seizure 2 months ago, and after the seizure had increasing episodes of scintillations approximately every other day." (ECF No. 135 at 50.) Brain tumor recently diagnosed. Dr. Senegor also noted that plaintiff complained of headaches on the right side, primarily in the parietal region. (ECF No. 135 at 50.) At this time, plaintiff was taking Strattera. (Id.) Upon neuro exam, Dr. Senegor noted plaintiff was alert, oriented, and appropriate; recounted history well; speech fluent. "On cranial nerve exam [plaintiff] has a fairly dense left homonymous hemianopia." (ECF No. 135 at 51.) Otherwise, cranial nerves are unremarkable. Motor exam shows good strength; deep tendon reflexes equal. Dr. Senegor noted plaintiff's right parieto-occipital mass, with a differential diagnosis of glioma versus meningioma. (Id.) Following discussions of risks, alternatives and benefits of surgery, plaintiff consented to brain surgery. (Id.)

92. On December 16, 2010, Dr. Senegor performed surgery: an uneventful right parieto-occipital craniotomy and excision of meningioma using a microsurgical technique. (ECF No. 136 at 2-3; 164-1 at 72-73.)

93. On December 20, 2010, plaintiff returned to MCSP; Dr. Rudas noted plaintiff reported mild post-op pain; left sided visual field vision is improving; only mild dull headache, no fever. (ECF No. 136 at 5.) Upon exam, plaintiff's craniotomy wound clean, no infection, only mild edema; left visual field defect is improved. Plaintiff was prescribed Dilantin 300 mg; Tylenol #3; follow up yard clinic 7 days; repeat MRI six months and one year. (ECF No. 136 at 5.)

94. On December 24, 2010, plaintiff declares he was disoriented and hit his surgical site on the foot of the bed, causing him severe pain and nausea, and he experienced light sensitivity on the way to or at the medication window. (ECF Nos. 53 at 13; 132-3 at 11.) Plaintiff declares he informed "medical staff" and asked for extra head protection, but "staff" told him extra protection was not necessary. (ECF No. 132-3 at 12.)[19]

95. It is undisputed that there is no evidence or assertion that plaintiff subsequently hit his head or sustained any injury as a result. (ECF No. 130-1 at 67.)

**2011**

96. On February 7, 2011, Dr. Tseng ordered a brain MRI to be performed in early May 2011 prior to plaintiff's neurology appointment. (ECF No. 136 at 7.)

97. On May 6, 2011, plaintiff received a brain MRI without contrast. (ECF No. 136 at 9.)

98. The radiologist's impression was "nonspecific changes in the right posterior parietal occipital area, likely related to the patient's meningioma resection in the past," but recommended ordering a contrast MRI for complete evaluation. (ECF No. 136 at 9.)

99. On May 10, 2011, Dr. Tseng ordered a follow-up MRI with contrast to rule out residual tumor. (ECF No. 136 at 11.) The MRI request was approved on May 17, 2011. (Id.)

100. On May 27, 2011, plaintiff's serum creatinine was recorded as within normal limits. (ECF No. 136 at 11.)

101. In a May 31, 2011, first level appeal interview, Log No. MCSP-16-11-10820, defendant Todd wrote that plaintiff was complaining of nausea, vomiting, seizures, headaches and body tremors since 2004 and plaintiff was diagnosed with a tumor by MRI. (ECF Nos.

---

[19] In his unverified pleading, plaintiff states he described his symptoms to defendant Todd, and when plaintiff requested head protection, none was provided, and that defendant Todd responded that "people always seem to hit their injury and can expect it to happen now and again." (ECF No. 53 at 13.) Plaintiff cites to no medical record.

133-1 at 12; 136 at 13.)  Following review of plaintiff's universal health record ("UHR") and after plaintiff's "seizure and syncopal episode on October 12, 2010," plaintiff's "symptoms intensified and the criteria for a MRI was met."  (Id.)

102. On May 31, 2011, defendant Todd ordered plaintiff to return to clinic on June 10 or 13 for follow-up MRI report and neurosurgery, schedule with Dr. Tseng if possible, and ordered labs, serum creatinine, to be done that week.  (ECF No. 136 at 14.)

103. On June 6, 2011, plaintiff completed a CDC 7362 stating that he was scheduled for an MRI, but told it was cancelled by his primary health care provider, and did not know why, but wanted it rescheduled.  (ECF No. 136 at 16.)

104. On Dr. Tseng's MRI request, an entry reads:  "6/6 -- out of time -- R/S for 6/17."  (ECF No. 136 at 11.)

105. It is undisputed that Dr. Bruce Barnett is a Harvard trained medical doctor, licensed to practice in California, board certified in family medicine, also a lawyer, and currently employed by California Correctional Health Care Services as Chief Medical Consultant for the Receiver's Office of Legal Affairs, and has practiced medicine for 30 years.  (ECF No. 107-2 at 1-2; 130-1 at 36.)  It is undisputed that Dr. Barnett specializes in correctional healthcare and the diagnosis and treatment of inmates including those with headaches, visual disturbances, seizures, chronic pain and brain surgery.  In addition to providing direct patient care at many California state prisons since 2007, Dr. Barnett reviews medical records, and instructs nurses and physicians regarding standards of care.  (ECF No. 107-2 at 2.)

106. It is undisputed that on June 10, 2011, Dr. Barnett saw plaintiff for follow-up neurological "sxs" and to discuss MRI.  (ECF Nos. 107-2 at 14; 136 at 18; 164-2 at 6, 33.) Dr. Barnett documented plaintiff's reported symptoms as "seizures that occurred up to 8

times each day in which he has 'tunnel vision' and odd feeling," and "headaches being worse and continuous for the past 30 days," and pain level 7 out of 10. (ECF Nos. 107-2 at 4; 136 at 18.) Following his exam, Dr. Barnett assessed plaintiff as having ocular migraine, ordered medications to treat the symptoms of headache and visual disturbances reported by plaintiff, and made arrangements for plaintiff to be seen by Dr. Rudas within 3 days to ensure plaintiff's visual and headache symptoms were reassessed, and work with chief and CME to contact neurosurgery/neurology. (ECF No. 107-2 at 4-5; 164-1 at 97; 164-2 at 9-12, 13.)[20]

107. It is undisputed that Dr. Barnett did not cancel plaintiff's MRI.

108. It is undisputed that on June 10, 2011, Dr. Barnett wrote an order for plaintiff to see Dr. Rudas the following Monday. (ECF Nos. 107-2 at 15; 130-1 at 38.) The medications ordered by Dr. Barnett on June 10, 2011, prednisone and verapamil, were both marked "stat" and marked to be faxed to pharmacy. (ECF No. 107-2 at 16; 164-1 at 101.) Such order confirms Dr. Barnett did not discontinue any of plaintiff's seizure medications; the undersigned finds it undisputed that Dr. Barnett did not discontinue plaintiff's seizure medications. (ECF No. 130-1 at 43.)

---

[20] Plaintiff declares that when he inquired why his MRI continued to be cancelled, Dr. Barnett told plaintiff that he would not order an MRI with contrast, that he was taking plaintiff off his anti-seizure medications, and was prescribing anti-migraine medications. (ECF No. 132-3 at 14.) Dr. Barnett declares that he did not tell plaintiff he was not having seizures, and did not cancel plaintiff's MRI or discontinue any medications previously prescribed. (ECF Nos. 107-2 at 4; 164-2 at 16-17.) Although it is undisputed that Dr. Barnett did not inquire as to why plaintiff did not yet have his MRI with contrast, the evidence reflects it was rescheduled to June 17, 2011, before Dr. Barnett first met with plaintiff. (ECF No. 136 at 11.) Thus, the record demonstrates that Dr. Barnett did not cancel plaintiff's MRI, and such fact is undisputed.

Plaintiff further declares that Dr. Barnett's treatment and diagnosis were inappropriate given plaintiff's report of having 8 seizures a day, and his history of visual symptoms associated with a brain tumor and his seizure on October 12, 2010. (ECF No. 130-1 at 47.)

109. It is undisputed that Dr. Barnett ordered additional medications to treat plaintiff's complaints of headaches and visual disturbances. (ECF No. 130-1 at 42, 43.)

110. It is undisputed that after consulting with outside specialists, Dr. Barnett recommended to Dr. Rudas that plaintiff undergo additional diagnostic tests in addition to those already scheduled. (ECF No. 130-1 at 38, 42.) Specifically, on June 12, 2011, Dr. Barnett emailed Dr. Rudas and Dr. Tseng, copying Dr. Heatley and Dr. Smith. (ECF No. 107-2 at 24.) Dr. Barnett explained that he contacted Larry Kneisley, a friend and professional colleague in neurology at UCLA, to seek advice on a patient suffering seizures after removal of his meningioma, and relayed the further workup suggested by Kneisley.[21] Dr. Barnett asked Dr. Rudas and Dr. Tseng to let Dr. Barnett know what was found on plaintiff's exam Monday morning. (Id.) It is undisputed that Dr. Barnett suggested hospitalizing plaintiff if his symptoms had not abated following the additional medications Dr. Barnett prescribed for plaintiff. (ECF No. 130-1 at 38.)

111. On June 13, 2011, Dr. Heatley emailed Dr. Rudas regarding plaintiff's seizure follow-up, asking Dr. Rudas to call Dr. Heatley after Dr. Rudas saw Kneisley. (ECF No. 107-2 at 23.)

112. It is undisputed that there is no evidence in plaintiff's medical record that anything Dr. Barnett did caused plaintiff any harm. (ECF No. 130-1 at 43.)

---

[21] In the email, Dr. Barnett relayed that Kneisley said that temporal lobe seizures can also cause these symptoms following tumor resection, and suggested the following: (a) more complete history as to the exact location of tumor removal; (b) full neurological exam, including testing for Babinski response, especially in light of hyperreflexia; (c) EEG as soon as practical; (d) MRI with gadolinium of the saggital spine because a second meningioma could be in the spine explaining the extremely hyperactive lower extremity DTR with Clonus; and (e) consider hospital admission to get diagnostic work-up done with some expediency and to control symptoms if plaintiff is still having so many episodes despite being on prednisone and verapamil. (ECF No. 107-2 at 24.)

113. It is undisputed that Dr. Rudas expedited further care for plaintiff and followed Dr. Barnett's recommendations for further tests and a neurology consultation. (ECF No. 130-1 at 43.) It is also undisputed that Dr. Rudas also assured Dr. Barnett that the MRI with contrast would be done soon. (ECF No. 130-1 at 43.)

114. On June 13, 2011, plaintiff was treated by nonparty Dr. Rudas. (ECF Nos. 107-2 at 17-18; 136 at 20-22.) Plaintiff reported having "a constant mild pressure-like headache and daily episodes of a 'pressure like aura' [with] a sense of confusion and tunnel vision. [Plaintiff] claims he has ~ 11 such episodes per day." (Id.)

115. On June 13, 2011, Dr. Rudas emailed Dr. Barnett and described the examination of plaintiff, and wrote that plaintiff's symptoms "suggest partial complex/temporal lobe seizure activity," and noted that plaintiff was already scheduled for a brain MRI with gadolinium on June 17, 2011. (ECF Nos. 107-2 at 23; 164-1 at 99; 164-2 at 34.) In addition, Dr. Rudas wrote urgent referrals for an EEG and a telemed neurology consult, and follow-up in TTA on June 22, 2011. (Id.) Dr. Rudas advised that they would hold off on further studies pending the neurology consult, and that Dr. Rudas would "follow-up with plaintiff weekly in TTA until we get a handle on his case." (Id.)

116. On June 17, 2011, the brain and C-spine MRI were done; the T-spine and L-spine had to be rescheduled. (ECF No. 136 at 11.)

117. On June 18, 2011, the results of plaintiff's brain MRI, with and without contrast, and Cervical spine MRI with contrast, were reported: Brain MRI impression: "Findings are compatible with residua versus recurrent tumor involving right parietal dura with possible involvement of the overlying calvarium. . . .Consultation with surgery service is recommended." (ECF No. 136 at 24.) The C-spine MRI revealed no hemangioma or tumor, but some disc bulges and herniations. (Id.)

118. On June 23, 2011, plaintiff received an EEG at Doctors Hospital of Manteca. (ECF No. 136 at 27.) The reporting doctor interpreted the EEG results as "abnormal, demonstrating a focus of slow wave activities over the right hemisphere with the background activities being less well-developed over the posterior right hemisphere. These findings are consistent with a focal process underlying the right hemisphere. No definite epileptiform discharges were identified." (ECF No. 136 at 27; 164-1 at 103.)

119. On June 27, 2011, Dr. Asela P. Jumao provided a telemedicine neurologic consultation, and the impression was "question of simple partial seizures; i.e., auras. The report of body shaking that occurred in 2010, while retaining consciousness, is atypical for a seizure; question of an anxiety disorder." (ECF No. 107-2 at 20.) Dr. Jumao's recommendations were: (a) EEG (awaiting results); (b) formal visual field testing; (c) for now, discontinue the prednisone and discontinue the verapamil, both given for possible migraines, because Dr. Jumao was "not certain that this is exactly what is going on with [plaintiff]. The possibility of occipital lobe seizures is part of the consideration;" and (d) plaintiff should be rechecked in one month. (ECF No. 107-2 at 20.)

120. On July 26, 2011, by telemed, plaintiff saw neurologist Dr. Pineda, who noted plaintiff's carbamazepine and Dilantin were discontinued because the EEG did not show epileptogenic events; plaintiff complained of blurred vision on the left side and has a visual field defect. (ECF No. 136 at 33.) Dr. Pineda's impression was "persisting visual phenomena rule out partial complex seizure without generalization." (ECF No. 136 at 34.) Because plaintiff's "spells were happening quite more frequently," Dr. Pineda recommended a 24-hour EEG telemetry to see if this is epileptogenic. (Id.)

121. Plaintiff declares that from July 26, 2011, to August 8, 2011, he continued to have the same seizure and vision episodes. (ECF No. 132-3 at 16.)

38

122. On August 8, 2011, while on the yard, plaintiff suffered a severe episode that included involuntary muscle movements. (ECF Nos. 132-3 at 16; 136 at 36.) First responders noted plaintiff "was lucid and answered all questions. However, [plaintiff] wanted to spin around in a left direction," and sent plaintiff to the TTA. (ECF No. 136 at 37.) Plaintiff declares he was hallucinating, saw spinning fans, had odd feelings, and his head was pulling off to the left. (ECF No. 132-3 at 16.) The RN in the TTA told plaintiff he could see Dr. Rudas the next day. (Id.)

123. On August 9, 2011, plaintiff was seen by Dr. Rudas, who had the nurse who observed plaintiff's episode the prior day describe plaintiff's actions. (ECF No. 132-3 at 16.) Plaintiff declares that Dr. Rudas said he was having trouble getting approval for the 24 hour EEG. (Id.) (no medical record)

124. On August 23, 2011, plaintiff had follow-up telemed neuro. (ECF No. 136 at 39.) Plaintiff's subjective complaints were recorded as: "Overall feeling the same. Vision still has in/out episodes all day -- darkness comes in and creates tunnel vision, associated with a spinning light lasting 2-3 minutes. Symptoms of obscured/hazy vision sometimes persists longer. Feels funny all the time, like head pressure with generalized haziness. Has a persistent headache, as well as a blind spot left visual field, and a fluttering movement sensation in the left lower quadrant. Uses Tylenol and naproxen for when headache becomes severe. But for his chronic lower grade headache, it doesn't really help." (ECF No. 136 at 39.) Assessment: "Persistent visual and vague symptoms s/p craniotomy for large meningioma in 12/10. Possible partial complex seizures. Neurosurgeon has recommended no further invasive surgery at this point in time." (Id.) Plan: await 24 hr EEG, long term surveillance of residual tumor. (Id.)

125. On September 12, 2011, UCD performed a video EEG which diagnosed plaintiff as having simple partial seizures of right occipital onset. (ECF No. 136 at 42; 164-1 at 75.) Dr. Masud Seyal prescribed plaintiff levetiracetam (Keppra) 500 mg prior to plaintiff's discharge. (Id.; 132-3 at 16; 136 at 44.)

126. Plaintiff's September 14, 2011 discharge report noted that after plaintiff was started on Keppra, plaintiff "felt his vision became less blurry," but that "the baseline 'fluttering' that [plaintiff] continuously experiences in his left lower visual field persisted." (ECF No. 136 at 45.) The Keppra could be "increased in 250 mg increments, max 1500 mg BID, to further treat the fluttering and any other visual or break-through seizures." (Id.) The outpatient follow-up plan also included: (a) neurologist within 7 days after hospital discharge; (b) primary care physician within 7 days of hospital discharge; (c) neurosurgeon for meningioma; and (d) interval MRI of brain without and with contrast 6 months to 1 year after resection. (ECF No. 136 at 48.)

127. On September 26, 2011, Dr. Rudas provided plaintiff with a chrono for new medical classification "Seizure Disorder," and Medical risk at "High Risk." (ECF No. 132-3 at 16.)

128. From September 27 to October 26, 2011, plaintiff declares he experienced similar symptoms, odd feeling, tunnel vision and darkness, a buzz or dizziness as if he'd been drugged, and seizures. (ECF No. 132-3 at 16.)

129. On November 10, 2011, plaintiff saw Dr. Tseng, who noted plaintiff was still having fluttering left visual field and strange auras several times a day, but recorded plaintiff said "symptoms are much improved compared to when he was not taking Keppra." (ECF No. 136 at 50.) Plaintiff had not yet seen neurology in telemed for follow-up since his video EEG. (Id.) Dr. Tseng increased plaintiff's Keppra to 750 mg BID, and emailed telemed

RN to ensure follow-up neurology scheduled. (Id.) Dr. Tseng also noted that there is some residual tumor seen on MRI 6/11; neurosurgeon has indicated that no further surgery needed at this time; plan repeat MRI yearly to monitor progress. (Id.) Follow-up visit 45 days. (Id.)

130. On November 16, 2011, via telemed, plaintiff saw neurologist Dr. Pineda, whose impressions were "occipital seizures secondary to meningioma. There may be a residual one CM tumor without clinical fracture except for the seizures." (ECF No. 137 at 3.) Dr. Pineda recommended a repeat MRI scan in one year, and to increase Keppra to 1000 mg BID and if seizures continue in 2 weeks, increase to 1250 BID, and return in 6 weeks. (Id.)

131. It is undisputed that defendant Dr. C. Smith is a medical doctor and practiced medicine for over 55 years. (ECF No. 130-1 at 48.)

132. On November 17, 2011, Dr. Smith approved Dr. Pineda's orders to increase plaintiff's Keppra to 1000 mg BID, and in two weeks to increase to 1250 mg BID if first increase not effective. (ECF No. 137 at 4.)

133. It is undisputed that Dr. Smith approved the medical requests entirely on the recommendations received from plaintiff's doctors, not through examining plaintiff or making any of his own determinations as to what treatments plaintiff may need. (ECF No. 130-1 at 49.)

134. From November 16, 2011, to December 5, 2011, plaintiff's symptoms continued with odd feelings, tunnel vision and darkness, a buzz or dizziness as if he'd been drugged and seizures. (ECF. No. 132-3 at 17.)

135. On December 5, 2011, plaintiff saw defendant Todd as a follow-up to telemed. Plaintiff reported he "continues to have 5 or 6 seizures per day and has noticed an increased

dizziness with the increased [Keppra]. The darkness has resolved from his vision, now just a little 'fuzzy' around the edges of his blind spot and fluttering in the left field. There were no reports filed in the UHR for his visit with telemed." Defendant Todd's plan was for plaintiff to continue with same medical regime and keep "[Chronic Care Program] ("CCP") of 12-22-11."[22] (ECF No. 137 at 6.)

136. Pharmacy records confirm plaintiff's Keppra prescription 500 mg BID was renewed by defendant Todd on December 8, 2011. (ECF No. 117-3 at 15.) Plaintiff was to take two tablets twice a day, or 1000 mg total. (Id.) Defendant Todd explains that this was a simple medication renewal based on prior doctor's orders, and did not require any assessment or recommendations from Todd. (ECF No. 117-3 at 5.)

137. Defendant Akintola is a licensed Physician's Assistant who routinely examined, diagnosed, and treated patients. (ECF No. 130-1 at 70.) It is undisputed that PA Akintola had the authority to write prescriptions, order diagnostic tests and implement treatment plans. (ECF No. 130-1 at 70.) It is undisputed that defendant Akintola was not a neurologist, neurosurgeon, oncologist or other type of specialist. (Id.)

138. On December 23, 2011, defendant Akintola saw plaintiff, who reported continued fluttering around visual field with strange aura several times a day. (ECF No. 137 at 8.) Akintola increased plaintiff's Keppra to 1200 mg. (Id.)

////

////

---

[22] Plaintiff declares Todd told plaintiff that she could not increase plaintiff's Keppra, but would schedule plaintiff to see the doctor. (ECF No. 132-3 at 17; see also 117-3 at 13-14.) Defendant Todd declares that plaintiff had an appointment with his neurologist that day (ECF No. 117-3 at 4), but no medical record from such visit was provided. Defendant Todd also declares that because plaintiff was under the care of a specialist, she recommended he stay on the same treatment program until his neurologist saw him. (ECF No. 117-3 at 4.)

**2012**

139. On January 24, 2012, via telemed, plaintiff was seen by Dr. Pineda.  (ECF No. 137 at 10.)  Dr. Pineda noted "the recent MRI scan shows multiple small nodules the largest of which is a 1 cm."  (Id.)  Dr. Pineda's assessment was "345.41 Localization-Related (Focal)(Partial) Epilepsy and Epileptic Stable Syndrome with Complex Partial Seizures with Intractable Epilepsy."  (Id.)  The plan was to increase Keppra to 1500 mg BID, follow-up in 3 months, and consider radiation treatment for the residual meningioma.

140. On January 31, 2012, defendant Dr. Smith signed off on Dr. Pineda's orders to increase plaintiff's Keppra to 1500 mg BID; PCP to consider radiation treatment for the residual meningioma; and telemedicine follow-up in 3 months (April 24, 2012).  (ECF No. 137 at 11.)

141. On February 7, 2012, plaintiff was seen by defendant Akintola, who noted plaintiff's Keppra was just increased one week prior, and plaintiff continued to have 4 to 5 seizures per day.  (ECF No. 137 at 13.)  Dr. Pineda considering radiation treatment.  Akintola's assessment/plan was seizure disorder; continue neuro consult.  Next visit 3 months.  (Id.)

142. On February 29, 2012, Dr. Rudas recommended plaintiff receive an urgent neurosurgery consult to determine optimal treatment options.  (ECF No. 137 at 23.)

143. On February 29, 2012, the request was approved, but urgent is crossed out, and marked routine, adding "within 30 days."[23]  (ECF No. 137 at 23.)  Handwritten notes on bottom of referral form state "meningioma stable on MRI.  Will repeat brain MRI in 6 months.  Follow-up appointment with Dr. Shahlaie in 6 months after MRI.  Bring MRI on CD to

---

[23]  Dr. Smith's name is stamped under the February 29, 2012 approval.  But in the middle of the form, the words UC DAVIS and Dr. Gregorious are crossed out, and "UCD - . . . Dr. Smith/Dr. Heatley" are handwritten.  (ECF No. 137 at 23.)

appointment with Dr. Shahlaie. Plaintiff sees Dr. Masud Seyal in UCD Department of Neurology for follow-up on seizure management. (ECF No. 137 at 23.)

144. On March 1, 2012, plaintiff was seen in the TTA by Dr. Rudas, who noted plaintiff "continues to complain of frequent intermittent episodes of feeling 'pressure in his head' followed by left visual field disturbance wherein [plaintiff] sees 'spinning colored wheels.' [Plaintiff] continues with these symptoms in spite of Keppra therapy." (ECF No. 137 at 16.) Dr. Rudas assessed breakthrough left visual field partial complex seizures, noted Dr. Pineda's radiation therapy recommendation, continued Keppra 1500 mg BID "for now," and referred plaintiff for "second opinion from UC Davis Neurosurgery to determine [plaintiff's] optimal treatment options." (ECF No. 137 at 16.)

145. On March 14, 2012, plaintiff was seen by Dr. K. Shahlaie and NP Jorgensen at UCD Neurosurgery Clinic. (ECF No. 137 at 18-21.) At the time of this consult, plaintiff was taking 500 mg Keppra one tablet two times daily. (Id.) Since the mass was resected, and MRI's reveal several nodules in the surgical bed, plaintiff's subsequent surveillance MRIs have not identified any interval changes between scans. (Id.) Plaintiff continues to have partial seizures 4-5 per day, and a constant headache on the right side of his head. (Id.) UCD recommended repeat brain MRI with and without contrast in 6 months; refer to UCD Department of Neurology for follow-up on his ongoing seizures; and schedule follow-up visit in 6 months with the neurosurgery clinic. (ECF No. 137 at 21.)

146. NP Jorgensen typewritten progress note was addressed to Dr. Rudas and Dr. Smith. (ECF No. 137 at 19.)

147. In the handwritten consultation form, NP Jorgensen wrote "F/U appt w/Dr. Shahlaie in 6 mos after MRI." (ECF No. 137 at 23.) Next to "recommendations," NP Jorgensen wrote:

"Pt. sees Dr. Masud Seyal in UCD Dept. of Neurology for F/U on seizure management."
(Id.)

148. On March 28, 2012, plaintiff was seen by Dr. Tseng, who recorded plaintiff was still having fluttering left visual field and strange auras several times a day. Dr. Tseng recounted plaintiff's treatments, and set forth his assessment/plan: "Simple partial seizures during video EEG 9/14/11 at UCD. [Plaintiff] currently on Keppra 1500 mg BID. [Plaintiff's] confusion and lethargy may be side effects of AEDs (anti-epileptic drugs). Radiation therapy has been ruled out as an option after neurosurgical consult. Basically radiation only affects fast growing tumors, and minimal effect on slow growing/stagnant tumors like the residual he has left. No further UCD follow-up is needed at this time. [Plaintiff] can continue to work with telemed neurology to maximize medical management . . . to control the seizures and prevent AED side effects. [Plaintiff] has telemed neuro follow up scheduled 4/24. Will plan to follow up with [plaintiff] after this (regular CCP scheduled 5/4)." (ECF No. 137 at 25.) In addition, repeat MRI yearly to monitor progress. (Id.)

149. Plaintiff continued to suffer seizures from February 7, 2012, to April 24, 2012. (ECF No. 132-3 at 18.)

150. On April 24, 2012, via telemed, plaintiff was seen by Dr. Pineda, who noted plaintiff's "persisting seizures probably secondary to an occipital meningioma postop incomplete removal." (ECF No. 137 at 27.) Plaintiff on Keppra 1500 mg BID and continues to have seizures; surgery and radiotherapy not indicated at this time per neurosurgeon. (Id.) Plaintiff had been on Dilantin, Lamictal and Depakote, the latter two for psychiatric

purposes.  (Id.)  Dr. Pineda's plan was to add a second drug, Topamax, gradually increasing dose to 400 mg a day, and recheck plaintiff in six weeks.[24]  (Id.)

151. On June 5, 2012, Dr. Pineda recorded plaintiff had "a significant reduction in seizure frequency" with the Topamax 50 mg BID.  (ECF No. 137 at 31.)  Plaintiff reported seizures occur anywhere from one a day to 4 a day.  (Id.)  Dr. Pineda recommended increasing Topamax to 50 mg TID for 4 weeks, and then 100 mg BID, and return in 3 months.  (ECF No. 137 at 31-32.)  Plaintiff told Dr. Pineda that plaintiff's balance was good and he could play sports.  (ECF No. 132-3 at 19.)

152.  On September 13, 2012, plaintiff submitted a CDC 7362:  "I'm taking medication for seizures.  I think I am having side effects to the medication like:  blurred vision, confusion, vertigo, and difficulty with speech."  (ECF No. 137 at 35.)

153. On September 17, 2012, Dr. Tseng saw plaintiff, who reported over the last few months having difficulties with dizziness, confusion, loss of words, and fatigue; has been having excessive somnolence and some tingling in his fingers; also continued having 3-4 seizures per day.  Seizure symptoms were noted as loss of vision left side, and visual/colored disturbance, some mild, some more intense.  (ECF No. 137 at 37.)  Dr. Tseng's assessment was "need to defer to neurology expertise in this regard regarding medication management.  Next appointment with neurology scheduled telemed in approx. 1 week."  (Id.)  Dr. Tseng ordered follow-up labs, referral for MRI brain, and follow-up CCP for seizures in 80-90 days.  (ECF No. 137 at 38.)

---

[24]  Topamax is the brand name for topiramate.  Plaintiff declares that Dr. Pineda told plaintiff that he needed either radiation or surgery, and that if the Topamax could not control the seizures, perhaps plaintiff's PCP would reconsider other treatment, such as radiation.  (ECF No. 132-3 at 19.)  Plaintiff also declares that Dr. Pineda again recommended radiation on June 5, 2012.  (Id.)  However, plaintiff provided no declaration from Dr. Pineda confirming such statements, and the June 5, 2012 report does not recommend radiation.  (ECF No. 137 at 31-32.)

154. On September 25, 2012, plaintiff was seen by a new neurologist, Dr. Chander Malhotra, who noted plaintiff's symptoms as "4-5 spells a day," each lasting 15-20 minutes (ECF No. 137 at 41.) Dr. Chander Malhotra recommended keeping plaintiff on same Keppra dose, increased Topamax to 125 mg BID for two weeks, then increase to 150 mg BID, neurosurgery evaluation after next brain MRI, and follow-up with telemed neuro in 2-3 months. (ECF No. 137 at 42.)

155. On October 1, 2012, Dr. Malhotra's telemed orders were typed, with handwritten change that primary care physician should consider neurosurgery evaluation after next brain MRI, and telemed appointment typed in 12/19/12; Dr. Smith signed off on the telemed orders on October 2, 2012. (ECF No. 137 at 39.)

156. On October 9, 2012, plaintiff was seen by defendant Akintola for neurology appointment follow-up; Akintola noted plaintiff states his seizures continue as before, with loss of vision on the left side, and visual color disturbance, some lasting 2-3 minutes, some as long as 15-20 minutes. (ECF No. 137 at 45.) Akintola noted plaintiff's Keppra dose remained the same, and Topamax to be titrated up to 150 mg BID, and keep 12/6/2012 CCP appointment. (Id.)

157. On November 16, 2012, plaintiff had a brain MRI with and without contrast. (ECF No. 137 at 48.) The impressions were: (a) postoperative changes of right parietal occipital craniotomy; (b) minimal postoperative encephalomalacia, right occipital lobe; and (c) dural enhancement posteriorly on the right which could be postoperative. (Id.)

158. On November 20, 2012, Dr. Tseng noted receipt of the MRI report. (Id.)

159. On November 21, 2012, Dr. Tseng saw plaintiff who complained that side effects from meds caused insomnia, making it difficult to wake up in time for the AM med line, causing plaintiff to miss Topamax on occasion. (ECF No. 137 at 50.) Dr. Tseng noted

that plaintiff reported still having several seizures per day, but if he misses AED doses, they become much more frequent.  (Id.)  Dr. Tseng changed plaintiff's Topamax to "Keep on Person" ("KOP") to improve meds compliance.  (Id.)

160. On November 26, 2012, Dr. Tseng referred plaintiff to be seen at San Juan General Hospital by F. Karl Gregorious, M.D., for plaintiff's yearly follow-up to his meningioma resection.  (ECF No. 138 at 2.)

161. On December 18, 2012, plaintiff was seen by Dr. Gregorious, who states the November 16, 2012 MRI brain scan was an extremely poor study, and could not tell but believes plaintiff may have a small recurrence in the dura, and it would be worthwhile to perform another scan with and without gadolinium.[25]  (ECF No. 137 at 51.)

**2013**

162. On January 11, 2013, plaintiff had a MRI brain scan with and without contrast, and the radiologist's impression was that no recurrent or new mass was identified.  (ECF No. 138 at 9.)  Dr. Galloway received the MRI report on January 17, 2013.  (Id.)

163. On February 5, 2013, plaintiff was again seen by Dr. Gregorious, who noted plaintiff has had persistent seizures following his resection, and the repeat MRI was necessary to rule out a recurrence.  (ECF No. 138 at 8.)  Dr. Gregorious reviewed the repeat MRI scan and noted "some mild dural enhancement at the site of the surgery, some encephalomalacia changes in the brain adjacent to the surgery," but "no sign of recurrent meningioma on this good technical study."  (ECF No. 138 at 8.)  Dr. Gregorious opined that plaintiff is not

---

[25]  On December 31, 2012, as follow-up, plaintiff was seen by Dr. Galloway, who notes the MRI was suboptimal and orders repeat MRI with and without contrast, and follow up with Dr. Gregorious after MRI results available.  (ECF No. 138 at 4-6.)  This treatment by Dr. Galloway is not at issue.

a candidate for any further surgery because he has no sign of any recurrent meningioma. (Id.) Plaintiff will need another follow-up scan in approximately one year, and if there is no sign of recurrence, then he could wait another two years to get an additional scan. But plaintiff should have intermittent scans at least for the next 10 years because meningiomas are known to recur. (Id.)

164. On February 21, 2013, plaintiff sent a CDC 7362 to Dr. Heatley stating plaintiff requested an interview on 2/13/13 regarding plaintiff's medical risk status, but it was returned with no response. (ECF No. 138 at 12.)

165. On February 22, 2013, Dr. Tseng responded, stating he "spoke with Dr. Heatley about plaintiff's case, and discussed plaintiff's high risk status and if there was any possibility of changing it. The answer is unfortunately no, and the computer classification cannot be altered in your case." (ECF No. 138 at 12.)

166. Dr. Tseng left MCSP employment in early 2013. (Dr. Tseng Dep. at 111.)

167. On March 12, 2013, via telemed, plaintiff was seen by neurologist Dr. Malhotra. (ECF No. 138 at 14.) Plaintiff reported he still has visual symptoms daily, each lasting 30-45 minutes, 3-5 per day, more when active; colored spinning ball in left field, and wavy object in left field; impaired visual field in left; may hallucinate about people on left side. (Id.) Dr. Malhotra's impression was "simple focal seizures+? Partial complex seizures." (Id.)

168. Keppra dose remained the same; Topamax increased to 175 mg BID, then increase to 200 mg BID after 2 weeks, and follow-up in two months. (Id.)

169. Plaintiff started taking 200 mg twice daily of Topamax on March 29, 2013. (ECF No. 132-3 at 20.)

170. On May 16, 2013, by telemed, plaintiff was seen by Dr. Malhotra, who noted reduction in frequency of seizures: 2-3 per day as compared to 3-5 per day. (ECF No. 138 at 16.) Plaintiff still has occasional confusional state. Poor attention span for math or conversation. (Id.) Impression unchanged; spells less frequent; confusion spells could be partial complex seizure. Dr. Malhotra increased Topamax to 225 mg BID; PCP 3/26/13; Keppra dose the same; follow-up in one month for close monitoring.

171. Plaintiff declares that Dr. Malhotra told plaintiff that 225 mg Topamax twice a day is a higher dose than recommended but plaintiff's "PCP will watch and determine if appropriate." (ECF No. 132-3 at 21.)

172. On May 20, 2013, Dr. Malhotra's typewritten orders increased plaintiff's Topamax to 225 mg po BID x 1 year; Keppra dose the same; and follow-up June 21, 2013. "(Close monitoring)." (ECF No. 138 at 18.) Dr. Smith signed off on the orders on May 20, 2013. (Id.)

173. Defendant PA Akintola declares that he did not have the education, training or experience to independently treat plaintiff's condition. (ECF Nos. 117-4 at 2; 130-1 at 71.)

174. On May 23, 2013, plaintiff was prescribed 225 mg Topamax KOP. (ECF No. 138 at 19.)

175. On May 30, 2013, plaintiff woke up and could not walk. (ECF No. 132-3 at 21.) The room was spinning, he felt sick, and could not walk to breakfast. (Id.) By 11:45 a.m., plaintiff was able to walk to clinic. (Id.)

176. On May 30, 2013, plaintiff was seen by defendant PA Akintola, who recorded plaintiff's partial seizures were about 1 to 2 times a day, down from 3-4 times a day prior to Topamax increase in March of 2013. Three days after the most recent increase to 225 mg BID, plaintiff started experiencing slight dizziness daily, and this morning had severe

vertigo.  Plaintiff did not take his morning dose because he did not think he could tolerate it.  Akintola explained that because plaintiff's condition was unique, the Topamax was increased above the recommended dose, but there are no well-established maximum doses for Topamax.  In light of plaintiff's symptoms, Akintola recommended that plaintiff take his afternoon dose at bedtime if his symptoms had resolved; if the symptoms had not resolved, advised plaintiff to wait until the day the symptoms are resolved and then resume taking the medication at 200 mg in the morning and 225 mg at night.  If the symptoms recur, plaintiff was to reduce his dose to 200 mg BID.  Akintola wrote that plaintiff was to be seen back in 7 to 10 days.  (ECF No. 138 at 22-23.)

177.  On May 31, 2013, plaintiff had a seizure, was dizzy, could not walk, and was wheelchaired to the clinic.  (ECF No. 132-3 at 21.)  Plaintiff was seen by defendant LVN Villanueva, who noted plaintiff complained of dizziness, slight headache about two days ago, unable to eat or do usual routine.  (ECF No. 138 at 26.)  Villanueva notified the RN in TTA who had talked to plaintiff regarding his complaints and advised him to fill out a CDC 7362.  Villanueva advised plaintiff to rest in his cell for a few days and gave him a lay-in.  (ECF No. 138 at 26.)

178.  On June 1, 2013, plaintiff completed a CDC 7362: "extreme dizziness.  Can't walk to chow. . . .still extremely dizzy. . . .  Please schedule me to see dr."  (ECF No. 138 at 28.)  Plaintiff stayed in bed and took the 200 mg Topamax.  (ECF No. 132-3 at 21.)

179.  On June 3, 2013, plaintiff declares he had multiple seizures and was wheeled to clinic.  (ECF No. 132-3 at 21.)  Plaintiff was seen by a nonparty RN, who noted plaintiff complained of possible side effects to Topamax?  extreme dizziness, inability to walk since May 31, 2013.  (ECF No. 138 at 30.)  The RN recorded that plaintiff's last seizure was May 31, 2013.  (Id.)  RN consulted with Dr. Soltanian, who reduced plaintiff's

Topamax to 200 mg BID.  (ECF No. 138 at 30-31.)  Plaintiff was given a cell feed/lay-in for three days, and RN follow-up on June 6, 2013, advised to return to clinic if symptoms worsen or do not improve.  (ECF No. 138 at 30.)

180. From June 3, 2013, to July 3, 2013, plaintiff declares he experienced extreme dizziness, could not walk and could not comprehend the medications he was to take.  (ECF No. 132-3 at 21-22.)  Plaintiff was having difficulty understanding instructions.  (Id.)

181. On June 6, 2013, plaintiff was wheeled to the clinic and explained he was still very dizzy after reducing the Topamax.  (ECF Nos. 132-3 at 21; 138 at 33.)  Nonparty RN Gentry observed plaintiff's unsteady gait, tremors to right hand, confusion when trying to concentrate after conversing.  (ECF No. 138 at 33.)  Gentry gave plaintiff a cell feed and medical lay-in until seen by neuro, and recommended "MD order to see neuro asap."  (Id.)

182. On June 6, 2013, a request for telemed consult with neurologist Dr. Malhotra was completed.  (ECF No. 138 at 34.)

183. On June 7, 2013, plaintiff was seen by defendant Akintola for follow-up on Topamax from May 31, 2013.  (ECF No. 138 at 36.)  Akintola noted plaintiff was last seen by neurology telemed on May 16, 2013, but consultation notes were not yet available. Plaintiff complained of severe dizziness, with not much improvement or lessening of the partial seizures from when he was taking 200 mg Topamax.  Plaintiff reported he had reduced his dose to 200 mg when the dizziness resolved, but that he started having symptoms again.  Plaintiff was seen on the MD line within a couple of days (notes not yet available), and told to reduce to 200 mg BID, but even now plaintiff continues to have symptoms of dizziness.  Plaintiff was seen yet again by the RN in consult with the clinician, who recommended plaintiff continue Topamax at 200 mg BID and be seen sooner by telemed.  Akintola recorded that plaintiff stated he has an appointment with

52

telemed for about 6/20/2013.  (ECF No. 138 at 36.)  Under assessment, Akintola wrote that plaintiff "is to take only 200 mg of [Topamax] 50 mg a day."  (ECF No. 138 at 36.)  If plaintiff starts having symptoms after his Topamax dose, "he should skip the next dose and result it 24 hours later."  (Id.)  "This would help determine whether the patient's symptoms of dizziness is actually secondary to the increased dosage of the [Topamax], or if this is independent of it.  There is some question as to whether the 225 mg had increased the serum [Topamax] to extent that it has simply not 'come back to the normal in the blood stream' though this is highly doubtful."  (Id.)  Plaintiff was told to return to clinic sooner if he has any problems.  (Id.)

184. On the request for follow-up services and consultant response form, an RN wrote that plaintiff was seen via telemed on June 13, 2013.  (ECF No. 138 at 34.)  Plaintiff confirms he was seen by Dr. Malhotra on June 13, 2013, and declares Dr. Malhotra recommended plaintiff's Topamax remain the same but that plaintiff should be closely monitored by his PCP.  (ECF No. 132-3 at 22.)  Plaintiff did not provide a medical record from this visit.

185. On July 3, 2013, plaintiff was taken by ambulance to San Juan General Hospital code 2 for evaluation and treatment of altered loss of consciousness.  (ECF No. 138 at 39.)

186. Plaintiff was told he overdosed on Topamax.  (ECF No. 132-3 at 22.)

187. It is undisputed that on July 9, 2013, plaintiff saw defendant Dr. Barnett who noted plaintiff complained that Topamax made him dizzy, and he has history of difficulty controlling seizures, simple partial, non-grand mal; left visual field wavy.[26]  (ECF Nos. 138 at 41; 164-2 at 35.)  Dr. Barnett questions seizure disorder, "see neurology note.

---

[26] Treatment by Dr. Barnett on this date is not included in plaintiff's second amended complaint, and therefore was not addressed in the motion or in Dr. Barnett's declaration, but the medical record demonstrates such visit took place.

Suspect somatoform disorder with personality disorder." (ECF No. 138 at 41.) Plaintiff was taking Topamax 100 BID and will taper Topamax to 50 BID, and Keppra stayed the same at 1500 mg. Dr. Barnett assessed plaintiff as having a personality disorder -- obsession/narcissism. "Doubt seizure disorder" and doubt neuro defects -- med related. ? Paranoia" (ECF No. 138 at 41.) Dr. Barnett plans to "minimize meds, and discuss with mental health, medical leadership." (Id.) Dr. Barnett again assesses "ocular migraine?" (ECF No. 138 at 41.) Dr. Barnett did not chart that plaintiff was diagnosed with simple partial seizures by UC Davis following a 24 EEG. Plaintiff declares that Dr. Barnett told plaintiff he was not having seizures, and he was going to get plaintiff off his seizure medications, but that the doctor did not discuss any mental health issues with plaintiff. (ECF No. 132-3 at 23.)

188. On July 9, 2013, Dr. Barnett ordered a 60-70 day MD line for follow-up for seizures, and referred plaintiff to mental health for evaluation of somatoform disorder, depression, and delusion. (ECF No. 138 at 42.)

189. After plaintiff saw Dr. Barnett, plaintiff declares that medical personnel began questioning whether plaintiff had a seizure disorder, and he would have to try to convince medical personnel that he does, despite the 24-hour EEG that confirms his seizures. (ECF No. 132-3 at 23.)

190. On July 12, 2013, plaintiff was seen by Licensed Clinical Social Worker D. Laughlin. Plaintiff reported intermittent depression regarding his health issues including 2-3 seizures per day for the last 3 years. Plaintiff was not taking psych medications. Plaintiff reported dizziness, tiredness, difficulty walking and concentrating due to recent changes in his seizure medication, Topamax. Laughlin observed plaintiff had "anxious mood, congruent affect, articulate, . . . cooperative, no evidence of psychosis, intermittent eye contact,

focused, [thought process] linear and goal-directed." (ECF No. 138 at 44.) Diagnosis was:

> Axis 1:   Mood disorder due to a medical condition; polysubstance dependence
> Axis III: Meningioma, simple/partial seizures, chronic pain
> Axis IV:  Medical problems, incarceration
> Axis V:   GAF: 65[27]

191. On August 13, 2013, via telemed, plaintiff saw neurologist Dr. Malhotra. (ECF No. 138 at 46.) Plaintiff reported he still feels dizzy, cannot run or jump because he gets too dizzy. He was off Topamax for 8 days, but dizziness remains unchanged. Still has 2-3 seizures per day, left visual hallucinations, occasional ringing in left ear. (ECF No. 138 at 46.) Plaintiff also complained of "fluid seeping from back of head," for two to three months daily. (Id.) Dr. Malhotra's impressions were plaintiff's seizures are stable; "dizziness – etiology?" (Id.) Plaintiff was to continue Keppra, and primary care physician is to evaluate fluid seeping from back of head (doubt neurologic/neurosurgical issue), and to evaluate plaintiff for anxiety/depression. Multiple symptoms seem to lack objective basis. Follow-up in two months via telemed. (ECF No. 138 at 46.)

**2014-2016**

192. On February 13, 2014, plaintiff was treated by Dr. Horowitz. (ECF No. 138 at 48.) After recording plaintiff's medical history, Dr. Horowitz notes long talk with plaintiff about dizzy with head movement; previously plaintiff says it was improved with

---

[27] "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR"). A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Id.

meclizine, now says it is not. ENT evaluation was negative. Plaintiff describes variable visual changes, no loss of consciousness, lasting 10-20 minutes while he's awake, 4 times a day, decreased head movement previously 10+ times a day before Keppra, now only 4 times a day. Plaintiff complains he still cannot do sports due to dizziness, and now "afraid the other part of his head needs surgery – a piece there moves, hurts and is clicking." (ECF No. 138 at 48.) Dr. Horowitz's assessment and plan: (a) partial simple seizures ok and functional on Keppra, no need for additional prescription but pending neuro consult, also visual symptoms with ophthalmology consult. Plaintiff has appointment with Dr. Rudas re "inject [plaintiff's] scalp nerve to eliminate the pain" re plaintiff's mobile lump on right which is not tender; (b) dizziness likely anxiety; no change in current prescription, but will get levels; (c) follow-up scheduled for neurology telemed 2/14/14; audiology 2/25/14; ENT 3/5/14. Although there is reasonable control for the partial complex seizures on Keppra and increasing the med may cause more dizziness, if there is a central source it would be better to find the problem. (d) MRI RFS done today as "urgent" follow-up; Dr. Rudas appointment with blocking trigeminal nerve to see if that eliminates any symptoms of pain and/or dizziness. (ECF No. 138 at 48.) After neuro minor surgery, audiology and ENT appointments, schedule follow-up in 4-6 weeks. (Id.)

193. On February 27, 2014, plaintiff is again seen by Dr. Horowitz, who reported that Dr. Rudas prescribed amitriptyline instead of injecting plaintiff's scalp nerve and plaintiff's symptoms are resolving. (ECF No. 138 at 50.) Dr. Horowitz opined that plaintiff's dizziness is likely anxiety; still pending optometry and audiology, follow-up visit 4-6 weeks thereafter. "Lab not doing Keppra levels as 'toxic level not established.'" (ECF No. 138 at 50.)

194. On April 23, 2014, Dr. Rudas approved a prescription for Vimpat for plaintiff's "occipital partial complex seizure disorder," because seizures not controlled with Venpix alone, and Vimpat specifically recommended by UCD epileptologist. (ECF No. 164-1 at 88.)

195. On November 7, 2014, Dr. Rudas ordered urgent neurology follow-up with Dr. Kennedy at UCD neurology. (ECF No. 164-1 at 89.) Plaintiff was scheduled for an appointment on November 10, 2014 ("first available"). (Id.)

196. On December 18, 2014, Dr. Horowitz ordered a follow-up from PET scan with Dr. Kennedy at UCD in 2 months. (ECF No. 164-1 at 90.)

197. On February 13, 2015, Dr. Horowitz signed off on Dr. Malhotra's order that plaintiff continue Vimpat, Keppra and Trileptal at current doses, and follow-up on April 13, 2015. (ECF No. 164-1 at 91.)

198. On March 9, 2015, Dr. Horowitz ordered a referral for plaintiff to be seen by Dr. Kennedy (neurology), epileptology at UCD. (ECF No. 164-1 at 78).

199. On March 11, 2015, Dr. Horowitz requested plaintiff be provided the nonformulary drug Clobazam for persistent seizures. (ECF No. 164-1 at 92.)

200. On March 24, 2015, plaintiff was taking Clobazam, Oxcarbazepine, Vimpat, Keppra (levetiracetam), and omeprazole. (ECF No. 164-1 at 93.)

201. On April 21, 2016, plaintiff was seen in the TTA by Dr. Rudas, who assessed "significant breakthrough visual seizures in spite of neocortical resection treatment and maximal third line anti-seizure medical treatment. (ECF No. 107-2 at 21.) At the time, plaintiff was taking Keppra 1500 mg BID; clobazam (onfi) 20 mg BID; and lacosamide (Vimpat) 200 mg BID. (Id.) Dr. Rudas planned to retain present meds for now, and arrange follow-up appointment with Dr. Kennedy, UCD Epileptologist, "ASAP." (Id.)

202. It is undisputed that tremors can also be caused by anxiety and drug use/abuse or as a result of taking psychiatric and other medications. (ECF No. 130-1 at 89.) It is undisputed that is why it is important to do blood work on a regular basis for plaintiff. (Id.)

203. Plaintiff was on many medications for his mental and physical health issues. (ECF No. 130-1 at 89.)

B. Interference with or Delay of DVI Doctor's Alleged Recommendation for CT

Plaintiff declares that while he was housed at DVI, an unidentified physician recommended plaintiff receive a CT scan. (ECF 132-3 at 2.) Plaintiff further declares that he informed Placer County probation officers in January of 2004 that plaintiff "was suffering from intermittent blindness of [his] peripheral vision and that a CAT scan had been ordered," and that this information was recorded in the officer's January 8, 2004 probation report filed with the Placer County court on January 13, 2004. (ECF No. 132-3 at 2.) However, plaintiff did not provide a medical record confirming this recommendation, or provide a copy of the probation report. On this motion for summary judgment, plaintiff's hearsay statement that a physician at DVI ordered a CT scan cannot be credited without a declaration from the physician or a copy of such order or medical record. Absent evidence that such order was incorporated into plaintiff's medical file, defendants cannot be charged with knowledge of such recommendation, and thus could not have interfered with such recommendation.

C. Failure to Diagnose Brain Tumor

Plaintiff's expert witness, Dr. Slyter, opines that defendants were aware, or should have been aware, that there was an undiagnosed neurological condition characterized by unremitting and stereotyped visual symptoms consistently on the left side, body tremors, headaches, and, at times, confusion, and the standard of care required defendants to refer plaintiff for expert evaluation. (ECF No. 132-1 at 2.)

////

58

Admittedly, the record reflects a long delay before plaintiff's meningioma was diagnosed by MRI.  However, in the Eighth Amendment context, plaintiff must adduce evidence demonstrating that each defendant took actions or failed to act in conscious disregard of an excessive risk to plaintiff's health.  If the person should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.  Farmer, 511 U.S. at 837, quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002).  Based on the undisputed facts, and construed in the light most favorable to plaintiff as the non-moving party, there is no genuine dispute of material fact as to the defendants who treated plaintiff prior to the discovery of his brain tumor.  Plaintiff presented with vague and conflicting symptoms which treating defendants failed to attribute to a brain tumor, a rare medical condition.  Plaintiff has failed to adduce evidence of the subjective awareness of any defendant prior to the brain MRI results.  Thus, plaintiff's situation is unlike that in Ortiz, where medical staff and doctor knew the pretrial detainee had a head injury, yet prescribed contraindicated medications.  Ortiz, 884 F.2d at 1314.  In other words, none of the defendants were aware that plaintiff had a brain meningioma prior to receipt of the results from the brain MRI.  See Silvis v. California Department of Corrections, 2011 WL 703548, at *11 (E.D. Cal. Feb. 18, 2011) ("Even if Defendants knew about Plaintiff's entire medical history on the day he arrived at ASP, Plaintiff has not provided any evidence of Defendants' subjective states of mind in deciding his medical care." ); Gilmore v. Bennett, 2013 WL 1785975 (E.D. Cal. April 25, 2013) (no facts suggesting defendant Bennett was even aware plaintiff had a benign tumor); Bolling v. Curry, 2011 WL 1193006, *3 (N.D. Cal. Mar. 30, 2011) (evidence failed to demonstrate defendant knew plaintiff had had a stroke).  In fact, all of the defendants involved at the time were actually attempting to analyze or treat plaintiff's myriad of symptoms, even if now with the benefit of hindsight they should have had a higher degree of suspicion of a possible brain tumor.  Thus, all of the defendants involved in plaintiff's care prior to December 14, 2010, when Dr. Tseng was informed of the MRI results, are entitled to summary judgment on plaintiff's claim that such defendants failed to diagnose plaintiff's brain tumor.  While a particular medical professional's failure to earlier diagnose the brain tumor may have been at most negligent or medical malpractice, such is

1   insufficient to meet the high standard for deliberate indifference required under the Eighth

2   Amendment.

3           D.  Pre-November 2006 Claims

4           Moreover, plaintiff has not shown that defendants Moreno, Galloway or Todd consciously

5   disregarded his need for treatment prior to November of 2006.  Defendants Moreno, Dr.

6   Galloway, and PA Todd each treated plaintiff for discrete periods of time, during efforts in 2006

7   to determine the etiology of plaintiff's vague symptoms.  Crediting plaintiff's statements to these

8   medical professionals, plaintiff admitted to suffering headaches for years, reported no loss of

9   consciousness, and medical records demonstrate that plaintiff also admitted to feeling better after

10  eating.  Thus, it was not deliberate indifference for medical professionals to order an eye exam, or

11  lab and blood sugar tests in an effort to obtain a diagnosis.  In addition, Dr. Ko opines that

12  "neuroimaging is not usually warranted for patients with migraine and a normal neurological

13  examination."  (ECF No. 164-1 at 5.)  On June 5, 2006, Dr. Galloway noted plaintiff's "CN II-XII

14  grossly intact."  (ECF No. 134 at 17; 164-1 at 59.)  Although Dr. Slyter opines that no adequate

15  and thorough neurological exam was conducted, such an assertion is a difference of opinion in the

16  face of Dr. Galloway's medical finding upon examination.  Moreover, as both Dr. Galloway and

17  Dr. Ko declare, seizures and body tremors are not the same.  (ECF Nos. 104-1 at 3; 104-2 at 3.)

18  In addition, when defendant Moreno saw plaintiff on July 19, 2006, plaintiff reported he was

19  taking Depakote and Moreno charted that she observed "tremors" of plaintiff's hands.  (ECF No.

20  134 at 20.)  Plaintiff states that during PA Todd's deposition, Todd testified that a nurse cannot

21  treat body tremors.  (ECF No. 130-1 at 79, citing Todd Dep. at 70:7-9.[28])  Although defendant

22  Moreno did not complete the CDC 7362 each visit or refer plaintiff to see a physician that same

23  day, the record reflects that plaintiff saw Dr. Galloway on August 7, 2006, in follow-up to the

24  July 15, 2006 CDC 7362, and on August 28, 2006, in response to the August 14, 2006 CDC

25  7362; and saw defendant Todd on October 4, 2006, in follow-up to the September 14, 2006 CDC

26  7362.

27  _____

28  [28]  It does not appear that plaintiff filed a copy of Todd's deposition transcript.

By the time defendant Todd saw plaintiff on October 4, 2006, PA Todd opined that plaintiff only experienced the tremors or dysphoria when his blood sugar levels dropped during exercise or for other reasons; tremors can also be caused by anxiety and drug use/abuse or as a result of taking psychiatric and other medications.  (ECF No. 117-3 at 3.)  PA Todd assessed plaintiff as having "episodic dysphoria, etiology unknown," and appropriately recommended follow-up with Dr. Nale.  At most, the failure of defendants Galloway, Moreno, and Todd to provide plaintiff the treatment he wanted, to have plaintiff see a doctor the same day, or to refer plaintiff to a neurologist or order an MRI prior to November of 2006, constitutes a difference of opinion, or at most negligence or medical malpractice.  Estelle, 429 U.S. at 107-08.  Indeed, even Dr. Slyter, plaintiff's expert, found that their treatment merely fell below the standard of care.  (ECF No. 132-1 at 2-4.)  Moreover, Dr. Ko disagrees with Dr. Slyter, opining that Dr. Slyter's interpretation of "body tremor" as a seizure is inaccurate and cannot be used as evidence of substandard care.  (ECF No. 164-1 at 4.)  Thus, even medical professionals disagree over the appropriate treatment for plaintiff at that time.

Therefore, any dispute of fact as to what symptoms plaintiff reported are not material on this record.  Plaintiff sets forth no additional facts suggesting that any of these defendants acted with the requisite culpable state of mind to establish the high standard of deliberate indifference.  Accordingly, defendants Galloway, Moreno, and Todd are entitled to summary judgment on plaintiff's claims arising before November of 2006.

E. Dr. Nale

By the time plaintiff was seen by Dr. Nale on November 7, 2006, numerous lab tests had been run, and results were all within normal limits.  Dr. Nale ordered no additional tests for the symptoms at issue here, but rather requested a three month follow-up.  (ECF No. 134 at 47.)  Dr. Nale saw plaintiff again on February 6, 2007, at which time plaintiff was no longer taking Depakote, but was still having body tremors.  Thus, Depakote could no longer be cited as the cause of such tremors.  Dr. Nale again ordered no further testing, but rather provided "reassurance/observation."  (ECF No. 135 at 4.)  On this record, and in the absence of a declaration by Dr. Nale, the undersigned finds Dr. Nale is not entitled to summary judgment.

Plaintiff has adduced evidence that given the normal results of the tests provided to plaintiff by the time he saw Dr. Nale and the fact that plaintiff was no longer taking Depakote, a reasonable jury could find that Dr. Nale's failure to order different or additional tests raises an inference of deliberate indifference.

Dr. Ko opines that the symptoms plaintiff reported to Dr. Nale were reasonably attributed to a number of causes, including the apparent migraine and the side effects of the Depakote, and did not necessarily evidence a neurological condition; argues that none of the documented symptoms would have led to the discovery of the tumor; and opines that Dr. Nale's decision not to refer plaintiff to a specialist or request an MRI was within the standard of care. (ECF No. 164-1 at 9.) But without a declaration from Dr. Nale, the record is silent as to why the doctor ordered no additional tests, or whether Dr. Nale actually considered whether or not to refer plaintiff to a specialist, or whether, as plaintiff declared, Dr. Nale believed that plaintiff's symptoms were all in his head, and intentionally chose to do nothing. The fact that Dr. Nale did nothing differentiates his treatment from the doctors who treated the prisoner in Estelle with bed rest, muscle relaxants and pain relievers. Accordingly, Dr. Nale is not entitled to summary judgment.

F. Dr. Naseer

Defendants move for summary judgment on the grounds that Dr. Naseer used his best professional judgment in examining and treating plaintiff on one occasion, provided reasonable and appropriate care and treatment to plaintiff, and Dr. Naseer was unaware of any known risk of harm or injury to plaintiff. (ECF No. 105.) To the extent plaintiff disagrees with Dr. Naseer's professional assessment and opinion, Dr. Naseer argues that such disagreement fails to rise to the high legal standard of deliberate indifference.

"Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060. "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837).

Dr. Naseer was on duty at the TTA when plaintiff was brought in by first responders on October 12, 2010, the first and only time Dr. Naseer treated plaintiff. Plaintiff contends that Dr.

62

Naseer denied plaintiff medical treatment on October 12, 2010, by failing to provide thorough diagnostic testing following reports that plaintiff was convulsing on the ground and first responders noted plaintiff might have suffered a seizure. (ECF No. 130 at 32.) By Dr. Naseer's own admission, the doctor was subjectively aware of the possibility that plaintiff had suffered a seizure, and the way to determine if plaintiff had a seizure was to perform diagnostic testing. (Id., citing ECF No. 105-2 at 3, 4.) Plaintiff argues that Dr. Naseer failed to perform an adequate and thorough neurological exam, did not seek and obtain the opinion of a specialist in the field of neurology, and did not seek and obtain a brain MRI scan. (ECF No. 130 at 33.)

However, the medical record and Dr. Naseer's declaration demonstrate that following his physical examination of plaintiff, Dr. Naseer did not think plaintiff had suffered a seizure. Although the TTA flow sheet notes plaintiff's chief complaint as "Code I, seizure activity," Dr. Naseer's declaration and progress note state plaintiff was brought to the TTA on a gurney for "near syncope vs. ? seizure." (ECF No. 105-2 at 3, 8.) While Dr. Naseer was subjectively aware that plaintiff may have suffered a seizure, as confirmed by the question mark written in his own hand, Dr. Naseer explained that he did not think plaintiff had suffered a seizure because plaintiff did not lose consciousness, and reported only mild twitching and lightheadedness.[29] (ECF No.

---

[29] In his declaration, plaintiff declares he went to the ground, shaking and convulsing. (ECF No. 132-3 at 8.) But plaintiff does not declare that he told Dr. Naseer that plaintiff was convulsing, and there is no mention of convulsing in the TTA nurse notes or Dr. Naseer's notes. Later, plaintiff declares that his supervisor, M. Higuera wrote in his report that he saw plaintiff convulsing on the ground. (ECF No. 132-3 at 9.) But the record does not reflect that Dr. Naseer saw Higuera's note, or was told that plaintiff was seen convulsing during the seizure. Dr. Tseng testified in his deposition that forms such as Higuera's are not typically filed in prisoner's medical records. (Tseng Dep. at 46.) When shown Higuera's report, Dr. Tseng testified that "with the assumption that the person who wrote [the report] is not a medical person, I don't know what the person means by convulsing, because convulsing can mean different things to different people." (Tseng Dep. at 48.) Plaintiff provided no declarations from eyewitnesses to the seizure.
Interestingly, defense expert Dr. Ko refers to plaintiff's October 12, 2010 seizure as a "significant seizure," but then refers to plaintiff's "potential seizure," initial "grand mal" and "grand mal seizure." (ECF No. 164-1 at 5, 6, 10, 13). Plaintiff's expert Dr. Slyter does not identify plaintiff's seizure as grand mal, but refers to plaintiff's report of convulsing and the first responders identifying "possible seizure." (ECF No. 132-1 at 6.) But again, following Dr. Naseer's exam of plaintiff, on October 14, 2010, Dr. Naseer did not subjectively believe plaintiff had suffered a seizure, thus failing to meet the deliberate indifference prong required under the Eighth Amendment.

63

105-2 at 4.)  Based upon his examination, Dr. Naseer believed that the most likely cause of the incident was syncope (fainting spells), characterized by lightheadedness, feeling dizzy, and seeing stars and lights.  (Id.)  Dr. Naseer considered whether plaintiff possibly could have suffered a seizure, but opined that was highly unlikely and inconsistent with plaintiff's medical history, the reported symptoms, and the doctor's examination of plaintiff.  (Id.)  As medical records confirm, Dr. Naseer examined plaintiff, reviewed his medical records, checked plaintiff's blood pressure and blood sugar and ordered an EKG.  Thus, crediting plaintiff's statements to Dr. Naseer, the record reflects that although Dr. Naseer was aware of the possibility plaintiff may have suffered a seizure, Dr. Naseer did not make the inference that plaintiff had suffered a seizure.  Toguchi, 391 F.3d at 1057.  Moreover, Dr. Naseer suggested that if plaintiff's symptoms returned, he should have a further examination and work-up and possibly a head CT scan, and advised plaintiff to follow-up with his primary care physician in five days.  Dr. Naseer then issued orders for plaintiff to have a follow-up with the yard doctor in five days, noting two test results were within normal limits.

The undersigned finds that Dr. Naseer's failure to diagnose plaintiff as having suffered a seizure, or order additional diagnostic testing or referrals, was, at most, a misdiagnosis, not deliberate indifference.  Dr. Slyter opined that Dr. Naseer did not perform an adequate and thorough neurological exam, and Dr. Naseer's failure to refer plaintiff to a neurologist and/or order a brain MRI fell below the standard of care.  But plaintiff fails to adduce facts demonstrating Dr. Naseer's culpable state of mind whereas Dr. Naseer declares that he did not subjectively believe plaintiff had suffered a seizure, and provided other medical treatment.  Indeed, because Dr. Naseer did not diagnose plaintiff as having a seizure, Dr. Naseer was not required to refer plaintiff to neurology or order a brain MRI.

As noted above, there are disputes of fact as to what plaintiff told Dr. Naseer, but the undersigned finds that such disputes are not material.  First, plaintiff declares he told Dr. Naseer that plaintiff did not recall being brought to the TTA.  However, plaintiff does not declare that he lost consciousness during the seizure.  Rather, plaintiff claims he does not remember being transported from outside the meat plant to the TTA, and counsel argues that this "indicates an

1    altered level of consciousness." (ECF No. 130-1 at 23.)  The responding nurse's notes document

2    a trip of about eight minutes:  8:25-8:33 a.m.  (Tseng Dep., Ex. 3.)  The nonparty nurse charted

3    that plaintiff was nonverbal during the transport, but does not indicate plaintiff was unconscious;

4    rather, his eyes were open and he was staring off to the side.  (Id.)  The nonparty nurse noted that

5    plaintiff "was conversing all the way into the TTA," and "denies [loss of consciousness]."  (Id.)

6    Moreover, plaintiff recalled and explained in detail what happened during the seizure, including

7    visual problems, body tremors going into more severe body shaking, his head involuntarily

8    turning to the left, going to the ground, shaking, as well as other inmates holding plaintiff on the

9    ground.  (ECF No. 132-3 at 8.)  Plaintiff recalls the emergency alarm was set off, and medical

10   staff responding.  (Id.)  In addition, plaintiff began having symptoms around 8:00 a.m., but the

11   TTA nurse charted that at 8:35 a.m., plaintiff's "vision is good."  (ECF No. 135 at 18.)  Finally,

12   Dr. Slyter does not opine that plaintiff was suffering an altered level of consciousness during this

13   transport.

14        In addition, with benefit of hindsight, we now know that plaintiff suffers simple partial

15   seizures.  (ECF No. 136 at 42 (EEG results); 132-1 at 8 (Dr. Slyter confirms).)  It is unclear

16   whether loss of consciousness is a part of such seizures, but Dr. Ko opined that when people have

17   simple partial seizures, they are fully awake, alert and able to interact throughout the seizure --

18   often making it undetectable to others that they are having a seizure.  (ECF No. 164-1 at 5.)

19   Thus, to the extent that Dr. Naseer erroneously relied on reports that plaintiff did not lose

20   consciousness to question whether plaintiff had suffered a seizure, such error would be, at most,

21   negligence or medical malpractice.

22        Second, whether or not plaintiff wanted to return to work is not material to whether Dr.

23   Naseer was subjectively aware that plaintiff had suffered a seizure and required additional

24   diagnostic tests.

25        Finally, plaintiff's expert Dr. Slyter declares only that Dr. Naseer failed to meet the

26   standard of care.  (ECF No. 132-1 at 5.)  On the other hand, Dr. Ko opined that Dr. Naseer's

27   decision not to refer plaintiff to a specialist or to request an MRI was within the standard of care.

28   (ECF No. 164-1 at 9.)  Thus, it appears that plaintiff's disagreement with the treatment by Dr.

Naseer constitutes a difference of medical opinion, not rising to the level of deliberate indifference.

For all of these reasons, Dr. Naseer is entitled to summary judgment on plaintiff's Eighth Amendment claim.

G. Defendant Dr. Tseng

October 14, 2010

In his October 12, 2010 CDC 7362, plaintiff wrote he needed to see a doctor as soon as possible to rule out the possibility of seizures. (ECF No. 135 at 28.) Plaintiff contends that Dr. Tseng was objectively and subjectively aware that plaintiff had a seizure on October 12, 2010, and that plaintiff's symptoms were caused by some neurological defect, and argues that Dr. Tseng denied plaintiff treatment by not scheduling plaintiff an MRI on October 14, 2010. (ECF No. 130 at 35.) Plaintiff argues that defendant Dr. Tseng was aware, or should have been aware, based on what plaintiff told him or because of plaintiff's medical records, reflecting 20/20 vision and normal blood sugar tests ruled out hypoglycemia, that plaintiff was suffering from an undiagnosed neurological condition. (ECF No. 130 at 36.) Plaintiff argues that the standard of care required Dr. Tseng to refer plaintiff for an expert evaluation. Further, Dr. Slyter opines that based on his experience and training, Dr. Tseng was aware, or should have been aware, that there was an undiagnosed neurological condition characterized by unremitting and stereotyped visual symptoms consistently on the left side, body tremors, headaches, and, at times, confusion, requiring Dr. Tseng to refer plaintiff for an expert evaluation, and immediately obtain an MRI scan of plaintiff's brain.

However, as discussed above, in the TTA, Dr. Naseer did not definitively diagnose plaintiff as having suffered a seizure. (ECF No. 105-2 at 4.) As explained in Dr. Tseng's deposition, Dr. Naseer's differential diagnoses appeared to be: (a) transient altered mental state ("AMS"); (b) seizure; (c) anxiety. (Tseng Dep. at 63.) It is unclear whether Dr. Naseer's notes were in plaintiff's medical file at the time Dr. Tseng saw plaintiff on October 14. (Tseng Dep. at 66, 84.) Nevertheless, Dr. Tseng was also uncertain whether plaintiff had a seizure disorder; it was but one possibility Dr. Tseng considered; he also considered syncope and anxiety. (Dr.

Tseng's Dep. at 63.)  When Dr. Tseng saw plaintiff on October 14, 2010, Dr. Tseng ordered additional lab work, including a thyroid panel.  (ECF Nos. 103-3 at 171; 135 at 23.)  Dr. Tseng did acknowledge that plaintiff suffered "some sort of episode," because he signed the chrono stating no work around machinery for four weeks.  (Tseng Dep. at 75-76; ECF Nos. 103-3 at 18; 132-3 at 9; 135 at 29; 164-1 at 95.)

Thus, when Dr. Tseng saw plaintiff on October 14, 2010, he considered the possibility that plaintiff had suffered a seizure, but also considered two other possible diagnoses and ordered lab work, provided plaintiff with a chrono for his safety, and a two-week follow-up.  Thus, Dr. Tseng was not indifferent; rather, Dr. Tseng examined plaintiff and chose more conservative treatment.  The fact that Dr. Tseng failed to provide plaintiff the treatment he wanted constitutes a mere difference of opinion.

This record does not demonstrate deliberate indifference on the part of Dr. Tseng.  Dr. Tseng was working with differential diagnoses that included seizure, and was taking steps to determine the sources of plaintiff's symptoms.  Dr. Slyter opines that Dr. Tseng's failure to immediately refer plaintiff to a specialist or seek an urgent MRI failed to meet the standard of care.  But such failure constitutes a difference of opinion, or at most negligence or medical malpractice.  Indeed, Dr. Ko opines that Dr. Tseng's treatment was within the standard of care, demonstrating that medical professionals viewed plaintiff's symptoms differently, which is insufficient to show deliberate indifference.  Accordingly, Dr. Tseng is entitled to summary judgment for his October 14, 2010 treatment of plaintiff.

November 1, 20100

By November 1, 2010, it appears plaintiff had been seen by mental health professionals, based on changes in his medications.  (ECF No. 103-3 at 17.)  Plaintiff declares he had a vision and head pressure episode on the yard on October 20, 2010, tried to play soccer, but his vision problems required him to stop, and on October 27, 2010, plaintiff needed assistance to go to chow because he could not see people in front or to the left of him.  (ECF No. 132-3 at 9-10.)  Plaintiff saw LVN Villanueva who charted plaintiff's complaints of dizziness, blurred vision and headache.  (ECF No. 135 at 31.)  Indeed, in his medical record Dr. Tseng noted a second episode

occurred one week after the October 12, 2010 episode: "plaintiff was playing soccer, visual disturbance -- loss vision (L) side," and plaintiff stated "visual disturbance lasted 7 hours." (ECF No. 135 at 33.)

Further, in his declaration, plaintiff states he talked with Dr. Tseng about plaintiff's history of episodes since 2004 and that plaintiff has seen multiple doctors at MCSP with no explanation of his symptoms. (ECF No. 132-3 at 10.) Plaintiff expressed his concerns that something should be done rather than just giving him follow up appointments, and that he was having severe headaches. (Id.) When Dr. Tseng told plaintiff that his glucose was a little elevated and plaintiff needed to eat something at the times of the episodes, plaintiff was "furious and yelled that [he] had a seizure and [Dr. Tseng] needed to do something to help me." (Id.) Plaintiff declares that Dr. Tseng said, "To be honest with you, because of the budget, there is nothing we can do for [you] unless you are dying." (Id.) Plaintiff asked how did the doctor know plaintiff did not have a brain tumor or that plaintiff was dying, and asked if an MRI could be done just in case. (Id.) Plaintiff declares Dr. Tseng responded that "it was not necessary and began to write notes." (Id.) Plaintiff got up to leave, and the doctor said, "let's go ahead and do a MRI to rule out a tumor, just to put your mind at ease." (Id.)

In his declaration, Dr. Tseng denies making a statement as to the budget, because "the budget was never a concern in determining what care or treatment a patient should receive." (ECF No. 103-3 at 3.) By the time Dr. Tseng saw plaintiff on November 1, 2010, Dr. Tseng states he was not convinced plaintiff had suffered a seizure because plaintiff had transient exertional symptoms; indeed, Dr. Tseng's differential diagnosis changed to include psychosomatic. (Tseng Dep. at 84.) Dr. Tseng explained that because "seizures were a part of the differential, but not necessarily the working diagnosis at this point," plaintiff did not meet the doctor's criteria for sending plaintiff out to emergency care on November 1, 2010. (Tseng Dep. at 87.) Nevertheless, Dr. Tseng ordered a routine MRI noting the principle diagnosis as "seizure." (ECF No. 135 at 35.) Dr. Tseng explained that he marked the order routine because plaintiff could self-ambulate, communicate with ease, had a long history of symptomology, and did not appear to be in immediate distress. (ECF No. 103-3 at 3.) Because the imaging service

68

came to MCSP once a month, Dr. Tseng knew the MRI would be performed in 30 days or less. (Id.) The MRI was approved on November 2, 2010, and plaintiff received the MRI on December 3, 2010.

Here, whether or not Dr. Tseng made the comment about the budget is not a material dispute of fact because Dr. Tseng ordered the MRI that plaintiff requested. Further, the record reflects that Dr. Tseng opined that seizures were simply a part of his differential diagnosis. Although Dr. Slyter opines that Dr. Tseng "was aware" of the possible seizure based on the first responder's report, he opines that Dr. Tseng failed to meet the standard of care because he failed to refer plaintiff for an expert evaluation. (ECF No. 132-1 at 6.) However, plaintiff fails to demonstrate Dr. Tseng acted with a culpable state of mind. Rather, Dr. Tseng listened to plaintiff's concern and, despite not being convinced that plaintiff was suffering seizures, Dr. Tseng ordered the MRI to put plaintiff's mind at ease. Such treatment cannot be construed as deliberate indifference. Moreover, the fact that Dr. Tseng did not order the MRI to be provided on an urgent basis supports Dr. Tseng's testimony that he was not convinced plaintiff had suffered a seizure. Thus, plaintiff's view that Dr. Tseng should have ordered an urgent MRI constitutes a difference of opinion, not rising to the level of deliberate indifference.

<u>December 14, 2010 – August 23, 2011</u>

In his pleading, plaintiff recounts various dates that Dr. Tseng wrote in plaintiff's medical file or saw plaintiff, but he includes no specific allegations as to how Dr. Tseng was deliberately indifferent to plaintiff's serious medical needs on such dates. (ECF No. 53-1 at ¶¶ 75, 89, 93, 95, 96, 100, 107, 112.) In one paragraph, plaintiff alleges he saw Dr. Tseng for "tissue protruding from [the] incision site," but Dr. Tseng "failed to treat plaintiff" on March 18, 2011. (Id., ¶ 93.) In his opposition, as well as his response to defendants' statement of facts, plaintiff did not address any of these dates of treatment, so there is no citation to a medical record. In his statement of undisputed facts, plaintiff recounts various dates where Dr. Tseng provided medical care, which cannot, without more, demonstrate deliberate indifference. (ECF No. 130-2 at 8, ¶¶ 93, 95.)

////

69

On the other hand, Dr. Tseng declares that during this time frame, plaintiff was under the care of neurologists and a neurosurgeon, and it would not be appropriate for him to address the surgical site unless it was recommended by such specialists.  (ECF No. 103-3 at 4.)  On April 4, 2011, Dr. Tseng referred plaintiff to a neurologist for examination and treatment, and plaintiff saw Dr. Col on August 9, 2011, regarding plaintiff's vision loss.  Dr. Tseng ordered MRIs on February 7, 2011, and May 10, 2011.

Thus, the undersigned finds that plaintiff has failed to rebut Dr. Tseng's evidence that he was not deliberately indifferent to plaintiff's serious medical needs between December 14, 2010, and August 23, 2011.  Therefore, Dr. Tseng is entitled to summary judgment on such claims.

March 28, 2012

In his opposition, plaintiff argues that Dr. Tseng contributed to the denial and delay in treatment for plaintiff's seizure disorder.  As an example, Dr. Slyter declares that on March 28, 2012, "it appears Dr. Tseng misquoted the UCD recommendations, which advised the need to follow-up with Dr. Seyal," an epilepsy specialist at UCD.  (ECF No. 132-1 at 6-7.)  This example is not addressed in Dr. Tseng's declaration, but is partially addressed in defendants' expert declaration.

Plaintiff's expert, Dr. Slyter, states that:

> the standard of care required Dr. Tseng to rely on the expert recommendations of UCD or to explain his demurral.  Once it was clear [plaintiff's] visual symptoms were seizures that occurred several times per day, the drug trials should have been completed, and could have been completed within several months, not several years.

(ECF No. 132-1 at 7.)  Dr. Slyter opines that an earlier resolution of the drug trials would have provided plaintiff an opportunity to have surgery to remove the tissue triggering the seizures, improving his chances of success.  (Id.)  On the other hand, Dr. Ko, as a board-certified epileptologist, reviewed plaintiff's epilepsy treatment, and opines that the treatment provided by Dr. Tseng was appropriate and within the standard of care.  (ECF No. 164-1 at 10.)

Plaintiff's opposition and Dr. Slyter's opinion do not provide citations to the record to support the March 28, 2012 example.  Plaintiff fails to cite to a specific recommendation that

70

plaintiff was to follow-up with Dr. Seyal. The typewritten progress notes from the March 14, 2012 "Department of Neurological Surgery Consultation," do not expressly refer plaintiff to Dr. Seyal or recommend that plaintiff see an epilepsy specialist. (ECF No. 137 at 19-21.) The progress note was signed by NP Julie Jorgensen, and states that plaintiff was also examined by Dr. K. Shahlaie, but there is no mention of Dr. Seyal. (ECF No. 137 at 21.) Rather, the UCD report states, "[r]eferral to UCD Dept. of Neurology for follow-up on his ongoing seizures." (Id.)

Nevertheless, the record reflects that the Health Care Services Physician Request for Services form signed by Dr. Rudas on February 29, 2012, and approved by Dr. Smith that same day, contains a section to be completed by the consultant. (ECF No. 137 at 23.) On such form, it appears NP Jorgensen handwrote: "F/U appt w/Dr. Shahlaie in 6 mos after MRI," and next to "recommendations," she wrote: "Pt. sees Dr. Masud Seyal in UCD Dept. of Neurology for F/U on seizure management." (ECF No. 137 at 23.)

Although Dr. Tseng's declaration does not address this date of care, his March 28, 2012 progress note documents plaintiff's chief complaint as "neurosurg consult 3/14/12," and the doctor wrote:

> [Plaintiff] seen on 3/14, and no recommendations for either [radiation therapy] or neurosurgery were made. [Plaintiff] needs to [follow-up] with neurology and focus on medication management of seizures only. . . .
>
> Assessment/Plan:
>
> 1. Simple partial seizures during video EEG . . . [Plaintiff's] confusion and lethargy may be side effects of AEDs. Radiation therapy has been ruled out as an option after neurosurgical consult. Basically radiation only affect fast growing tumors, and minimal effect on slow growing/stagnant tumors like the residual he has left. *No further UCD follow-up is needed at this time*. [Plaintiff] can continue to work with telemed neurology to maximize medical management seizures to control the seizures and prevent AED side effects. Pt. has Telemed neuro [follow-up] scheduled 4/24. . . .
>
> 2. s/p R parietal meningioma removal 12/10. There is some residual tumor seen on MRI 6/11 and 12/11. Neurosurgeon has indicated that no further surgery needed at this time. Plan repeat MRI yearly to monitor progress.

(ECF No. 137 at 25 (emphasis added).)

////

71

Such medical record confirms that Dr. Tseng examined plaintiff, reviewed the UCD Neurology report, and despite writing no further UCD follow-up is needed, Dr. Tseng explained that plaintiff can be seen by telemed neurology to address the medical management of plaintiff's seizures. Importantly, Dr. Rudas initially referred plaintiff to UC Davis Neurosurgery for a second opinion in light of Dr. Pineda's radiation therapy recommendation. (ECF No. 137 at 16.) While UCD neurosurgery did not find radiation to be a viable treatment option, there is no finding that Dr. Pineda's treatment to date was ineffective or inappropriate, and the report offered no specific reasons why plaintiff should be referred to UCD for further seizure management, as opposed to being returned to the care of neurologist Dr. Pineda. The report recommended plaintiff be referred to UCD Neurology for follow-up, but did not provide a specific appointment or express an urgency requiring an immediate appointment at UCD neurology.

In addition, despite the writing that plaintiff "sees Dr. Masud Seyal in UCD Dept. of Neurology for F/U on seizure management" (ECF No. 137 at 23), the records show that Dr. Seyal was the doctor who conducted the video EEG and initially prescribed Keppra prior to plaintiff's discharge on September 14, 2011. (ECF No. 136 at 41-44.) Plaintiff identifies no other records showing Dr. Seyal treated plaintiff's seizures thereafter.

Thus, it appears that Dr. Tseng, in his medical opinion, determined that plaintiff could continue care with telemed neurology rather than UCD neurology. Plaintiff was already being seen by neurologist Dr. Pineda via telemed, and when Dr. Tseng saw plaintiff on March 28, 2012, Dr. Tseng noted that plaintiff was scheduled to see Dr. Pineda on April 24, 2012. Plaintiff fails to demonstrate how Dr. Tseng's medical decision to continue plaintiff's treatment by Dr. Pineda, a neurologist, constitutes interference with a recommendation that plaintiff be referred to UCD neurology, or delayed plaintiff's treatment for his seizure disorder. Plaintiff has failed to demonstrate that the course of treatment chosen by Dr. Tseng was medically unacceptable. Jackson, 90 F.3d at 332. This is not a situation where Dr. Tseng ignored the need for plaintiff to see a neurologist, yet failed to refer plaintiff to a neurologist. Rather, Dr. Tseng opted to continue plaintiff's treatment with neurologist Dr. Pineda rather than refer plaintiff to UCD neurology. Indeed, in his deposition testimony, Dr. Tseng testified that "UC Davis has many, many benefits.

72

But in terms of for Mr. Gress, I don't necessarily think that one place is better than another."
(Tseng Dep. at 107.)  Such testimony confirms Dr. Tseng did not act with a culpable state of
mind.  Thus, to the extent that UCD neurosurgery recommended that plaintiff follow-up at UCD
neurology, but Dr. Tseng believed plaintiff could follow up with neurologist Dr. Pineda, absent
evidence not present here, such difference of opinion does not amount to deliberate indifference.

Plaintiff declares he suffered additional harm caused by Dr. Tseng's failure to order a
follow-up with Dr. Seyal:  plaintiff continued to suffer several seizures per day, including a bad
one on April 9, 2012, requiring his transport to the TTA, yet was not seen by Dr. Pineda, via
telemed, until April 24, 2012.  (ECF No. 132-3 at 18.)  But plaintiff did not provide a copy of a
medical record from April 9, 2012.  The record does not show that Dr. Tseng was even aware of
the April 9, 2012 seizure.  Moreover, at the time plaintiff saw Dr. Tseng on March 28, 2012,
plaintiff already had an appointment scheduled with neurologist Dr. Pineda.  Thus, Dr. Tseng's
actions on March 28, 2012 could not have delayed plaintiff's follow-up neurology appointment.
On this record, the court cannot find that Dr. Tseng delayed plaintiff's neurological care by
failing to recommend plaintiff be seen at UCD neurology rather than by Dr. Pineda.

For all of the above reasons, Dr. Tseng is entitled to summary judgment.

In connection with plaintiff's expert's reference to an earlier opportunity for surgical
intervention, Dr. Ko, who is board certified in neurology and epilepsy, points out that Dr. Slyter is
not board certified in epilepsy or certified as having surgical expertise, unlike Dr. Ko.  (ECF No.
164-1 at 7.)  Dr. Ko opines that "the average duration of a patient having epilepsy before getting
surgery is about 20 years," but because such surgery is elective, "there is no hard timeline."  (Id.)
Because most of plaintiff's seizures are simple partial (no alteration in consciousness), Dr. Ko
found plaintiff is not an epilepsy surgical candidate because most of his seizures are not disabling
-- "he has visual symptoms without loss of consciousness."  (Id.)  Also, plaintiff's meningioma
surgery left him with vision loss, so any additional surgery "could result in further visual loss."
(Id.)  Thus, Dr. Ko opines that plaintiff's epilepsy treatment was appropriate and not below the
standard of care.

////

As early as August 23, 2011, the neurosurgeon recommended no further invasive surgery for plaintiff at that time.  (ECF No. 136 at 39.)  On February 5, 2013, Dr. Gregorious opined that plaintiff is not a candidate for any further surgery because he has no sign of any recurrent meningioma.  (ECF No. 138 at 8.)

Moreover, Dr. Slyter did not address whether surgery is appropriate for patients suffering from simple partial seizures; indeed, he only states plaintiff "*might* be a candidate for surgery to remove the tissue triggering the seizures."  (ECF No. 132-1 at 7, emphasis added.)  In addition, Dr. Slyter did not address any risks plaintiff might face in connection with additional surgery.

As to Dr. Slyter's reference to "drug trials," neither of the documents referred to in plaintiff's example assist the court in analyzing the reference to "drug trials."  Dr. Slyter opines that "the drug trials should have been completed, and could have been completed within several months, not several years."  (ECF No. 132-1 at 7.)  On the other hand, Dr. Ko confirmed that plaintiff was tried on "phenytoin, Vimpat, clobazam, oxcarba[]zepine, and was on Keppra and Topamax more recently," which medical records confirm.  (ECF No. 164-1 at 6, 88-93.)  Dr. Ko declares that when plaintiff was on Depakote and phenytoin, plaintiff's levels were obtained.  (ECF No. 164-1 at 7.)  In addition, Dr. Ko provided a medical study, "Early Identification of Refractory Epilepsy," published in 2000 in the New England Journal of Medicine revealing that "there is not much benefit to trying more AED after trying two."  (ECF No. 164-1 at 6, 52-57.)  Dr. Ko opined that, contrary to Dr. Slyter's opinion, plaintiff's treatment was "aggressive with the trial of six different AEDs, and each AED was adjusted up but [plaintiff] remained refractory."  (ECF No. 164-1 at 6.)

In light of Dr. Ko's opinion, it appears that plaintiff's claims based on an inability to earlier consider another surgery, or a delay in the drug trial process, supported by Dr. Slyter's contrary opinion, are a difference of medical opinion, not rising to the level of deliberate indifference.  See Snow, 681 F.3d at 987; Wilhelm, 680 F.3d at 1122-23.  Defendants are entitled to summary judgment on such claims.

////

////

74

1  September 17, 2012

2  Dr. Slyter opines that Dr. Tseng failed to meet the standard of care by failing to recognize

3  the common symptoms of drug toxicity, a serious medical condition, when plaintiff presented

4  with dizziness, confusion, loss of words, and fatigue.  (ECF No. 132-1 at 7.)  Dr. Slyter opines

5  that if Dr. Tseng recognized such toxicity, he was required to adjust the medication downward,

6  and if Dr. Tseng was unaware, he was required to timely consult an expert, not days or weeks

7  later.  (Id.)  On the other hand, Dr. Ko opines that reducing AED is dangerous, and that

8  "continuing the AED so that the patient does not have more or stronger seizures was a prudent

9  way to treat this patient."  (ECF No. 164-1 at 10.)

10  Plaintiff argues that Dr. Tseng's treatment on September 17, 2012, failed to meet the

11  standard of care.  (ECF No. 130 at 36-37.)  Absent facts not pled here, Dr. Tseng's actions on

12  September 17, 2012, do not demonstrate deliberate indifference.  Plaintiff's CDC 7362 alerted Dr.

13  Tseng to plaintiff's concern that he was suffering side effects to the Topamax:  blurred vision,

14  confusion, vertigo, and speech difficulty.  (ECF No. 137 at 35.)  Dr. Tseng wrote on this form that

15  plaintiff was "encouraged to discuss issue with neurology consultant at next appointment."  (Id.)

16  Although plaintiff was not seen by neurologist Dr. Malhotra until eight days later, at that time Dr.

17  Malhotra did not decrease plaintiff's medications.  Rather, Dr. Malhotra recommended increasing

18  plaintiff's Topamax in two stages, and then to have a follow-up with telemed neurology in two to

19  three months.  (ECF No. 137 at 42.)  In light of Dr. Malhotra's subsequent recommendation, Dr.

20  Tseng's failure to reduce plaintiff's medication or urgently refer plaintiff to his neurologist was

21  not deliberate indifference, and Dr. Tseng is entitled to summary judgment.

22  Failure to Monitor Topamax

23  Plaintiff also argues that Dr. Tseng, plaintiff's PCP, denied, delayed, and interfered with

24  the administration and monitoring of Topamax, without specific citations to the record (ECF No.

25  130 at 37), other than the September 12, 2012 date of treatment (ECF No. 130-1 at 86).  Dr.

26  Pineda first prescribed Topamax to plaintiff in April of 2012; plaintiff was seen by Dr. Tseng on

27  September 17, 2012, while plaintiff was taking Topamax.  Dr. Tseng's treatment on September

28  17, 2012, is addressed above, but his medical record confirms that Dr. Tseng was deferring to

neurologist Dr. Malhotra on the issue of medication. On November 21, 2012, Dr. Tseng changed plaintiff's Topamax to "keep on person" to assist plaintiff in complying with Dr. Malhotra's medication protocol. Such action, without more, cannot be deemed deliberate indifference, particularly in light of plaintiff's report that if he missed a dose of his medication, his seizures became much more frequent. (ECF No. 137 at 50.)

Importantly, while it is unclear when plaintiff's Topamax levels reached toxicity, Dr. Malhotra did not recommend "close monitoring" until May 16, 2013. There is no evidence of Dr. Tseng's involvement in plaintiff's care on or after May 16, 2013; indeed, the last medical record reflecting Dr. Tseng's involvement was dated February 23, 2013, and it is undisputed that Dr. Tseng left MCSP in early 2013. Rather, it was nonparty Dr. Soltanian and defendant PA Akintola who were primarily involved in plaintiff's care at MCSP after May 16, 2013. The undersigned finds that plaintiff failed to factually support his claim that Dr. Tseng was deliberately indifferent by failing to monitor plaintiff's Topamax prescription. Therefore, Dr. Tseng is entitled to summary judgment on this claim.

### H. Defendant Villanueva

Defendants move for summary judgment on the grounds that plaintiff lacks sufficient evidence to establish that defendant Villanueva was deliberately indifferent to his medical needs, provided reasonable and appropriate care and treatment, and did not disregard any known risk of harm or injury to plaintiff. (ECF No. 117.)

#### October 27, 2010

In his pleading, plaintiff alleges Villanueva's response was "another example of the medical staff harassing plaintiff and dismissing plaintiff's symptoms and concern." (ECF No. 53 at 10.) Plaintiff alleges this treatment caused plaintiff to believe nothing was wrong with him, and discouraged him from seeking medical treatment. (Id.)

In support of the motion, Villanueva declares that she does not recall this incident, had not reviewed any medical records to determine whether such record exists, but does not believe that she would have made that comment to plaintiff in the manner alleged. But in any event, Villanueva declares that such comment did not prevent Villanueva from taking plaintiff's vitals,

76

and confirming that his test results were within normal limits and determining no further care was required at that time. (ECF No. 117-5 at 2.) Further, she notes that the operative complaint alleges plaintiff was seen by Dr. Tseng less than two weeks earlier and was seen again in the C clinic just one week earlier, and plaintiff was seen again days later on November 1, 2010. (ECF No. 53 at ¶¶ 61, 62, 65.)

In his declaration, plaintiff states he explained to Villanueva plaintiff's past events and current complaints of left vision loss, headache, head pressure, blurred vision, confusion, body tremors/shaking and overall weakness, and that this episode was similar to the one preceding the episode requiring his medical transport on October 10, 2010.[30] (ECF No. 132-3 at 10.) Plaintiff told Villanueva that plaintiff was not able to communicate during the prior incident, so requested that his vitals be reported accurately in case plaintiff was not able to communicate during another incident. (ECF No. 132-3 at 10.) Plaintiff alleges that Villanueva responded that plaintiff "should not say things like that or someone will think that [plaintiff is] going to fake a medical emergency," and that plaintiff "looked fine." (Id.) Plaintiff was so dizzy he did not want to argue. (Id.)

Initially, plaintiff is advised that allegations of harassment are not cognizable under section 1983. Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1982) (allegations of harassment with regards to medical problems not cognizable).

There is a dispute of fact as to what symptoms plaintiff reported to Villanueva. Although Villanueva declares she cannot recall the October 27, 2010 incident, her medical note states that plaintiff complained of dizziness, blurry vision and headaches. There is no mention of plaintiff suffering body tremors, or requesting to see a doctor. Plaintiff declares he told Villanueva plaintiff was suffering body tremors, and various other symptoms, and asked to see a doctor. Defendant Villanueva did not address such factual dispute. Moreover, plaintiff argues that during PA Todd's deposition, Todd testified that a nurse cannot treat body tremors. (ECF No. 130-1 at

---

[30] Although Villanueva failed to provide plaintiff with a written report for his own record (ECF No. 53-1 ¶ 64), she did complete a record retained in plaintiff's medical file. (ECF No. 135 at 31.) Plaintiff identifies no constitutional requirement that he be provided with a written report.

79, citing Todd Dep. at 70:7-9.[31])  In light of plaintiff's complaints of body tremors, he contends Villanueva should have referred plaintiff to a doctor that day.

However, absent evidence that Villanueva acted with a culpable state of mind, her failure to refer plaintiff to a doctor on October 27, 2010, is at most negligence.  Medical records confirm that defendant Villanueva took plaintiff's vital signs and checked his oxygen level, all of which were within normal limits.  Villanueva charted that plaintiff was to have an appointment with a doctor on the following Monday, and plaintiff's gait was steady on his return to cell.  (ECF No. 135 at 31.)  It is undisputed that plaintiff was previously seen by Dr. Tseng on October 14, 2010, and five days after the visit with Villanueva, on November 1, 2010.  Thus, Villanueva's failure to refer plaintiff to a doctor on October 27, 2010, does not rise to the level of deliberate indifference, and she is entitled to summary judgment based on her care of plaintiff on October 27, 2010.

<u>May 31, 2013</u>

In his opposition, plaintiff argues that on May 31, 2013, while working in the clinic, defendant LVN Villanueva saw plaintiff, who complained that he had a seizure, was dizzy, could not walk, had slight headache about two days ago, and was unable to eat or do his usual routine. (ECF No. 130 at 34.)  Plaintiff saw defendant Villanueva after the Topamax was increased to 225 mg BID, and argues that Villanueva failed to refer him to the neurologist or primary care physician, and denied plaintiff treatment by a doctor.  (ECF No. 130 at 34-35.)

In his declaration, plaintiff declares:

> On May 31, 2013, I had a seizure.  I was dizzy and could not walk. I was wheel-chaired to the clinic.  I was seen by Villanueva, but she did not send me to see a doctor or specialist.  I was only given a lay-in.  The doctors did not address my medication.  I decided to go back to 200 mg twice daily from the 225 mg twice daily because I thought the increased dosage was causing my symptoms.

(ECF No. 132-3 at 21.)

Defendant Villanueva did not address this care in her declaration.  (ECF No. 117-5.)  This date of care is also not addressed in plaintiff's response to defendants' statement of facts.  (ECF

---

[31] It does not appear that plaintiff filed a copy of Todd's deposition transcript.

No. 130-1.)  Defendant Villanueva's medical record reflects she notified the RN in TTA who had talked to plaintiff and advised him to fill out a CDC 7362.  Villanueva advised plaintiff to rest and gave him a lay-in.  (ECF No. 138 at 26.)

Plaintiff does not declare that he informed Villanueva of plaintiff's increased medication or his belief that his symptoms related thereto, and the medical record does not reflect such complaint.  Defendant Villanueva's medical record confirms that she consulted with an RN about plaintiff's complaints, and provided plaintiff with a lay-in.  Thus, plaintiff failed to demonstrate that defendant Villanueva acted with a culpable state of mind.  While Villanueva may not have provided the care plaintiff wanted, such actions do not raise an inference of deliberate indifference.  Accordingly, defendant Villanueva is entitled to summary judgment.

I.  Defendant Kettelhake

Defendants move for summary judgment on the grounds that plaintiff lacks sufficient evidence to establish that defendant Kettelhake was deliberately indifferent to his medical needs, provided reasonable and appropriate care and treatment, and did not disregard any known risk of harm or injury to plaintiff.  (ECF No. 117.)

In plaintiff's December 12, 2010 CDC 7362 form, he complained of headache pain of 10 out of 10, and noted he had run out of people from whom he could get aspirin.  In addition, plaintiff noted that 20 days ago he had received a note stating he would see the doctor in a week.

But the only notations on the form are defendant Kettelhake's notation that plaintiff had an appointment on "12/11/10," the day before plaintiff presented complaining of pain on a scale of 10 out of 10.  (ECF No. 135 at 42.)  However, plaintiff was not seen on December 11, 2010, because it was a Saturday and the clinic is closed on Saturday.  (ECF No. 132-3 at 11.) Defendants did not provide a medical record demonstrating that plaintiff was seen on December 11, 2010.

Defendant Kettelhake did not provide a declaration.  Rather, defendants provided pages from Kettelhake's deposition in which he testified that the inmates must see a nurse or doctor in response to the CDC 7362, and confirmed that Kettelhake took this form to mean plaintiff was under the care of a doctor, and he had seen a doctor the day before.  (ECF No. 117-6 at 12.)

Kettelhake further testified that plaintiff told Kettelhake that plaintiff had a doctor's appointment scheduled within a week. (ECF No. 117-6 at 12-13.) Based on that fact, Kettelhake confirmed that he believed his triage was completed because he determined plaintiff needed to see a doctor and he already had an appointment. (ECF No. 117-6 at 13.)

However, Kettelhake's testimony that plaintiff told him that he had an appointment within a week is belied by plaintiff's written statement on the form that he was supposed to see the doctor over 13 days ago (20 days ago he was to see a doctor within a week); thus, plaintiff was seeking medical care because he had not seen a doctor as expected. Indeed, although another RN had noted on plaintiff's November 6, 2010 CDC 7362 that plaintiff would be seen by his primary care provider "in approximately one week," plaintiff was not seen by a doctor within a week. In fact, plaintiff was not seen by a nurse or a doctor at all in response to his December 12, 2010 CDC 7362.

Importantly, on December 12, 2010, plaintiff was complaining of pain at the level of 10, yet defendant Kettelhake took no steps to provide plaintiff with pain medication, or ensure that plaintiff saw a doctor or other medical professional as soon as possible to address such pain. Defendants provide no evidence demonstrating plaintiff was provided with pain medication between December 12, 2010, and December 15, 2010, when he was taken to the TTA in response to the radiologist's report of the brain tumor. On this record, a reasonable juror could find that defendant Kettelhake's response to plaintiff's CDC 7362 was deliberately indifferent, because noting that plaintiff had seen a doctor the day before he now presented with level 10 pain, yet did nothing to ensure current treatment, raises an inference of deliberate indifference.

Defendant Kettelhake's motion for summary judgment should be denied.

J. Defendant PA Todd

Defendants move for summary judgment on the grounds that plaintiff lacks sufficient evidence to establish that defendant Todd was deliberately indifferent to his medical needs, provided reasonable and appropriate care and treatment, and did not disregard any known risk of harm or injury to plaintiff. (ECF No. 117.)

////

80

In his opposition, plaintiff generally alleges that defendant Todd denied plaintiff treatment when Todd would not refer plaintiff to a doctor. Plaintiff states that a reasonable jury could find that Todd denied plaintiff treatment "when she determined that [plaintiff] met the criteria for an MRI on October 12, 2010, but [Todd] didn't do anything about it as charged in the 602 hearing rules. A reasonable jury could find that Todd delayed treatment by not providing the prescription medication Gress [sic] or telling him to come back later." (ECF No. 130 at 38.) Plaintiff argues that Todd's conduct was not consistent with the community standards. (Id.)

Plaintiff does not identify specific dates of treatment, or cite to pertinent portions of the record. (ECF No. 130 at 38-39.) The court will address the dates of service identified in the briefing.

December 24, 2010

In his unverified pleading, plaintiff alleges that defendant Todd denied plaintiff's request for head protection after he hit his head on his bunk. (ECF No. 53-1 at 2.) In his declaration, plaintiff declares he informed "medical staff" and asked for extra head protection, but "staff" told him extra protection was not necessary. (ECF No. 132-3 at 12.) Plaintiff cites to no medical record in support of this claim, which is not addressed in his opposition (ECF No. 130 at 38-39). In any event, it is undisputed that there is no evidence or assertion that plaintiff subsequently hit his head or sustained any injury as a result. (ECF No. 130-1 at 67, citing ECF No. 117-3 at ¶¶ 4, 6.) Thus, defendant Todd is entitled to summary judgment on this claim.

May 31, 2011

Plaintiff declares that on May 31, 2011, he had a 602 appeal hearing with PA Todd regarding the lack of medical care. (ECF No. 132-3 at 13.) Plaintiff told Todd that plaintiff had not received an MRI with contrast as ordered by surgeon Dr. Senegor and Dr. Tseng. Plaintiff declares PA Todd made a phone call and found it was cancelled. Plaintiff went through his history of repeated symptoms. Todd told plaintiff that he met the criteria for an MRI on October 12, 2010; however, the MRI was not ordered until weeks later, and during this delay plaintiff experienced severe pain. (Id.)

////

On May 31, 2011, PA Todd interviewed plaintiff in connection with his appeal, Log #MCSP-16-11-10820. (ECF Nos. 117-3 at 10; 133-1 at 3.) In her first level response, defendant Todd identified plaintiff's appeal as requesting:

> Patient states since 2004 he has been having multiple complaints from nausea, vomiting, seizures, headaches, body tremors. Tumor was diagnosed via MRI and primary care physician was notified on December 14, 2010. Patient was sent to Neurosurgery on December 15, 2010, and a partial meningioma [resection] was completed.

(Id.)[32] Defendant Todd reviewed plaintiff's UHR, had a 60-minute discussion with plaintiff, and researched plaintiff's efforts after the interview ended. (Id.) In her response, defendant Todd recounted plaintiff's medical history, and concluded that plaintiff had not met the criteria for a CT scan or an MRI with contrast through plaintiff's seizure on October 12, 2010. Todd stated that after plaintiff's "seizure or syncope on October 12, 2010," his "symptoms intensified and a MRI criteria was met . . . and completed on December 3, 2010." (Id.) Following excision of the meningioma, plaintiff received a post-op brain MRI, and a brain MRI with contrast was scheduled. (ECF No. 117-3 at 10; 136 at 13.) A neurosurgical follow-up was requested, as well as a follow-up with plaintiff's PCP following the MRI. Defendant Todd partially granted plaintiff's appeal.

Plaintiff was dissatisfied with Todd's response, objecting that Todd focused on unrelated medical symptoms and failed to mention the numerous medical visits in which plaintiff complained of visual disturbances and body tremors, and Todd confirmed plaintiff met the criteria for an MRI on October 12, 2010. (ECF No. 133-1 at 8.) Plaintiff argued that all of his symptoms were indicative of a brain tumor and therefore he met the criteria for a CT or MRI before October 12, 2010. Plaintiff contended that the medical care prior to the discovery of his tumor was not appropriate or timely, and the reviewer must see his original 602 submitted on February 9, 2011 (Log # 11-10328) to clarify what actions he requested. (ECF No. 133-1 at 8.) The February 9, 2011 grievance is not appended, but the second level appeal response identifies

---

[32] Although Todd's first level appeal response references an "attached 602 appeal form," plaintiff's appeal #MCSP-16-11-10820 is not appended to Todd's declaration, and the first page of such appeal is not appended to plaintiff's declaration re statute of limitations. (ECF Nos. 117-3 at 10; 133-1 at 3.)

the prior actions requested were: "'just compensation,' continued medical care and follow-ups." (ECF No. 133-1 at 11.)

Plaintiff also appealed the partial grant of his second level review, stating that medical records demonstrate that the tumor went untreated and was allowed to grow "to an incredible size," thus his past treatment at MCSP was not "adequate/appropriate nor timely." (ECF No. 133-1 at 4.) Plaintiff's director's level appeal was denied on November 9, 2011. (Id. at 14.)

First, to the extent that plaintiff contends defendant Todd was deliberately indifferent when she found that plaintiff met the criteria for an MRI on October 12, 2010, yet "didn't do anything about it," such claim fails. Defendant Todd interviewed plaintiff on May 31, 2011, long after plaintiff's seizure on October 12, 2010, and after plaintiff received his first MRI in December of 2010. Thus, defendant Todd could not have taken further action in response to plaintiff's medical needs prior to the October 12, 2010 seizure or the December 2010 MRI.

Second, medical records confirm that as of the date of plaintiff's interview with Todd, plaintiff's MRI with contrast was scheduled for June 6, 2011. In handwritten notes written after her interview with plaintiff concluded, Todd wrote that the MRI was scheduled for June 6, 2011. (ECF No. 117-3 at 9.) Plaintiff's appeal objecting to the "cancellation" of the MRI with contrast was dated June 6, 2011. The MRI with contrast was later rescheduled for June 17, 2011, but the May 10, 2011 request form does not reference PA Todd. (ECF No. 136 at 11.)

Third, to the extent that plaintiff contends defendant Todd should have taken additional steps following the 602 appeal interview, such claims fail in light of the record evidence. Following the interview, defendant Todd issued follow-up orders, including lab work. (ECF No. 136 at 14.) Plaintiff's disagreement with the steps defendant Todd took during or following this interview constitute a mere difference of opinion that does not rise to the level of deliberate indifference.

For all of the above reasons, the undersigned recommends that defendant Todd be granted summary judgment on plaintiff's claims arising from Todd's May 31, 2011 appeal review.

<u>December 5, 2011</u>

On this date, plaintiff declares he told PA Todd about plaintiff's ongoing seizures, vision

problems, and that the telemed doctor said to increase Keppra, which should be in plaintiff's file. (ECF No. 132-3 at 17.) He claims Todd told him that she could not increase his medication, but would schedule a doctor's visit. PA Todd declares that plaintiff also had an appointment with his neurologist on that day, and because plaintiff was under the care of a specialist, "and was being seen by the specialist that same day," she recommended that plaintiff stay on the same treatment program until he saw the neurologist. (ECF No. 117-3 at 4.) Todd's progress note confirmed plaintiff told her he was seen in neuro telemed on November 16, 2011; however, Todd also charted that there were no reports filed in the UHR from the telemed visit. (Id.) In the absence of a doctor's order confirming plaintiff's medications could be increased, Todd's refusal to adjust plaintiff's medication cannot be viewed as deliberate indifference.

Defendant Todd did not provide a neurologist's medical record from December 5, 2011. Contrary to Todd's declaration, her December 5, 2011 progress note does not reflect that plaintiff had an appointment with neurology on that day. Rather, Todd noted a December 22, 2011 appointment with "CCP." (ECF No. 117-3 at 13.) Todd's follow-up order was for plaintiff to keep such appointment. (Id. at 14.) Defendant Todd's notes and follow-up order do not reflect any further action to schedule an appointment with plaintiff's neurologist, or to find the report from telemed to confirm or deny plaintiff's claim that his medication should be increased. Indeed, on November 16, 2011, Dr. Pineda had recommended that plaintiff's Keppra be increased in 2 weeks (November 30, 2011) if the seizures continued, and Dr. Smith approved Dr. Pineda's order on November 17, 2011. (ECF No. 137 at 4.)

PA Todd's progress note confirms that plaintiff reported he was continuing to have 5 or 6 seizures per day. Thus, even if Dr. Pineda's order was not filed in the UHR, plaintiff put Todd on notice of the order. Because plaintiff was not going to be seen by a doctor until December 22, a reasonable jury could find that a delay of 17 days in complying with the specialist's order was deliberate indifference to plaintiff's serious medical needs, particularly in light of plaintiff's medical history, of which defendant Todd was thoroughly familiar. Moreover, defendant Todd failed to schedule an appointment with the neurologist. As it turns out, plaintiff was not seen until December 23, 2011, at which time defendant Akintola, also a PA, increased plaintiff's

1  Keppra to 1200 mg.  Thus, defendant Todd is not entitled to summary judgment on plaintiff's

2  claims arising from the December 5, 2011 medical visit.

3      K.  Defendant Dr. Heatley

4      Defendant Dr. Heatley moves for summary judgment on the grounds that plaintiff lacks

5  sufficient evidence to establish that he was deliberately indifferent to plaintiff's medical needs.

6  Dr. Heatley was Chief Medical Officer ("CMO") at MCSP from July 2008 through May 2014.  It

7  is undisputed that Dr. Heatley first heard of plaintiff when Dr. Rudas contacted Dr. Heatley and

8  requested that plaintiff be sent out immediately because of a brain mass detected on an MRI,

9  which request Dr. Heatley immediately approved.  (ECF No. 130-1 at 54.)

10     In his opposition, plaintiff contends that Dr. Heatley (a) denied plaintiff's medical

11 treatment by denying plaintiff's second level appeal; and (b) Dr. Heatley was involved in

12 plaintiff's medical treatment, as evidenced by (i) receiving Dr. Barnett's June 12, 2011 email,

13 (ii) asking Dr. Rudas to call Dr. Heatley after seeing Kneisley; and (iii) delaying plaintiff's

14 treatment by denying plaintiff's request for an interview concerning plaintiff's medical risk status.

15 (ECF No. 130 at 40.)

16     Evidence shows that Dr. Heatley partially granted plaintiff's second level appeal in Log

17 #MCSP-16-11-10820 on August 9, 2011.  (ECF No. 133-1 at 4.)  However, as discussed above,

18 plaintiff's second level appeal addressed the delay in receiving adequate medical care for his

19 brain tumor, as well as an MRI, which plaintiff received in December of 2010, long before Dr.

20 Heatley received plaintiff's appeal.  Plaintiff was not seeking a particular treatment that the court

21 could find Dr. Heatley was remiss in failing to provide.  Indeed, by the time Dr. Heatley reviewed

22 the appeal, plaintiff had received the initial MRI, his tumor had been resected, and he had

23 received the MRI with contrast on June 17, 2011.  The gravamen of plaintiff's appeal is

24 confirmed by his dissatisfaction with Dr. Heatley's decision in which plaintiff complained that

25 the tumor went untreated allowing it to grow from 2004 to December 14, 2010, and alleged that

26 the "past treatment" at MCSP "has not been adequate/appropriate nor timely."  (ECF No. 133-1 at

27 4.)  The undersigned cannot find that Dr. Heatley's role in addressing plaintiff's administrative

28 appeal regarding past medical treatment states a cognizable Eighth Amendment claim.

85

Plaintiff's remaining two claims also fail.  Simply being put on notice of a portion of medical treatment by way of email or phone call fails to establish that Dr. Heatley was medically treating plaintiff, and does not meet all of the elements of an Eighth Amendment deliberate indifference claim.  Similarly, plaintiff fails to demonstrate how Dr. Heatley's alleged refusal to meet with plaintiff concerning his high risk status states a constitutional violation.  Plaintiff relies on his own declaration and his February 21, 2013 CDC 7362 form, which bears Dr. Tseng's message relaying Dr. Heatley's alleged response to plaintiff's request.  (ECF Nos. 132-3 at 20; 138 at 12.)  There is no evidence defining "high risk status" or explaining what benefit such status imparts, if any.  It is unclear whether the classification, "high risk status" can be viewed as a medical treatment or simply a classification.  In his opposition, plaintiff obliquely adds "and help Gress see the epilepsy specialist" (ECF No. 130 at 41), but fails to make a factual connection between plaintiff's high risk status, Dr. Heatley, and such reference.

Following review of the records provided, as well as plaintiff's vague allegations as to Dr. Heatley, the undersigned finds Dr. Heatley is entitled to summary judgment.

L.  Defendant PA Akintola

Defendants move for summary judgment on the grounds that plaintiff lacks sufficient evidence to establish that defendant Akintola was deliberately indifferent to his medical needs, provided reasonable and appropriate care and treatment, and did not disregard any known risk of harm or injury to plaintiff.  (ECF No. 117.)

In his opposition, plaintiff argues that he requested to see a doctor or specialist for help with Topamax, but that defendant Akintola denied plaintiff treatment on multiple occasions when Akintola would not refer plaintiff to a doctor to address Topamax.  Plaintiff states that a reasonable jury could find that Akintola delayed treatment by not scheduling plaintiff, or by telling plaintiff to come back later.  (ECF No. 130 at 39.)  Plaintiff argues that Akintola's conduct was not consistent with the community standards.  (Id.)

In his opposition, plaintiff does not identify specific dates of treatment, or cite to pertinent portions of the record.  (ECF No. 130 at 38-39.)  In his response to defendants' statement of undisputed facts, plaintiff's disputes focus on Akintola's care in 2013, primarily involving

86

Topamax.  (ECF No. 130-1 at 70-72.)  Thus, the court addresses only those 2013 allegations.[33]

Defendants move for summary judgment on the grounds that Dr. Malhotra only increased the dose of Topamax two weeks prior to plaintiff's visit on May 30, 2013, and argue that because the neurologist had prescribed it, it was not Akintola's place to change or alter the prescription. (ECF No. 117 at 10.)  Because Akintola lacked the education and experience to second guess plaintiff's neurologist, defendants argue that recommending that plaintiff continue to follow the instructions of his treating specialists was reasonable and within the community standard of care. (Id.)

It is undisputed that on May 20, 2013, Dr. Malhotra increased plaintiff's Topamax to 225 mg BID, which was above the recommended dose, adding "(Close monitoring)."  (ECF No. 138 at 18.)[34]  That same day, Dr. Smith approved Dr. Malhotra's recommendation increasing plaintiff's dose of Topamax.  On May 23, 2013, plaintiff was prescribed 225 mg Topamax.  On May 30, 2013, only seven days later, plaintiff woke up and could not walk.  Despite plaintiff's complaints of severe vertigo, and defendant Akintola's declaration that he does not have the education, training or experience to treat plaintiff's condition, Akintola's medical record notes Akintola explained to plaintiff that there was no well-established maximum dose for Topamax, recommended plaintiff take his afternoon dose at bedtime if his symptoms had resolved, but if not, to wait until the day the symptoms are resolved and then resume taking the medication at 220 mg in the morning and 225 mg at night, and if the symptoms resume, to reduce his dose to 200 mg BID.  (ECF No. 138 at 22-23.)  Akintola wrote plaintiff was to be seen back in 7 to 10 days, and did not refer plaintiff to neurology or to his PCP.

////

_____

[33] The undersigned acknowledges that plaintiff included earlier dates of service by Akintola in both his declaration as well as the unverified pleading.  However, because his opposition focuses on allegations concerning Topamax, which was first prescribed in April of 2012, and plaintiff's opposition includes no specific factual allegations demonstrating Akintola's alleged deliberate indifference in care prior to 2013, the undersigned does not address the earlier dates of care.

[34] Plaintiff also declares that Dr. Malhotra told plaintiff that plaintiff's "PCP will watch and determine if appropriate."  (ECF No. 132-3 at 21.)  Although this is hearsay, plaintiff could call Dr. Malhotra to testify at trial.

Thus, contrary to defendant Akintola's declaration that it was not his place to change or alter the prescription, the medical record reflects that Akintola instructed plaintiff to adjust the Topamax, and, despite Dr. Malhotra's order that plaintiff have "close monitoring," Akintola failed to refer plaintiff to a doctor or neurologist who could address the prescription of plaintiff's new symptoms. As a result, plaintiff suffered a delay in seeing a physician (he next saw Dr. Soltanian on June 3, 2013, who reduced the Topamax)[35] during which delay plaintiff was extremely dizzy, making it difficult to walk, and nauseous. A reasonable jury could find that defendant Akintola interfered with Dr. Malhotra's order for close monitoring by failing to refer plaintiff to a physician, particularly in light of defendant Akintola's declaration that he was not educated or experienced to second guess plaintiff's neurologist (ECF No. 117-4 at 3).

Subsequently, plaintiff was seen by defendant Akintola on June 7, 2013, June 24, 2013, and June 25, 2013, but defendant Akintola's declaration does not specifically address the care given on such dates.[36] In Akintola's June 7, 2013 medical record, he wrote that plaintiff was seen by an RN in consult with the clinician, who recommended plaintiff be seen sooner by telemed, but then noted plaintiff's next telemed appointment was "about" June 20, 2013. Under assessment, Akintola advised plaintiff to adjust his Topamax dose, but there is no mention of Akintola attempting to advance plaintiff's appointment with Dr. Malhotra, and Akintola did not refer plaintiff to his PCP. (ECF No. 138 at 36.)

Despite Dr. Ko's expert declaration generally stating that he sees "nothing in the medical records to suggest the care provided by any of [plaintiff's] health care providers fell below the standard of care," Dr. Ko does not address Dr. Malhotra's order for "close monitoring." (ECF No 164-1 at 13.) Moreover, defendants did not provide a declaration from Dr. Malhotra explaining what he meant by "close monitoring," or submit evidence as to how such an order was to be

---

[35] Plaintiff declares Dr. Soltanian did not reduce the Topamax (ECF No. 132-3 at 21), but medical records confirm Dr. Soltanian reduced the dose to 200 mg (ECF No. 138 at 31).

[36] Plaintiff's declaration confirms that from May 30 through July 3, 2013, plaintiff suffered from severe dizziness, at most times could not walk, requiring a wheelchair, and was constantly nauseated. (ECF No. 132-3 at 21-22.)

1    carried out in connection with plaintiff's prescription.  The evidence demonstrates that plaintiff

2    presented to medical numerous times following the increased dose of Topamax.  A reasonable

3    jury could find that defendant Akintola's failure to refer plaintiff to his PCP each time Akintola

4    treated plaintiff was deliberate indifference in light of Dr. Malhotra's order for close monitoring,

5    particularly in light of Akintola's declaration that it was not his place to alter or change plaintiff's

6    prescription.  Subsequently, plaintiff was diagnosed as having overdosed on Topamax, raising the

7    further inference that plaintiff was not "closely monitored."

8         Thus, defendant Akintola is not entitled to summary judgment for medical care provided

9    in 2013.

10        M.  Defendant Dr. Barnett

11        June 10, 2011

12        In his operative complaint, plaintiff contends that on June 10, 2011, he saw Dr. Barnett

13   regarding the previously scheduled MRI with contrast.  Plaintiff explained his medical history as

14   best he could.  Plaintiff declares that Dr. Barnett told plaintiff he was not having seizures, but was

15   having migraine headaches, cancelled the MRI with contrast, took plaintiff off all his

16   medications, and ordered migraine medication for plaintiff.  However, medical records contradict

17   many of these allegations.  Dr. Barnett did diagnose plaintiff as having ocular migraines, but he

18   ordered additional medications to treat plaintiff's headache pain and did not discontinue any of

19   plaintiff's seizure medications.  (ECF No. 107-2 at 16; 164-1 at 101.)  In addition, the record does

20   not reflect that Dr. Barnett cancelled plaintiff's MRI.  Plaintiff's June 6, 2011 CDC 7362

21   complained that someone told him his PCP cancelled the MRI.  An unidentified individual wrote

22   on Dr. Tseng's MRI request:  "6/6 -- out of time -- R/S for 6/17."  (ECF No. 136 at 11.)  Thus, the

23   evidence shows that Dr. Barnett, who first saw plaintiff on June 10, 2011, and was not plaintiff's

24   PCP, did not cancel the MRI.  Rather, it appears that someone ran out of time, perhaps the MRI

25   imaging tech, and therefore rescheduled the MRI, which was done on June 17, 2011.

26        In his opposition, plaintiff argues that Dr. Barnett erroneously diagnosed plaintiff as

27   having ocular migraines, despite having plaintiff's medical records, and hearing plaintiff's report

28   of having eight seizures a day, the association of visual symptoms with a brain tumor, and the

89

"witnessed convulsions of October 2010,"[37] and did not inquire why plaintiff did not yet have an MRI. (ECF No. 130 at 42.) However, in his deposition, Dr. Barnett explained that he was concerned that plaintiff may "have a brain tumor that's enlarging" or could deteriorate over the weekend, so he did a thorough physical exam, including looking "at the back of plaintiff's eyes to see that the discs were sharp, and that there were no signs of edema in the disc, of pressure in the head that was untoward." (ECF No. 164-2 at 9.) Dr. Barnett found plaintiff's discs were sharp, his gait was normal with one exception, he had clonus on his ankles bilaterally, which he charted for further follow-up. (Id.) Dr. Barnett considered stopping plaintiff's medications, but decided against it. (Id.) Dr. Barnett was concerned about plaintiff's headaches, which is why he prescribed the additional medications. Dr. Barnett testified that he believed "there was a very good possibility that what [plaintiff] was experiencing was migraine headaches on top of seizures." (ECF No. 164-2 at 19.)

An erroneous diagnosis, or misdiagnosis, is insufficient to state an Eighth Amendment medical claim. "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Toguchi, 391 F.3d at 1060. Plaintiff has failed to demonstrate that the course of treatment chosen by Dr. Barnett was medically unacceptable. Jackson, 90 F.3d at 332. Dr. Slyter fails to opine how Dr. Barnett's failure to inquire about plaintiff's MRI on June 10, 2011, constitutes deliberate indifference, particularly where there is evidence that over the weekend Dr. Barnett confirmed plaintiff's MRI was already scheduled for June 17, 2011. Dr. Slyter's opinion in connection with Dr. Barnett's June 10, 2011 exam constitutes a difference of medical opinion. "A difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987.

---

[37] Although Dr. Barnett had plaintiff's medical records, there is no evidence that Dr. Barnett saw Higuera's note that he witnessed plaintiff convulsing on October 12, 2010. Indeed, Dr. Tseng testified that such records are not typically filed in prisoner's medical records. (Tseng Dep. at 46.) Moreover, by the time Dr. Barnett saw plaintiff, the meningioma had been resected and the source of plaintiff's continued seizures had not yet been diagnosed, as confirmed by Dr. Barnett's June 12, 2011 email to his colleagues.

90

Although Dr. Barnett conceded in his deposition that he was not certain when the MRI would be done, evidence demonstrates plaintiff's MRI was re-scheduled for June 17, 2011, and Dr. Barnett testified that if plaintiff was not better in three days, an emergency MRI could be done. (ECF No. 164-2 at 15.) Dr. Barnett summarized plaintiff's symptoms since the meningioma resection about six months earlier, and prescribed additional medication to treat the symptoms of headache and visual disturbances that prescribed medications had not already ameliorated. (ECF No. 107-2 at 4.) Dr. Barnett also wrote orders for plaintiff to be seen by Dr. Rudas the following Monday -- within three days -- and arranged for Dr. Rudas to take over plaintiff's care in Dr. Barnett's absence. (ECF Nos. 107-2 at 15; 164-2 at 13; 20.)

But in addition, at some point after the Friday, June 10, 2011 exam, Dr. Barnett called a neurology colleague to seek advice on plaintiff's seizures following removal of the meningioma. (ECF No. 107-2 at 24.) On Sunday, June 12, 2011, Dr. Barnett emailed Dr. Rudas to relay the discussion, and offer the colleague's suggested follow-up. Dr. Barnett also asked Dr. Rudas to advise the results of plaintiff's exam on Monday. On Monday, Dr. Rudas confirmed plaintiff's symptoms suggested partial complex/temporal lobe activity, and that an MRI was scheduled for June 17, 2011. (Id. at 23.) Dr. Rudas also wrote an urgent referral for plaintiff to receive an EEG and a telemed neurology consult. Dr. Rudas would hold off on further studies pending the neurology consult but would follow up with plaintiff "weekly in TTA until we get a handle on his case." (Id.)

Thus, the factual differences between what plaintiff declares he told Dr. Barnett at this visit and what Dr. Barnett declares do not raise material disputes of fact because the record confirms that the MRI with contrast was scheduled; Dr. Barnett was not involved in ordering or cancelling the MRI; Dr. Barnett did not discontinue plaintiff's seizure medication; and Dr. Barnett added medications in an effort to ameliorate plaintiff's headache pain. Crediting plaintiff's statements that Dr. Barnett told plaintiff he was not having seizures, and would not order an MRI, the evidence shows that Dr. Barnett sought advice from his neurology colleague, relayed such advice to Dr. Rudas, who subsequently and urgently followed up within less than three days, incorporating much of the treatment recommended by Dr. Barnett's neurology

1    colleague. Such actions on the part of Dr. Barnett do not evidence deliberate indifference despite

2    what Dr. Barnett allegedly told plaintiff.

3        July 9, 2013

4        Defendants initially contended that Dr. Barnett examined plaintiff on a single occasion,

5    June 10, 2011. Medical records confirm Dr. Barnett also examined plaintiff on July 9, 2013, but

6    such exam was not included in plaintiff's second amended complaint, and Dr. Barnett did not

7    address such treatment in his declaration. In their reply, defendants did not address Dr. Barnett's

8    July 9, 2013 treatment. However, Dr. Barnett was deposed at length concerning his July 9, 2013

9    treatment of plaintiff. (See, e.g., Dr. Barnett Dep., 125-55.) Also, defendants' expert, Dr. Ko,

10   addressed Dr. Barnett's second exam.[38]

11       Dr. Barnett's exam was a follow-up to plaintiff's recent hospitalization on July 3, 2013,

12   for which plaintiff was later diagnosed as suffering a Topamax overdose. By July 9, 2013,

13   plaintiff's Topamax had been reduced to 100 mg BID, and Dr. Barnett would further taper the

14   Topamax to 50 mg BID. (ECF No. 138 at 41.) In his declaration, plaintiff claims Dr. Barnett

15   told plaintiff that Dr. Barnett did not think plaintiff was having seizures, and was going to get

16   plaintiff off all seizure medications. (ECF No. 132-3 at 23.) Plaintiff declares Dr. Barnett

17   lowered plaintiff's Topamax because plaintiff was not having seizures, and would call plaintiff's

18   neurologist to discuss the change. (Id.) Plaintiff declares that Dr. Barnett told plaintiff he was

19   having migraines. Plaintiff was confused because he had been diagnosed with a seizure disorder

20   at UC Davis. Plaintiff further declares that Dr. Barnett did not discuss any mental health issues

21   with plaintiff, or ask about plaintiff's mental health evaluations. (Id.)

22       The medical record from the July 9, 2013 visit reflects the following:

23       Plaintiff complained that Topamax made him dizzy, and has history of difficulty

24   controlling seizures, simple partial; left visual field wavy. (ECF Nos. 138 at 41; 164-2 at 35.) Dr.

25   Barnett wrote: "? seizure disorder, see neurology note. Suspect somatoform disorder with

26   personality disorder." (ECF No. 138 at 41.) Plaintiff was taking Topamax 100 BID and will

27
28   [38] Both Dr. Slyter and Dr. Ko refer to Dr. Barnett's treatment on July 7, 2013, but the medical records from Dr. Barnett's exam are dated July 9, 2013. (ECF No. 138 at 41, 42.)

taper Topamax to 50 BID, and Keppra stayed the same at 1500 mg. Dr. Barnett assessed plaintiff as having a personality disorder – obsession/narcissism. "Doubt seizure disorder" and doubt neuro defects -- med related. ? Paranoia" (ECF No. 138 at 41.) Dr. Barnett plans to "minimize meds, and discuss with mental health, medical leadership," and again assesses "ocular migraine?" (ECF No. 138 at 41.)

On July 9, 2013, Dr. Barnett issued the following orders for plaintiff: MD line follow-up for seizures, and mental health referral for evaluation – somatoform disorder, depression, delusion. (ECF No. 138 at 42.) Plaintiff was seen in mental health on July 12, 2013. By the time plaintiff saw Dr. Malhotra again on August 13, 2013, plaintiff had been off Topamax for eight days (ECF No. 138 at 46), and plaintiff concedes that Dr. Malhotra "no longer recommended Topamax as a medication." (ECF No. 132-3 at 23.) At the time plaintiff prepared his declaration in 2016, he was under the care of UC Davis doctors for the seizure disorder. (ECF No. 132-3 at 23.)

In opposition, Dr. Slyter opines that the standard of care required Dr. Barnett to review plaintiff's medical records; plaintiff argues that Dr. Barnett's refusal to acknowledge plaintiff's seizure disorder reflects Dr. Barnett did not review plaintiff's medical records. Plaintiff declares that after he saw Dr. Barnett, medical staff began questioning whether plaintiff had a seizure disorder, requiring plaintiff to try to convince medical staff that plaintiff was so diagnosed. Plaintiff argues that had Dr. Barnett confirmed the seizure disorder diagnosis, it would not have been appropriate for him to diagnose ocular migraine or to attribute plaintiff's symptoms to a psychological disorder. Further, plaintiff argues that Dr. Barnett's interference caused plaintiff undue delay in receiving necessary treatment from UC Davis neurology specialists. (ECF No. 130 at 44.)

In his deposition, Dr. Barnett testified that such medical records are "shorthand," and that his record from July 9, 2013, said that he doubts "the seizure disorder is responsible for all the symptoms [plaintiff was] describing or that the nature of the seizure disorder is why he's unable to control the seizures." (Dr. Barnett Dep. at 151; 152.) Dr. Barnett explained that the interpretation of his medical record had to encompass the entire record because Dr. Barnett earlier

wrote that plaintiff was being treated for a seizure disorder and the treatments are for simple, partial non grand mal seizures.  (Id. at 154.)  Thus, the medical record expressed Dr. Barnett's differential diagnoses to be considered.  (Id. at 155.)

Dr. Ko also opined that the whole of the record shows that, based on his examination, Dr. Barnett properly considered plaintiff's symptoms as "consistent with ocular migraine, in addition to the seizure disorder."  (ECF No. 164-1 at 12.)  In support of his view that Dr. Barnett thought some neurologic symptoms may be simple partial seizures, but suspected some symptoms may not be, Dr. Ko opined that Dr. Barnett's suspicion is not an uncommon scenario because some patients with epilepsy also have pseudoseizures (seizure-like symptoms but are not seizures) as well."  (Id.)  Dr. Ko opined that Dr. Barnett "is able to use his medical judgment to assess these symptoms which is appropriately within the standard of care."  (Id.)

The medical record in which Dr. Barnett specifically identifies plaintiff's seizures as "simple partial, non grand mal" raises an inference that Dr. Barnett was aware plaintiff had been diagnosed as having simple partial seizures, and supports Dr. Ko's opinion.  In addition, on August 13, 2013, Dr. Malhotra charted that plaintiff's seizures were stable, and questioned the etiology of plaintiff's dizziness, and planned for plaintiff to be evaluated for anxiety/depression, finding that plaintiff's "[m]ultiple symptoms seem to lack objective basis."  (ECF No. 138 at 46.)  Indeed, years before, outside neurologist Dr. Jumao had also considered an anxiety disorder. (ECF No. 107-2 at 20.)

Plaintiff attempts to ascribe some ulterior motive on the part of Dr. Barnett in diagnosing plaintiff with ocular migraines and referring plaintiff to mental health.  But the diagnosis of one condition does not preclude the diagnosis of additional conditions, and absent facts not present here, ordering additional tests or inquiries by other medical professionals does not demonstrate deliberate indifference.  As it turns out, plaintiff's medical conditions were complex and involved not only a 3.8 cm brain meningioma, which was fortunately benign, but also a complex seizure disorder that proved difficult to diagnose and effectively treat.  Then, following the diagnosis of those two conditions, plaintiff suffered an overdose of Topamax, which initially was effective in reducing plaintiff's seizures, and following the discontinuation of Topamax, plaintiff continued to

suffer dizziness, which has apparently also been difficult to diagnose and treat.

Plaintiff argues that Dr. Barnett's diagnoses delayed plaintiff's "necessary treatment from UC Davis neurology specialists." (ECF No. 130 at 44.) But Dr. Barnett's referral to mental health did not delay plaintiff's neurologic care because plaintiff was seen by mental health staff just three days later, on July 12, 2013. (ECF No. 138 at 44.) Dr. Barnett's assessment did not interfere with plaintiff seeing neurologist Dr. Malhotra on August 13, 2013. In addition, plaintiff declares that after the Topamax overdose, he was prescribed Vimpat by UC Davis doctors. (ECF No. 132-3 at 23.) Thus, Dr. Barnett's treatment did not interfere with plaintiff's prescription to an alternative medication for his seizure condition. It is undisputed that Dr. Barnett only provided treatment on two occasions. Thus, plaintiff fails to set forth facts or evidence demonstrating how Dr. Barnett's treatment interfered with plaintiff's subsequent treatment by UC Davis neurology specialists in violation of the Eighth Amendment.

Accordingly, Dr. Barnett is entitled to summary judgment.

Role as Lawyer

Finally, plaintiff points out that Dr. Barnett is a doctor and a lawyer, and was not employed at MCSP, yet treated plaintiff on two occasions. Plaintiff argues that Dr. Barnett interfered in plaintiff's medical treatment by creating a record with a diagnosis of migraines rather than allow plaintiff to receive costly treatment for his seizure disorder: "As there is no medical explanation for Barnett's diagnosis, it is reasonable that Barnett's motivation was to create a difference of opinion as a defense for his employer" and to minimize legal liability. (ECF No. 130 at 44.)

Contrary to plaintiff's argument, defense expert Dr. Ko subsequently evaluated Dr. Barnett's treatment of plaintiff and found that Dr. Barnett used his medical judgment to evaluate plaintiff's symptoms, and opined that Dr. Barnett's care on both occasions did not fall below the standard of care. (ECF No. 164-1 at 12-13.) Because the standard of care is lower than the higher standard required for deliberate indifference, the Eighth Amendment was not violated.

The undersigned finds no support for plaintiff's speculative theory. Because Dr. Barnett is a Harvard-trained medical doctor, licensed to practice in California, and board certified in

family medicine, the undersigned cannot find that Dr. Barnett's provision of medical care at MCSP constitutes deliberate indifference, even though he is also a lawyer. Dr. Barnett testified that as a chief medical officer, now known as chief medical consultant, being an attorney was not a requirement for such position, and does not include acting in a legal capacity. (Dr. Barnett Dep. at 26-27.) It is undisputed that Dr. Barnett specializes in the diagnosis and treatment of inmates including those with headaches, visual disturbances, seizures, chronic pain and brain surgery. In addition, the evidence confirms that Dr. Barnett's call to his neurology colleague Kneisley expedited plaintiff's care by Dr. Rudas. Absent facts or evidence not present here, plaintiff's speculation based on Dr. Barnett's legal degree is unpersuasive.

N. Radiation

In his pleading, plaintiff argues that several neurologists informed him that his seizure disorder could be reduced or eliminated by radiation treatment, but MCSP staff will not follow their recommendations. (ECF No. 53-1 at 9.) In two pages of his opposition, plaintiff refers to radiation as follows: Dr. Pineda recommended target radiation on January 24, 2012; on February 7, 2012, defendant PA Akintola noted Dr. Pineda was "considering radiation treatment;" on March 1, 2012, Dr. Rudas noted that Dr. Pineda recommended radiation treatment on January 24, 2012; and on March 28, 2012, Dr. Tseng noted no recommendations for surgery or radiation were made by plaintiff's neurosurgeon. (ECF No. 130 at 15, 16.) Dr. Rudas requested plaintiff receive an urgent appointment with UC Davis neurosurgery to determine plaintiff's optimal treatment options. (Id.) Plaintiff makes no other arguments in his opposition or in his response to defendants' statement of facts concerning plaintiff's alleged need for radiation therapy.

Dr. Pineda's plan from the January 24, 2012 visit stated, "*Consider* radiation treatment for the residual meningioma." (ECF No. 137 at 10 (emphasis added).) The Telemed Orders dated January 31, 2012, state "PCP to *consider* radiation treatment for the residual meningioma." (ECF No. 13 at 11 (emphasis added).) On March 1, 2012, Dr. Rudas' plan stated Dr. Pineda "has recommended radiation therapy as an *option* to treat patient," and ordered referral for second opinion from UC Davis Neurosurgery to determine plaintiff's "optimal treatment options." (ECF No. 137 at 16 (emphasis added).) The neurosurgeon did not recommend radiation. (ECF No. 137

96

at 19-23.)  Dr. Tseng's medical record explains that "Radiation therapy has been ruled out as an option after neurosurgical consult.  Basically radiation only affects fast growing tumors, and minimal effect on slow growing/stagnant tumors like the residual he has left."  (ECF No. 137 at 25.)  In light of Dr. Tseng's medical record, and plaintiff's lack of argument or evidence in support of his radiation claim, it appears plaintiff abandoned this claim.

      O.  Earlier Referral to Epilepsy Specialist

      Finally, plaintiff argues that defendants did not refer plaintiff to an epilepsy specialist in a timely fashion.  (ECF No. 130 at 27.)  Dr. Slyter opined that: "When his seizures proved refractory to medical managements (the use of pills), the standard of care required he be placed in the hands of an epilepsy specialist."  (ECF No. 132-1 at 3.)  But plaintiff provides no additional factual support for this argument, i.e. the date his seizures proved refractory, or which defendant was responsible for plaintiff's care at that time.  Moreover, as set forth above, failing to meet the standard of care is insufficient to show deliberate indifference.  Plaintiff points to no facts demonstrating that a particular defendant was deliberately indifferent to plaintiff's need to be earlier referred to an epilepsy specialist.  Therefore, plaintiff's argument fails.

V.  Second Cause of Action:  Supervisory Liability

      A.  Undisputed Facts:  Supervisory Liability[39]

1.  At MCSP, the only policy or procedure Dr. Galloway was involved in was "the use of a 'problem list' which contains annotations of prior diagnoses or significant medical conditions" for the benefit of inmate patients.  (ECF No. 130-1 at 4.)

2.  Dr. Tseng had no involvement in supervising or training staff or in establishing medical procedures at MCSP.  (ECF No. 130-1 at 32.)

3.  Dr. Naseer had no involvement in supervising or training staff or in establishing medical procedures and had no involvement in creating or implementing medical policies and procedures at MCSP.  (ECF No. 130-1 at 17.)

4.  Dr. C. Smith is a medical doctor and practiced medicine for more than 55 years.  (ECF

_____

[39] Unless otherwise indicated, these facts are undisputed for purposes of summary judgment.

No. 130-1 at 48.)

5. Dr. Smith never personally saw or examined plaintiff. (ECF No. 132-3 at 23.)

6. When Dr. C. Smith became Chief Physician and Surgeon, he instructed the nurse to bring all medication requests from outside health care providers to Dr. Smith, and Dr. Smith signed them so the patient could get the medication immediately. (ECF No. 106-2 at 3.) In approving the request, the only information Dr. Smith had was the nurses' request to approve a recommendation from an outside provider. Dr. Smith did not examine the patient or review any medical records. Dr. Smith did not second guess the medical opinions and recommendations, but simply signed them because the requests were made by a health care provider who treated the patient. (Id.)

7. The only policy or procedure that Dr. Smith was involved in creating or implementing was the expedited approval process for the provision of medicines recommended by plaintiff's treating physicians and specialists. (ECF No. 130-1 at 50-51.)

8. Christopher Smith, M.D., is listed as "Supervising Physician," on defendant PA Akintola's June 7, 2013 medical progress note.[40] (ECF No. 138 at 36.)

9. Dr. Heatley is a medical doctor and practiced medicine for more than 30 years. (ECF No. 130-1 at 54.)

10. To the best of his knowledge, Dr. Heatley first heard of plaintiff when Dr. Rudas contacted him and requested that plaintiff be sent out immediately because of a brain mass detected on an MRI. (ECF No. 130-1 at 54.) Dr. Heatley immediately approved the request. (Id.)

11. Defendant PA Todd did not supervise other employees. (ECF No. 130-1 at 68.)

12. Defendant Todd also reviewed and responded to some inmate administrative appeals regarding their medical care. (ECF No. 130-1 at 68.)

////

---

[40] Plaintiff also claims that Dr. Smith was designated plaintiff's primary care physician. (ECF No. 130-1 at 49, 54, citing Ex. MMMM.) However, plaintiff's exhibit MMMM does not identify Dr. Smith as plaintiff's PCP. (ECF No. 138 at 36.)

13. Defendant PA Akintola's job duties did not include supervising any medical staff, and was not responsible for the care or treatment provided by others. (ECF No. 130-1 at 72.)

B. Discussion

In the second amended complaint, plaintiff contends that defendants Dr. Galloway, PA Akintola, PA Todd, Dr. Nale, Dr. Naseer, Dr. Tseng, Dr. C. Smith, and Dr. Heatley failed to "adequately supervise, train staff and establish procedures that would ensure [p]laintiff would receive, at a minimum, adequate medical care." (ECF No. 53, ¶ 157.)

Defendants move for summary judgment on the grounds that plaintiff's claim for supervisory liability fails because defendants were not supervisors and cannot be held liable for the acts of others. (ECF Nos. 106; 117.) Defendants argue that there is no respondeat superior liability under § 1983, that plaintiff was required to identify actions each defendant took that violated plaintiff's constitutional rights, and failed to show that a triable issue of material fact as to a claim for supervisorial liability exists against any defendant. In plaintiff's opposition, he solely argues that defendants PA Todd, Dr. Smith, and Dr. Heatley are liable for their acts as supervisors. (ECF No. 130 at 44-48.) The undersigned begins with these three defendants, and then addresses the remaining defendants.

1. Defendant PA Todd

Plaintiff does not dispute that defendant Todd did not supervise any medical staff. (ECF No. 130-1 at 68.) Rather, plaintiff argues that defendant Todd "assumed the role of a supervisor by conducting a medical appeal review." (ECF No. 130 at 47.) Plaintiff contends that defendant Todd is responsible for the harm caused by the medical personnel when she reviewed and acquiesced in their behavior. Plaintiff met the criteria for an MRI on October 12, 2010, but an MRI was not ordered until November 1, 2010, and was not acted upon by medical personnel until December 15, 2010. Plaintiff appealed such issues, and defendant Todd denied the appeal, allowing the doctors she was reviewing to avoid any consequences, and causing further delay to plaintiff, and forcing him to litigate in court. In addition, plaintiff argues that defendant Todd, as a PA, was lower in rank than the medical doctors whose actions she was reviewing. As a PA, plaintiff contends that defendant Todd was prohibited from reviewing the conduct of doctors.

99

(ECF No. 130 at 48.)

In reply, defendants contend that in the case of non-doctors such as defendants Moreno, Todd, Kettelhake, and Akintola, the exercise of their professional judgment was to defer to the doctors and specialists who were treating plaintiff because they lacked the education, training and experience to second-guess the judgment of experienced doctors. (ECF. No. 164 at 12, citing Todd Dec. ¶ 3.)

The undersigned is not persuaded by plaintiff's argument. Plaintiff provided no legal authority for his position that reviewing medical appeals can be construed as assuming the role of a supervisor. Moreover, as discussed above, the undersigned finds that defendant Todd did not violate the Eighth Amendment on May 31, 2011, and thus, there is no basis for liability under a supervisory theory in any event. In light of such finding, the undersigned need not address plaintiff's tangential arguments concerning Todd's May 31, 2011 appeal review.

Accordingly, defendant Todd is entitled to summary judgment on plaintiff's supervisory liability claim.

### 2. Defendant Dr. Smith

In 2003, Dr. Smith was promoted to Chief Physician, a position he holds today. Plaintiff argues that "[Dr.] Smith admits to creating a system that denied patients the treatment from their doctors regarding prescription drugs," and contends that whether or not this system caused plaintiff harm is a question for the jury. (ECF No. 130 at 47.) Plaintiff argues that Dr. Smith admits to changing the system, and that in order to expedite the process, when Dr. Smith became Chief, he instructed the nurse to bring all of the medication requests directly to him, and Dr. Smith signed them so that the patient could get their medication immediately. (ECF No. 130 at 47.) According to plaintiff's expert Dr. Slyter, the Topamax dosage increase to 225 mg. BID was a toxic level that caused harm to plaintiff, and plaintiff then repeats his claim that Dr. Smith admits to creating a system that denied patients the treatment from their doctors regarding prescription drugs. (Id.) Further, plaintiff contends that Dr. Smith appointed defendant Todd to conduct 602 reviews, apparently in violation of the Health Care Services manual, which states that

> First formal level appeals shall not be reviewed by a staff person who participated in the event or decision being appealed, who is of lower administrative rank than any participating staff, or who participated in review of a lower level appeal that has now been re-filed at a higher level.

(ECF No. 130 at 47.)  Moreover, first level appeal responses must be completed within 30 working days of receipt.  (Id., citing Chapter 12 of the Health Care Services manual, Section III, B.)  Plaintiff argues that Dr. Smith is liable for the harm caused by Todd's failure to supervise the medical personnel subject to medical appeal by plaintiff and the harm caused to plaintiff by Todd's denial of treatment.  (ECF No. 130 at 47.)

In reply, defendants argue that plaintiff's allegation that Dr. Smith created "a system that denied patients the treatment from their doctors regarding prescription drugs," is vague, and plaintiff fails to provide sufficient detail to even identify the policy to which he refers. Defendants contend that plaintiff fails to provide specific allegations of Dr. Smith's involvement in the implementation of a deficient policy.

Discussion

Defendants' arguments are well-taken.  Plaintiff's contention that the system implemented by Dr. Smith "denied patients the treatment from their doctors regarding prescription drugs" is vague.  However, in the response to defendants' statement of facts, plaintiff clarified that the expedited approval process for the provision of medicines recommended by plaintiff's treating physicians and specialists is the only policy or procedure in which Dr. Smith was involved, and Dr. Smith admits such involvement.  Plaintiff claims that Dr. Smith's policy harmed and did not benefit plaintiff because he overdosed on medication as a result of not being monitored by the prescribing physician.  (ECF No. 130-1 at 51.)

Dr. Smith declares that "[i]t was the duty of the provider to counsel the patient on the use of the medication, side effects, etc."  (ECF No. 106-2 at 3.)  In addition, Dr. Tseng testified that the patient is responsible for informing medical staff regarding side effects, and that predominantly monitoring would be multidisciplinary; that is, by nurses, PCP and the specialist. (Dr. Tseng Dep. at 108.)  Thus, it would be inappropriate for plaintiff to report side effects to Dr. Smith, who had no hands-on or day to day responsibility with regard to plaintiff's medical care.

101

1   Dr. Smith admitted to implementing a system to expedite the receipt of medications ordered by

2   outside health care providers, but plaintiff fails to demonstrate how this system denies plaintiff

3   treatment where other medical staff are available and responsible for addressing plaintiff's

4   complaints.  Moreover, plaintiff's position is disingenuous in light of his declaration admitting

5   that when Dr. Malhotra increased the Topamax beyond the recommended dose, the doctor told

6   plaintiff that his "PCP will watch and determine if appropriate."  (ECF No. 132-3 at 21.)

7          In addition, plaintiff fails to demonstrate Dr. Smith acted with a culpable state of mind.

8   Dr. Smith's act in ordering the prescription recommended by Dr. Malhotra does not evidence

9   deliberate indifference, but rather confirms Dr. Smith's goal in expediting the fulfillment of

10  outside specialists' orders for medication.  Arguably, if Dr. Smith had not ordered the treatment

11  recommended by Dr. Malhotra, plaintiff could maintain that Dr. Smith interfered with an outside

12  doctor's recommendation.  See, e.g., Tolbert v. Eyman, 434 F.2d 625 (9th Cir. 1970) (finding

13  cognizable claim for deliberate indifference where warden refused to authorize prisoner's receipt

14  of medicine, which was required to prevent serious harm to his health, that had been previously

15  prescribed by a physician).  Plaintiff failed to rebut Dr. Smith's evidence that his sole role in

16  approving the outside health care provider's prescriptions was to expedite prisoners' receipt of the

17  medications, or that it was the duty of the provider to counsel the patient on the use of the

18  medication and side effects.  Plaintiff failed to demonstrate a triable issue of material fact exists

19  as to whether Dr. Smith may be liable based on his role as supervisor, or that he was deliberately

20  indifferent in violation of the Eighth Amendment.

21         Plaintiff also argues Dr. Smith is liable based on a reference to Dr. Smith in the medical

22  records.  In addition to his admitted role in approving recommendations for medications by

23  outside doctors, Dr. Smith is also named as the "supervising physician," on the June 7, 2013

24  medical record from plaintiff's visit with PA Akintola.[41]  (ECF No. 138 at 36.)  Plaintiff also

25  contends Dr. Smith was listed as plaintiff's PCP, but no such reference is made on this medical

26  record.  There is no notation in the June 7, 2013 record that Akintola contacted Dr. Smith or

27  _____

28  [41]  This specific date of treatment is not addressed in the declarations filed by defendants PA
    Akintola or Dr. Smith.

                                          102

discussed plaintiff's care with Dr. Smith. In addition, another medical record shows nonparty Dr. Soltanian as plaintiff's PCP. (ECF No. 138 at 30.) Moreover, Akintola's May 30, 2013 medical record reflects Dr. Soltanian as Akintola's supervising physician. (ECF No. 138 at 23.) Subsequent medical records reflect Dr. Soltanian was contacted by Akintola about plaintiff, and Dr. Soltanian also treated plaintiff. (ECF No. 138 at 30, 33, 39.) There are no other medical records confirming Dr. Smith physically examined plaintiff or was assigned as plaintiff's PCP to rebut Dr. Smith's declaration to the contrary. Indeed, it is undisputed that Dr. Smith approved medical requests based entirely on recommendations received from plaintiff's outside doctors, not through examining plaintiff or Dr. Smith making his own determination as to what treatment plaintiff needed. (ECF No. 130-1 at 49.) Also, there is no evidence that Dr. Smith was aware that plaintiff was having increased side effects from the Topamax. Absent facts demonstrating Dr. Smith's involvement on June 7, 2013, or otherwise treating plaintiff, the single reference on one of Akintola's medical records listing Smith as the supervising physician is insufficient to state an Eighth Amendment deliberate indifference claim.

Plaintiff's argument as to Dr. Smith's supervision of defendant Todd is also unsupported. Plaintiff cites to no evidence showing that Dr. Smith appointed defendant Todd to conduct 602 appeal reviews. (ECF No. 130 at 47.) Moreover, plaintiff points to no evidence demonstrating that Dr. Smith was responsible for reviewing defendant Todd's actions or omissions in addressing such appeals, or in any other way supervising defendant Todd in this process. Also, plaintiff fails to identify a particular medical appeal he suggests was addressed beyond the 30 day time frame, if it was, or to identify Todd's appeal decision over which plaintiff argues Dr. Smith should have intervened or supervised.

In any event, as set forth above, the undersigned finds that defendant Todd did not violate the Eighth Amendment in her review of plaintiff's appeal Log #MCSP-16-11-10820; therefore, the undersigned cannot find Dr. Smith liable for any supervisory role he may have played over such appeal for the same reasons discussed above.

For all of the above reasons, defendant Dr. Smith is entitled to summary judgment on supervisory liability.

### 3. Dr. Heatley

Plaintiff argues that as CMO, Dr. Heatley is liable based on his role as supervisor of physicians for the following reasons. First, Dr. Heatley oversaw the system that provided for nurses to evaluate the symptoms of patients in the CDC 7362 to determine treatment, yet by their own admissions, defendants Moreno, Villanueva, and Kettelhake lacked the training to make such determinations. Plaintiff contends that Dr. Heatley is responsible for allowing such incompetent system to be used. Second, plaintiff argues that Dr. Heatley was aware Dr. Barnett was treating plaintiff, based on an email, and because Dr. Barnett is a lawyer in the Legal Affairs Office, a reasonable jury could conclude that Dr. Heatley acquiesced to a lawyer treating patients in an effort to mitigate liability rather than to provide appropriate medical care. Third, plaintiff contends that as a result of Plata v. Brown, No. 3:01-1351 JST (N.D. Cal.), a class action suit concerning the adequacy of prison medical care in California, Dr. Heatley was assigned to MCSP to identify and fix medical care that did not meet constitutional standards. One of the areas of concern identified by Dr. Heatley was urgent services. Dr. Heatley testified that an individual, first time seizure patient presenting to the TTA would fall in the category of urgent services, and the failure to send such patient to an outside facility would not be adequate care. (ECF No. 130 at 46, citing Heatley Dep. at 82-86.[42]) Despite such assignment, plaintiff alleges Dr. Heatley failed to ensure plaintiff received the required treatment. (ECF No. 130 at 46.)

In reply, defendants argue that plaintiff's claim that Dr. Heatley oversaw a system in which nurses and physicians' assistants lacked the training to determine medical care for inmates does not reflect a specific failure to train or the implementation of a deficient policy. Defendants contend that in the case of non-doctors such as defendants Moreno, Todd, Kettelhake, and Akintola, the exercise of their professional judgment was to defer to the doctors and specialists who were treating plaintiff because they lacked the education, training and experience to second-guess the judgment of experienced doctors. (ECF. No. 164 at 12, citing Todd Dec. ¶ 3.) Because

---

[42] It does not appear that plaintiff lodged Dr. Heatley's deposition with the court. However, because the deposition could be provided at trial in connection with Dr. Heatley's testimony, the undersigned considers the argument.

1 Dr. Barnett is a licensed physician, defendants argue it is unclear how plaintiff believes Dr.

2 Barnett's treatment of plaintiff was improper, simply because he is employed by the Legal Affairs

3 Office.

4 Discussion

5       The undersigned is not persuaded that the MCSP medical system is incompetent simply

6 because defendants Moreno, Villanueva, and Kettelhake were unable to diagnose a brain tumor,

7 or determine proper treatment for a complex seizure disorder.  A reasonable jury would not so

8 find, particularly where most Americans must first be triaged through nursing staff before gaining

9 access to a doctor for medical care.

10       Plaintiff's second argument fails for the same reasons his speculative theory as to Dr.

11 Barnett failed.  The fact Dr. Barnett also holds a law degree does not raise a reasonable inference

12 that Dr. Heatley acquiesced to a lawyer treating patients in an effort to mitigate liability rather

13 than to provide appropriate medical care.

14       Plaintiff's third argument fails because despite Dr. Heatley's identification of a concern

15 with urgent services, plaintiff adduces no evidence demonstrating Dr. Heatley was aware plaintiff

16 was taken to the TTA on October 12, 2010, or was otherwise involved in plaintiff's care.  Rather,

17 the record reflects Dr. Heatley's first involvement was being copied on an email on June 12,

18 2011.  In any event, as discussed above, Dr. Naseer did not definitively diagnose plaintiff as

19 having suffered a seizure.  (ECF No. 105-2 at 4.)  Thus, any failure on the part of Dr. Heatley to

20 properly supervise Dr. Naseer, absent facts not alleged here, also does not rise to the level of

21 deliberate indifference.

22       Finally, plaintiff's arguments as well as the evidence fail to demonstrate a sufficient

23 causal connection between Dr. Heatley's conduct and any constitutional violation.

24       For all these reasons, Dr. Heatley is entitled to summary judgment on supervisory

25 liability.

26             4.  Remaining Defendants Named in Supervisory Capacity

27       Defendants contend that plaintiff fails to demonstrate a triable issue of material fact with

28 regard to a claim for supervisory liability as to any of the remaining defendants, and such claims

1    should be dismissed as a matter of law.  Defendants argue that in his opposition, plaintiff failed to

2    argue supervisory liability as to Dr. Galloway, PA Akintola, Dr. Nale, Dr. Naseer, and Dr. Tseng.

3    Plaintiff's second amended complaint sets forth only generalized allegations as to these

4    defendants sued on the basis of their alleged supervisory liability.

5         As argued by defendants, plaintiff failed to address these claims in his opposition.  (ECF

6    No. 130 at 44-48.)  In his response to defendants' statement of facts, plaintiff concedes that it is

7    undisputed that defendants Dr. Naseer, Dr. Tseng, and PA Akintola had no involvement in

8    supervising or training staff.  (ECF No. 130-1 at 17, 32, 72.)  Thus, Dr. Naseer, Dr. Tseng, and

9    PA Akintola are entitled to summary judgment as to supervisory liability.

10        In the response to defendants' statement of facts, plaintiff disputes Dr. Galloway's claim

11   that he had no involvement in supervising or training staff, citing Dr. Galloway's statement that

12   he was involved in creating and implementing the use of a problem list containing annotations of

13   prior diagnoses for the benefit of patients including plaintiff.  (ECF No. 130-1 at 4.)  Plaintiff did

14   not address the supervisory liability of Dr. Nale in such response.[43]  (ECF No. 130-1, *passim.*)

15        In order to adequately plead such a claim, "allegations in a complaint . . . may not simply

16   recite the elements of a cause of action, but must contain sufficient allegations of underlying facts

17   to give fair notice and to enable the opposing party to defend itself effectively."  Starr, 652 F.3d at

18   1216.  In light of all of the declarations filed in support of the motion, the medical records, as well

19   as the undisputed facts set forth above, plaintiff has failed to demonstrate a triable issue of

20   material fact exists in connection with plaintiff's generalized allegations that defendants Dr.

21   Galloway or Dr. Nale were deliberately indifferent to plaintiff's serious medical needs based on

22   their alleged roles as supervisors.  In any event, plaintiff fails to demonstrate how Dr. Galloway's

23   creation of a "problem list" demonstrates his deliberate indifference.  Also, none of the medical

24   records provided demonstrate that Dr. Nale held a supervisorial role; rather, he was a treating

---

26   [43]  In the response to defendants' statement of facts, plaintiff claims it is undisputed that "It was
     not Dr. Nale's job to direct their work on a daily basis or to second guess their treatment of
27   individual patients. (Heatley Dec., ¶ 7.)"  (ECF No. 130-1 at 64.)  However, because Dr.
     Heatley's declaration does not address Dr. Nale, this appears to be a typographical error which
28   should read "Dr. Heatley," not "Dr. Nale."  (ECF No. 117-2 at 3.)

physician. Plaintiff's disputes of fact as to Dr. Nale all involve the doctor's role in treating

plaintiff. (ECF No. 130-1 at 61-63, 66-67.) Both doctors are entitled to summary judgment on

their alleged supervisory liability roles.

Therefore, defendants Dr. Galloway, PA Akintola, Dr. Nale, Dr. Naseer, and Dr. Tseng

should be granted summary judgment on plaintiff's supervisory liability claims.

THIRD CAUSE OF ACTION: NEGLIGENCE-MEDICAL MALPRACTICE

I. <u>Undisputed Facts: Plaintiff's Medical Malpractice Claims</u>[44]

1. Plaintiff presented a claim to the Victims Compensation and Government Claims Board
   ("VCGCB") on May 14, 2011. (ECF Nos. 53, ¶ 29; 164-1 at 42-43.)

2. The claim was received by the VCGCB on May 27, 2011. (ECF Nos. 53, ¶ 30; 164-1 at
   41.)

3. The VCGCB rejected plaintiff's claim on August 18, 2011. (ECF Nos. 53, ¶ 31; 164-1 at
   40.)

4. The third level review concerning plaintiff's medical treatment was dated November 9,
   2011. (ECF Nos. 133 at 2; 133-1 at 14-16.)

5. Plaintiff filed this action on February 15, 2013. (ECF No. 1 at 3, 32; <u>see</u> <u>also</u> fn. 1.)

II. <u>Are Plaintiff's Medical Malpractice Claims Time-Barred?</u>

In the second amended complaint, plaintiff avers that he presented his claim to the

California Victim Compensation and Government Claims Board ("VCGCB") on May 14, 2011,

and that, following a hearing on August 18, 2011, the VCGCB rejected plaintiff's claim. (ECF

Nos. 53 at 4; 164-2 at 40.)

In their answers, defendants pled affirmative defenses that plaintiff's state law claims are

barred by the statute of limitations of Code of Civil Procedure section 342 (relating to claims

against public entities and employees) and Government Code sections 954.4 and 945.6. (ECF

Nos. 56 at 3; 84 at 3; 98 at 2.) In their motions, defendants argue that plaintiff's medical

malpractice claims are barred by the statute of limitations. (ECF Nos. 117 at 15-16; 103 at 11-12;

[44] The undersigned finds these facts undisputed.

1    104 at 11-12; 105 at 10-12; 106 at 9-10; 107 at 9-10.)

2    California's Government Claims Act requires that a tort claim against a public entity or its

3    employees for money or damages be presented to the VCGCB no more than six months after the

4    cause of action accrues.  Cal. Gov't Code §§ 905.2, 910, 911.2, 945.4, 950-950.2.  "Timely claim

5    presentation is not merely a procedural requirement, but is . . . a condition precedent to plaintiff's

6    maintaining an action against defendant and thus an element of the plaintiff's cause of action."

7    Shirk v. Vista Unified Sch. Dist., 42 Cal. 4th 201, 209 (2007) (citations omitted), abrogated on

8    other grounds by statute as recognized in Rubenstein v. Doe No. 1, 221 Cal. Rptr. 3d 761, 400 P.

9    3d 372, 379 (2017); State v. Superior Court of Kings Cnty. (Bodde), 32 Cal. 4th 1234, 1239

10   (2004).  Thereafter, the six-month limitations period starts to run from the date the notice of

11   rejection is "deposited in the mail."  Cal. Govt. Code § 945.6(a)(1).  Suit must then be

12   commenced not later than six months after the date the written notice was deposited in the mail.

13   Cal. Gov't Code § 945.6(a)(1) (quotation marks omitted); Clarke v. Upton, 703 F. Supp. 2d 1037,

14   1043 (E.D. Cal. 2010); Baines Pickwick Ltd. v. City of Los Angeles, 72 Cal. App. 4th 298, 303

15   (Cal. Ct. App. 1999).  "The deadline . . . is a true statute of limitations defining the time in which,

16   after a claim presented to the government has been rejected or deemed rejected, the plaintiff must

17   file a complaint alleging a cause of action based on the facts set out in the denied claim."  Shirk,

18   42 Cal. 4th at 209 (citations omitted).

19   Here, it is undisputed that plaintiff filed his claim with the VCGCB on May 14, 2011, and

20   that the claim was rejected on August 18, 2011.  (ECF No. 53 at 4; 164-2 at 40; see also ECF No.

21   167 at 3-5.)  Plaintiff did not file the instant action until February 15, 2013, 547 days after the

22   claim was rejected.  Thus, defendants have met their burden to demonstrate that plaintiff's

23   medical malpractice claims were not filed within six months from the rejection by the VCGCB.

24   Absent tolling, plaintiff's medical malpractice claims are time-barred.

25   Because plaintiff is an inmate, he argues that he is entitled to additional tolling under

26   California Code of Civil Procedure § 352.1(a) (two years), and that under § 340.5, prisoners have

27   up to three years to file a medical malpractice lawsuit.  (ECF No. 130 at 49.)  However, such

28   limitations periods do not supplant the filing deadline contained in the Government Claims Act

governing tort claims brought against public employees.  Indeed, California Code of Civil

Procedure § 352.1(b) exempts the disability of imprisonment from such actions against a public

entity or public employee.  Id.  Thus, plaintiff's imprisonment does not toll the time limits on tort

claims against government entities.  Cal. Civ. Proc. § 352.1(b); Moore v. Twomey, 120 Cal. App.

4th 910, 914 (2004) ("[t]he statute of limitations for commencing a government tort claim action

is not tolled by virtue of a plaintiff's imprisonment.").[45]

Next, plaintiff correctly argues that he is entitled to tolling while he exhausted his

administrative remedies, relying on Brown v. Valoff, 422 F.3d 926, 942-43 (9th Cir. 2004).  (ECF

No. 130 at 49.)  Plaintiff admits that the third level review concerning his medical treatment was

dated November 9, 2011.  (ECF No. 133 at 2.)  Thus, plaintiff had six months from November 9,

2011, or until May 9, 2012, in which to file his complaint.  However, this action was filed on

February 15, 2013, over nine months after the deadline expired.  Thus, the administrative

exhaustion tolling does not render plaintiff's medical malpractice claims timely.

Plaintiff attempts to further extend the filing period of the instant complaint by relying on

his June 18, 2012 administrative appeal seeking assistance in the law library with his vision

problems and to obtain books on tape.  Plaintiff argues that such appeal was denied on February

15, 2013, only five days before he filed the instant action, and therefore the limitations period

should be tolled during such period.  However, plaintiff provides no legal authority for his

position that such subsequent administrative appeal should further extend the six month deadline

for bringing his state law claims.

Plaintiff argues that he is entitled to additional equitable tolling of the statute of

limitations, citing Lantzy v. Centex Homes, 31 Cal. 4th 363, 2 Cal. Rptr. 3d 655, 660 (2003), and

Daviton v. Columbia/HCA Healthcare Corp., 241 F.3d 1131, 1137 (9th Cir. 2001) (en banc).

_____

[45]  Defendants claim that in an apparent attempt to plead around the statute of limitations, plaintiff alleges that he was "incapacitated" such that he could not file suit pursuant to California Code of Civil Procedure § 352.  (See, e.g., ECF No. 103 at 11.)  Plaintiff did not pursue such argument in his opposition.  Nevertheless, § 352 specifically states that it does not apply to an action against a "public employee."  (Cal. Civ. Proc. § 352(b).)  "Incapacity" does not toll the statute of limitations relating to claims against public entities or employees.  Paniagua v. Orange County Fire Authority, 149 Cal. App. 4th 83, 88 (2007).

(ECF No. 130 at 51.)  In <u>Daviton</u>, the court applied California's equitable tolling doctrine to exclude from the limitations period the time that the non-prisoner plaintiff was pursuing administrative actions against the defendants.[46]  Here, plaintiff gains nothing by invoking California's tolling rule for prior proceedings, because the Ninth Circuit independently provides equitable tolling in prisoner cases for the time the inmate is exhausting his administrative remedies as required by the Prison Litigation Reform Act.  <u>Brown</u>, 422 F.3d at 942-43.  This court has already found that the additional six month period is not enough to render the malpractice claims timely.

Plaintiff's reliance on <u>Katz v. Children's Hosp. of Orange County</u>, 28 F.3d 1520, 1534 (9th Cir. 1994), is also unavailing.  In <u>Katz</u>, the appellant was not suing public employees, and the date of injury was critical to determine whether the complaint had been filed within the three year statute of limitations period in California Code of Civil Procedure § 340.5.  Here, such inquiry is not relevant because the deadline in the Government Claims Act context turns on the date the government tort claim was rejected, not on the date of plaintiff's injury.  <u>See</u> <u>Boston v. Kitsap County</u>, 852 F.3d 1182, 1186 (9th Cir. 2017) (discussing <u>Silva v. Crain</u>, 169 F.3d 608 (9th Cir. 1999), where a challenge under California Government Code § 945.6 was a "separate freestanding special statute of limitations which appl[ied] when claims [were] presented to public agencies," and "entirely changed the statute of limitations based on the filing of a claim.") (internal quotation marks omitted).)  Plaintiff's reliance on <u>Belton v. Bowers Ambulance Service</u>, 20 Cal. 4th 928, 930 (Cal. 1999), fails for the same reason.

Finally, in his opposition, plaintiff relies heavily on the general policy justifications for equitable tolling, arguing that "[e]quitable tolling under California law 'operates independently of

---

[46]  Under California law, equitable tolling "reliev[es] plaintiff from the bar of a limitations statute when, possessing several legal remedies he, reasonably and in good faith, pursues one designed to lessen the extent of his injuries or damage."  <u>Daviton</u>, 241 F.3d at 1137 (citations omitted).  "[P]ursuit of a remedy in another forum equitably tolls the limitations period if the plaintiff's actions" satisfy the three-pronged standard set forth above, that is, 1) the defendants must have had timely notice by the filing of the first claim; 2) defendants are not prejudiced "in gathering evidence for the second claim;" 3) plaintiff's conduct in the filing of the second [or amended] complaint was reasonable and based on good faith.  <u>Cervantes v. City of San Diego</u>, 5 F.3d 1273, 1275 (9th Cir. 1993) (citations omitted).

the literal wording of the Code of Civil Procedure' to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." (ECF No. 130 at 50, quoting Lantzy, 31 Cal. 4th at 370.) The undersigned sympathizes with plaintiff's situation. At the time his claim was rejected, plaintiff was proceeding pro se. Plaintiff submits evidence that he was attempting to obtain the names of pertinent medical staff, had difficulty reading, comprehending, and processing information in the law library, and was denied help by staff and books on tape. (ECF Nos. 133, 133-1.) But plaintiff fails to identify any California authority that provides for equitable tolling outside the context of administrative remedies or the pursuit of relief in another forum. As the California Supreme Court has recognized,

> [A] statute of limitations . . . operates conclusively across-the-board. It does so with respect to all causes of action, both those that do not have merit and also those that do. That it may bar meritorious causes of action as well as unmeritorious ones is the price of the orderly and timely processing of litigation -- a price that may be high, but one that must nevertheless be paid.

Norgart v. Upjohn, 21 Cal. 4th 383, 410, 87 Cal. Rptr. 2d 453 (1999) (internal quotation marks and citations omitted). Accordingly, plaintiff's medical malpractice claims are untimely and must be dismissed.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that defendants' motions for summary judgment be granted in part, and denied in part, as follows:

A. Eighth Amendment Claims

1. Defendants be granted summary judgment on plaintiff's claims that defendants interfered or delayed a DVI doctor's alleged recommendation that plaintiff receive a CT scan;

2. Defendants be granted summary judgment on plaintiff's claim that they failed to diagnose plaintiff's brain tumor;

3. Defendants Moreno, Dr. Galloway and Todd be granted summary judgment based on claims arising before November of 2006;

4. Defendant Dr. Galloway's motion for summary judgment (ECF No. 104, 119) be granted;

5. Defendant Dr. Naseer's motion for summary judgment (ECF No. 105, 120) be granted;

6. Defendant Dr. Tseng's motion for summary judgment (ECF No. 103, 122) be granted;

7. Defendant Dr. Barnett's motion for summary judgment (ECF No. 107, 118) be granted;

8. Defendant Dr. Smith's motion for summary judgment (ECF No. 106, 121) be granted;

9. The remaining defendants' motion for summary judgment (ECF No. 117) be granted in part and denied in part, as follows:

    A. Defendant Moreno's motion for summary judgment be granted;

    B. Defendant Dr. Nale's motion for summary judgment be denied;

    C. Defendant Villanueva's motion for summary judgment be granted;

    D. Defendant Kettelhake's motion for summary judgment be denied;

    E. Defendant Todd be granted summary judgment on all claims except plaintiff's claims arising from the December 5, 2011 medical visit;

    F. Defendant Akintola's motion for summary judgment be denied as to care provided in 2013, and granted in all other respects; and

    G. Defendant Dr. Heatley's motion for summary judgment be granted on all claims.

10. Defendants be granted summary judgment on plaintiff's allegations that any defendant is liable under a claim of supervisory liability.

B. State Law Claims

Plaintiff's medical malpractice claims against all defendants be dismissed as barred by the statute of limitations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **thirty** days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that

failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 5, 2018

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/gres0328.msj.med

113